Isaac LORA, as member of a class representing all Black and Hispanic students currently assigned to Special Day Schools for Emotionally Disturbed Students in New York City, et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF the CITY OF NEW YORK et al., Defendants.

No. 75–C–917.

United States District Court, E. D. New York.

June 2, 1978.

See also D. C., 74 F.R.D. 565.

Charles Schinitsky, The Legal Aid Society, Juvenile Rights Div., Brooklyn, N. Y., Nathaniel R. Jones, James I. Meyerson, National Association for the Advancement of Colored People, New York City, for plaintiffs; Michael J. Dale, Henry S. Weintraub, Brooklyn, N. Y., Lydia Tugendrajch, Gene B. Mechanic, New York City, of counsel.

Allen Schwartz, Corp. Counsel, New York City, for defendants; Joseph F. Bruno, Norma Kerlin, Gregg M. Mashberg, Carol Noymer, Mary Tucker, New York City, of counsel.

| | | Page |
|---|---|---|
| I. | Introduction | 1213 |
| II. | Procedural History | 1215 |
| | A. This Case | 1215 |
| | B. Administrative | 1216 |
| | 1. State–*Riley Reid* Orders | 1216 |
| | 2. Federal | 1218 |
| III. | Facts | 1219 |
| | A. History of Special Day Schools | 1219 |
| | B. Special Day Schools Today | 1221 |
| | C. Statutory and Organizational Framework | 1224 |
| | 1. Federal | 1224 |
| | a. Education of All Handicapped Children Act | 1224 |
| | b. Rehabilitation Act of 1973 | 1228 |
| | 2. New York State | 1230 |
| | 3. New York City | 1230 |
| | D. Diagnostic and Placement Procedures | 1234 |
| | 1. Generally | 1234 |
| | 2. Social Worker | 1236 |
| | 3. Educational Evaluation | 1236 |
| | 4. Psychologist | 1237 |
| | 5. Psychiatrist | 1237 |
| | 6. Neurological Evaluation | 1238 |
| | 7. Case Conference | 1238 |
| | 8. COH Review | 1239 |
| | 9. Due Process Hearing | 1241 |
| | 10. Appeals | 1241 |
| | 11. Reexaminations | 1242 |
| | E. Changes in Placement; Decertification | 1242 |
| | F. Criticism of Procedures and Programs | 1243 |
| | 1. Lack of Unbiased Tests | 1243 |
| | 2. Lack of Regular Classroom Observation | 1244 |

III. Facts—Continued

F. Criticism of Procedures and Programs—Continued Page

 3. Lack of Fixed Criteria for Placement 1245

 4. Excessive Class Size 1247

 5. Lack of Adequate Support Services 1248

 6. Lack of Curriculum Extra-curricular Activities and Special Programs 1249

 7. Lack of Use by Minorities of Private Institutions to the Same Extent as the Middle Class 1252

G. Explanations for Discrepancy In Percentage of Minority Students 1256

H. Mainstreaming 1264

 1. Theory 1264

 2. Alleged Lack of Consistent Use 1270

I. Supplementation of Record by Judicial Views 1271

IV. Law 1274

A. Right to Treatment 1274

 1. Theory 1274

 2. Students in Special Day Schools 1275

 a. Due Process 1275

 b. Equal Protection 1275

 c. Statutory Rights 1277

B. Right to Due Process In Procedures 1278

C. Discrimination in Referral of Students to Predominantly White Private Facilities 1280

V. Application of Law to Facts 1285

A. Evaluation Process as Violation of Right to Treatment and Due Process 1285

 1. Right to Treatment 1285

 2. Due Process 1287

B. Special Day Schools as Violation of Right to Treatment 1290

C. Statutory Violations 1291

 1. EHA; Rehabilitation Act of 1973; New York State Education Law 1291

 2. Title VI 1292

D. Use of Private Facilities at Government Expense by Disproportionate Percentage of Middle Class 1292

VI. Defense of Lack of Funds 1292

VII. Conclusion 1293

Appendices

A. Glossary of Abbreviations 1295

B. Additional Relevant Federal Statutes and Regulations [omitted]

C. Additional Relevant State Statutes and Regulations [omitted]

---

MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

## I. INTRODUCTION

Plaintiffs complain that their constitutional and statutory rights are being denied by the procedures and facilities afforded by New York City for the education of children whose emotional problems result in severe acting-out and aggression in school, behavior which may produce danger to others as well as themselves. These children

often have severe academic problems. They have been placed in special day schools for the education of the emotionally handicapped. The schools utilize smaller class size, specially trained teachers and support staff, and special facilities, designed to provide a "generally therapeutic" atmosphere.

Racial composition of the pupil population in these special day schools is 68% Black; 27% Hispanic; and 5% other, primarily White (figures as of October 31, 1977). The high percentage of "minorities" in these schools is not a recent phenomenon; rather, a disparate racial composition has remained constant for nearly 15 years. The other major services for children with emotional disturbance, "classes for emotionally handicapped" (CEH classes) have a higher proportion, 20%, of non-minority students. Still higher is the proportion of Whites in the New York City public school equivalent grades: 36% Black, 23% Hispanic and 41% "other."

Starting from this striking racial disparity plaintiffs have added extensive evidence supporting their thesis. They contend that the special day schools are intentionally segregated "dumping grounds" for minorities forced into inadequate facilities without due process. White students with the same problems, it is maintained, are treated more favorably in other settings. Defendants and their witnesses deny any racial bias. They point with considerable pride to the advantages afforded, at substantial taxpayers' expense, in an effort to bring these problem students into the mainstream of education and society.

Laid bare by the dispute is one of the most excruciating issues of our democratic society. Almost every American agrees that the ringing words of the Declaration of Independence, "all men are created equal," mean at least that each person shall have an equal opportunity to develop and exercise his God-given talents. But many children born into deprived social, economic and psychological backgrounds lack the equality of real opportunity they would have had were their familial circumstances more fortunate. Unfavorable environment in such cases overwhelms favorable genes. To afford equality of opportunity so far as we can, we depend primarily on education. The free public system of education is the great equalizer, conceived to allow those born into the lowliest status the opportunity of rising as far as their potential talents, drive and luck will take them. But the system is—and perhaps by its nature must be—inadequate to lift fully the burden of poverty, of discrimination and of ignorance that so many of our children carry.

Depressingly revealed by the record are some of the almost insoluble problems of educating certain of the products of this background—the socially and emotionally maladjusted children who present a physical danger to themselves and others, who cannot learn and who prevent others from learning in a regular school setting. Yet the evidence before us also illustrates how talented and devoted school personnel, sympathetic to this group of children and operating under federal, state and local laws and regulations, can help even those who appeared beyond redemption.

Hope for substantial improvements lies not in the courts but in the hands of those who control society's resources and of those who are trained and dedicated to use pedagogic and therapeutic arts. Nevertheless, since the matter has been properly placed before us for adjudication, we have, under our legal system, no alternative but to address the issues in their limited legal context. The dismal facts, the enobling aspirations, and the encouraging portents for the future have been revealed by devoted and skillful counsel for both sides.

At the time this suit was commenced in 1975, the plaintiffs could have demonstrated a violation of their rights by clear and convincing evidence. Since then, however, partly as a result of the litigation process itself, substantial improvements have been instituted by defendants. During the

course of this law suit many of those charged with supervising the evaluation, placement and education of plaintiffs testified and were forced to face up to and justify shortcomings, and to modify the system as it was. For example, one day school for girls that the Court visited did not measure up to the standards enunciated by those in charge of the program. Partly as a result of colloquy between the Court and witnesses, the school was reexamined and closed. Developments on the administrative front, to be examined in more detail *infra,* have also had an ameliorating effect.

The preponderance of evidence still indicates a degree of deprivation of certain rights of some members of the plaintiff class. Yet the momentum for changes favoring plaintiffs' rights is now so strong that it cannot be said that a claim for powerful equitable relief has been substantiated. The energies of educators and therapists are best devoted to improving the education of the youngsters who need their help, rather than in litigating details of their educational practices. The record suggests that the extensive legislative and administrative regulations recently injected into the system will in due course provide adequate protections for plaintiffs. Time is needed for the educational system to absorb and adjust to the new legal standards. The case will not be dismissed but the remedies granted will be designed to have a minimal disruptive impact on personnel striving to meet plaintiffs' needs under difficult conditions.

## II. PROCEDURAL HISTORY

### A. *This Case*

The original complaint in this suit was filed in June 1975. The plaintiffs alleged violations of their rights under the Fourth, Eighth, Thirteenth and Fourteenth Amendments, as well as rights guaranteed by the Civil Rights Statutes, 42 U.S.C. §§ 1981, 1983, and 2000d (1974). Subsequently, the pleadings were amended to include claims under the Education of All Handicapped Children Act (20 U.S.C. §§ 1401 *et seq.*

(1978)) (EHA) and the Rehabilitation Act of 1973 (29 U.S.C. §§ 701 *et seq.* (1975)).

A motion for class certification was denied by the late Judge Bruchhausen in January of 1976. In May of that year, the Court of Appeals for the Second Circuit ruled that the denial of class certification was not appealable. A request for rehearing en banc was denied in July and a petition for certiorari to the United States Supreme Court was denied in November. Subsequently, this court granted class action certification. The class includes all minority students who have been assigned to the special day schools.

In January of 1976 plaintiff moved for a preliminary injunction aimed at termination of all student placement in the special day schools without a due process hearing. This motion was denied in March of 1976 and that denial was affirmed by the Second Circuit.

In January of 1977, defendants moved for partial summary judgment on plaintiffs' due process claims and certain of their factual allegations. In addition, plaintiffs moved to compel discovery with regard to expert visits to Evaluation and Placement Centers and access to 50 diagnostic and referral files of non-party children. Defendants' motion for partial summary judgment was denied in all respects, but plaintiffs' motion to compel discovery was granted with special limitations to protect the privacy of the children involved. 74 F.R.D. 565 (E.D.N.Y.1977).

After various amended and supplemental complaints, there are now six plaintiffs representing the class composed of all Black or Hispanic students who have been assigned to the special day schools. The defendants include various officials of the New York City Board of Education, including Board members and administrators, as well as principals of some of the special day schools.

In their pre-trial brief plaintiffs alleged that the special day school system operates as an

institutionalized method to perpetuate a system of education in New York City, whereby Black and Hispanic children are isolated into a racially segregated school system which does not provide them with a "special" education.

Plaintiffs' pre-trial memorandum at 5.

Plaintiffs claim, first, that the referral and assignment of students to special day schools is based upon vague and subjective criteria and that the combination of processes, practices and policies has a racially discriminatory effect on Black and Hispanic children. This, it is alleged, constitutes a violation of 42 U.S.C. § 1983 as well as section 2000d of Title VI of the Civil Rights Act of 1964, prohibiting racial discrimination under any program or activity receiving federal financial assistance. Second, plaintiffs allege that they have been denied their rights to due process, equal protection and equal educational opportunity because they have been placed in special day schools with the natural and foreseeable consequences that they will be isolated within a racially segregated system which does not provide them with suitable facilities and instruction. Third, plaintiffs charge that defendants have violated their due process rights by (1) placing students in the special day schools without giving them the opportunity for prior hearings mandated by federal and state law and regulations and (2) failure to reevaluate students already in such schools as required by state regulations, with the result that those who may be ready to return to regular schools are not able to do so. Fourth, plaintiffs invoke jurisdiction under 20 U.S.C. § 1415(e)(4) of the EHA, claiming specific violations of due process rights provided by that statute. Finally, plaintiffs claim that the special day school program affords students only inadequate educational opportunity in violation of § 791 of the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.) and its accompanying regulations prohibiting discrimination against the handicapped.

This is essentially a constitutional and not a statutory case, involving racial discrimination and denial of educational rights.

Defendants' strong reliance on exhaustion cases is, therefore, inappropriate.

After extensive discovery, trial commenced on May 2, 1977, and ended on March 21, 1978. There were 49 witnesses, approximately 3900 pages of transcript and over 230 groups of documents admitted in evidence; final briefs consisted of over 600 pages.

Since the inception of the suit before us, there has been considerable development on the administrative front bearing directly on the education of handicapped children in New York City, including those referred for special day school placement. The following brief summary illustrates the degree of administrative regulation of special education in the City.

B. *Administrative*

1. State *Riley Reid* Orders

A series of orders issued by the New York State Commissioner of Education had its genesis in a federal court proceeding brought in 1971 on behalf of a class composed of all handicapped children in New York City. It was alleged that in violation of state statutory rights these children were not receiving appropriate educational services. Specifically, plaintiffs charged that they had not been examined sufficiently to ascertain the nature and severity of their handicaps, had not had the benefit of recommendations for appropriate educational placement, and had been placed on waiting lists for screening and subsequent placement without being provided adequate home instruction during the waiting period. The district court denied a motion for an injunction compelling the Board of Education to provide adequate and appropriate educational opportunities and granted defendants' cross-motion to dismiss. *See Riley Reid et al. v. Board of Education of the City of New York*, 71 C 1380 (S.D.N.Y. 1971). On appeal, the Second Circuit held that the district court had properly abstained from deciding the constitutional claims prior to a decision by New York State authorities, but that jurisdiction should have been retained pending such a determination. 453 F.2d 238 (2d Cir. 1971).

Petitioners then instituted proceedings before the State Commissioner of Education. In response an order was entered in November 1973. N.Y.Comm.Ed.Dec. No. 8742 (1973). The Commissioner found that although the named petitioners were receiving adequate educational opportunity, there were many children in the New York City school system whose educational needs were not being met. The controlling statute, former section 4404 of the New York Education Law, required special classes for handicapped children. It read:

The board of education of each school district in which there are ten or more handicapped children who can be grouped homogeneously in the same classroom for instructional purposes shall establish such special classes as may be necessary to provide instruction adapted to the mental attainments of such children from their fifth birthday until the end of the school year during which they attain their twenty-first birthday, or shall contract with the board of education of another school district, a board of cooperative educational services or a vocational education and extension board for the education of such children, under regulations to be established by the commissioner of education.

*See* N.Y.Comm.Ed.Dec. No. 8742 at 119 (1973).

The Commissioner noted the following deficiencies in the school system affecting handicapped children:

1. Undue delays in examinations and diagnostic procedures.
2. Failure to examine and diagnose handicaps.
3. Failure to place handicapped children in suitable programs.
4. Failure to provide available space and facilities for programs.

. . . . .

8. Incomplete or conflicting census data on the number of handicapped children residing in New York City.
9. Inadequate means of informing parents of the processes related to special education services, and inadequate plans for parent involvement in effective planning and decision-making regarding their children.
10. Suspensions of handicapped children from classes without adequate notice or provision for alternate educational services.

*Id.* at 120.

To correct these abuses it was ordered, among other things, that all students diagnosed as handicapped be placed immediately in appropriate public school classes or in private schools at public expense; that a plan be submitted to eliminate waiting lists for diagnosis and placement; that a plan be submitted for regionalization of the evaluation of handicapped youngsters; that a study of these students' needs and a plan to meet them be submitted; and, finally, that a plan be provided for notification to all parents and interested persons, in a language understood by them, of services available for handicapped pupils in the City school system. *Id.* at 121–22.

Since 1973 the Commissioner has retained jurisdiction, policing the school system's handling of educational services for the handicapped and measuring its adequacy by applicable state statutes and regulations. In September 1977 additional relief was afforded. N.Y.Comm.Ed.Dec. No. 9499 (1977). In effect, the use of private facilities was required where there were delays in assigning handicapped pupils to special public facilities:

IT IS ORDERED that within thirty days after diagnosis or thirty days after the date of this order, whichever date shall later occur, respondents place in suitable programs those students diagnosed as having a handicapping condition; and upon failure to effect such placement, bear the expense of any private placement in a school, approved by the State Education Department for the purpose of contracting with school districts pursuant to the provisions of section 200.9 of the Regulations of the Commissioner, which offers an appropriate program for a child so diagnosed, at the option of the parent or guardian of such student; and

IT IS FURTHER ORDERED that pending my further order, respondents not transfer any handicapped child who is currently attending a private school under contract with the board of education to a program operated by respondents, unless the committee on the handicapped finds that the current placement is no longer appropriate; and

IT IS FURTHER ORDERED, that respondents submit by November 1 of each year a list of students receiving home instruction or exempted from instruction, and the reasons for such home instruction or exemption; and

IT IS FURTHER ORDERED that respondents submit a detailed plan, by January 2, 1978, setting forth respondents' proposed course of action to effectively eliminate delays and waiting lists in the diagnosis and placement of children with handicapping conditions, and that the respondents include in such plan specific procedures and techniques for handling fluctuations in referrals; and

IT IS FURTHER ORDERED that respondents submit by January 2, 1978 a comprehensive plan to meet the needs of all handicapped students on the secondary level; and

IT IS FURTHER ORDERED that respondents submit a report by January 2, 1978 of the means used, with sample copies of printed materials, to disseminate information concerning available services to all interested persons and to notify persons in parental relationship to handicapped children as to services available for such children; and

IT IS FURTHER ORDERED that jurisdiction be retained pending my further order.

N.Y.Comm.Ed.Dec. No. 9499 at 11–13 (1977). *Cf.* 8 N.Y.C.R.R. § 200.5(c)(d) (1977).

In October of 1977 a supplementary order required that all students diagnosed as handicapped and awaiting placement since September 2, 1977 be placed in suitable programs. N.Y.Comm.Ed.Dec. No. 9526 (1977). Failing such placement the City

was required to bear the expense of appropriate private school placement. New York City is in the process of complying with these mandates. As will be noted in section III(C)(3), *infra*, the expansion of the number of Evaluation Units, the shift of responsibility for placement from the Evaluation Units to the Committees on the Handicapped, the coordination of the Units and the Committees, and other changes have been made in part in an effort to comply with these orders.

### 2. *Federal*

In October 1977, the Office of Civil Rights of the Department of Health, Education and Welfare addressed a letter of findings to Dr. Irving Anker as Chancellor of the New York City Board of Education. It concerned the qualifications of personnel, the maintenance of facilities, the administration of discipline, and the availability of academic opportunities for students in the school system generally. These findings had been made in response to inquiries received by H.E.W. about the City school system from a variety of sources. The letter, originally issued in January 1977 and then revised by H.E.W., represented the findings of an eight month review of the system. It charged extensive illegal discrimination.

With regard to the areas at issue in the present suit, the Office of Civil Rights found possible violations of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) prohibiting discrimination on the basis of handicap, as well as of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*) prohibiting racial discrimination. Specifically, the Board of Education was criticized for an alleged failure to provide appropriate educational services to handicapped children in four respects: first, the excessive waiting lists for diagnosis reevaluation, and placement; second, a policy of dismissing, in certain instances, special education students earlier than the normal 3:00 hour, thus failing to provide these children with the full school day afforded other pupils; third, inadequate and improper evalu-

ation and placement of handicapped students, due to subjective, non-validated standards, resulting in disparities existing in the special day schools; and, fourth, a lack of consistent mainstreaming or placement of students to the greatest degree possible in an educational environment with non-handicapped students.

The Board of Education was given 45 days to respond to this warning by developing plans to bring the schools into compliance with the Rehabilitation Act and Title VI. In January of this year the Board offered a lengthy series of documents describing the various programs offered and recent changes which had been made in evaluation and placement of all handicapped children, including those referred for special day school education. The information closely parallels the evidence outlined in sections III C 3, D, E and G, *infra.*

Later that month H.E.W. replied declaring the Board's response inadequate to forestall findings of violations stemming from waiting lists and shortened school days. On the other points more specific information was requested. In March of this year, an administrative enforcement action was instituted by H.E.W. The parties are currently seeking to resolve their disagreements. *See* Letter of Agreement Between: The Board of Education of the City of New York and the Office for Civil Rights, United States Department of Health, Education and Welfare (June 23, 1978) (tentative agreement encompassing Board of Education commitments to resolve problems in special education provisions including those for the handicapped).

## III. FACTS

Changing conditions of the special day schools and the involved procedures for referring students to them necessitate a synopsis of the evidence before us. We begin with a brief review of the history of the special day schools, followed by an overview of the schools at present. Next is an outline of the federal, state and local regulatory schemes developed to afford full educational opportunity for handicapped children. This is followed by a more detailed look at the procedure in New York City for referral to the special day schools, including a summary of problems with that procedure and with the special day schools themselves. We then consider the causes of behavioral and emotional problems suffered by the students referred to the special day schools, and, finally, review of the concept of "mainstreaming".

### A. History of Special Day Schools In New York City

New York City has had limited school programs for the handicapped for at least seventy years. *See* D. Ravitch, *The Great School Wars, New York City, 1805–1973,* 190 (1974). By 1934 the Board of Education considered special education to be one of the most innovative and progressive aspects of the school system. Special schools, special classes and homebound instruction programs were established to meet the needs of mentally, physically and "morally" handicapped children. These programs included ungraded classes for the retarded, special schools and classes for the physically handicapped, and special "schools of opportunity for behavior problem boys who are unable to make a suitable adjustment in the traditional school." B. R. Gifford, "Legal Issues in the Classification of Handicapped Children in New York City," 8 (mimeo. 1977) (citations omitted). In the 1930's, Associate Superintendent of Schools Margaret McCoovey stated that special education was established "to give to every child an equal chance with his brother, and a chance to become a self-sustaining member of society." *Id.* at 9.

The immediate antecedents of New York City's special day schools were the "600" schools. These schools were established in 1946 for the "education of children so severely emotionally disturbed or socially maladjusted as to make continuance in a regular school hazardous to their own safety and welfare and to the safety and welfare of the other pupils." The children referred to these schools were characterized as "defiant, disruptive, disrespectful and

hostile to all authority." Report to the Superintendent of Schools, Board of Education of New York City, "600 Schools Yesterday, Today & Tomorrow," 1 (mimeo. 1965).

The spur for the establishment of the "600" schools was the need to cope with aggravated gang-delinquency problems of the mid-1940's. The underlying purpose of the schools was to

provide a therapeutic educational program, non-punitive in approach, in which the antisocial, hostile and disruptive behavior would be molded and redirected through positive, constructive approaches toward more wholesome, socially useful and socially acceptable patterns of conduct.

*Id.* at 2. The schools were seen as

rehabilitative centers where, through the joint efforts of clinical guidance and educational teams, these deviant children would receive new opportunities to participate in carefully planned activities and experiences that would lead to the kind of self-realization and achievements and insights necessary for one to become a personally and socially competent, productive citizen of our American democracy.

*Ibid.*

Despite this admirable theory, the special day schools have been the subject of considerable criticism. In the 1950's and early 1960's a number of studies and reports recommended improvements and changes in the program. *See* Report to the Superintendent of Schools, Board of Education of New York City, "600 Schools Yesterday, Today & Tomorrow," 2–3 (mimeo. 1965).

Some of the resulting recommendations were implemented. Others were postponed because of fiscal constraints. The conclusion of much of the extensive literature was that the schools were not fulfilling their obligation to provide a meaningful educational opportunity for the pupils assigned to them.

In 1966, in line with a suggestion made in a 1964–65 report, the name of the schools was changed from "600" to Special Day Schools for Socially Maladjusted and Emotionally Disturbed Children (SMED schools). This modification was prompted by a desire to avert the stigma associated with assignment to "600" schools. Now that the term SMED has likewise been abandoned (see section III C 3, *infra* ), the schools are referred to as Special Day Schools or Special Day Schools for Emotionally Handicapped Children. Unfortunately, however, the brand "600" is still commonly used, even by teachers. *See, e. g.*, "U.S. Judge Visits '600' Schools, Finds Things Bad, and Good Too," New York Times, May 11, 1977, p. B3, col. 2. Much of the stigma remains. *E. g.* Testimony of Dr. Rachel Lauer, transcript at 1145; testimony of Dr. Kenneth B. Clark, transcript at 1624–25; testimony of Dr. Florence Halpern, transcript at 3097–98; deposition of Dr. Bernard Robert Grifford at 11.

Criticism of the schools came to a head in 1965 when a group of parents and educators, led by the Reverend Milton A. Galamison, boycotted the special day schools in an effort to point up serious problems with the program. Populated overwhelmingly by minority students at that time as today, the schools were attacked as segregated. In addition, it was charged that they offered no useful academic curriculum and that the criteria employed in placing students in the schools were arbitrary. This lay group action did not bring any major improvement to the special day schools.

From the mid-1960's on the schools have been criticized along several basic lines. First, the inadequacies of the programs provided in the schools, including insufficient support staff, physical plants and materials for instruction, have been noted repeatedly. Second, the referral process, which until recently did not require any clinical certification of students, has been attacked as inadequate and prone to misclassification. Third, failure to return children to regular schools, to the "mainstream," wherever possible, has been decried. Finally, because of the segregated state of the schools, it has been charged that they are a device for disposing of problem children with whom largely White middle class teachers are unable or unwilling to cope. J. D. Goldman,

"Special Day Schools for Socially Maladjusted and Emotionally Disturbed Children, N.Y.C." (mimeo. 1973); A. Budnick and J. Andreacchi, "Day Schools for Disturbed Boys," in P. Berkowitz and E. Rothman, *Public Education for Disturbed Children in New York City* (1967); B. Mackler, "A Report on the '600' Schools: Dilemmas, Problems and Solutions" (mimeo. 1966); Report to the Superintendent of Schools, Board of Education of New York City, "600 Schools Yesterday, Today & Tomorrow" (mimeo. 1965).

### B. *Special Day Schools Today*

Perceptions of those responsible for the program are quite different from those of its critics. The present special day schools have been described by proponents in the following favorable terms:

> The Special Schools program is designed to provide a planned educational program with a concentration of supportive services for emotionally disturbed and socially maladjusted pre-adolescents and adolescents whose behavior patterns necessitate their placement in Special Schools. These behavioral patterns may range from the reactive to the psychotic.

The programs are "tailored" to meet the educational, emotional, social and physical needs of the students. . . .

> In addition to specially planned curriculum offerings, which include remediation in reading and mathematics, the programs include the supportive services of guidance and clinical personnel. . . . The aim of the Day Schools is to return pupils to the mainstream as quickly as is practicable or to provide guidance and terminal educational training whose rehabilitative value will make itself evident in preparing the adolescent for wholesome living, law-abiding citizenship and job adjustment. . . .

Bureau for Socially Maladjusted and Emotionally Disturbed Children, N.Y.C. Board of Education, "An Overview of Programs," 1, 5 (1977).

In New York City there are nine day schools for grades 5–8 and three for grades 9–12. P 8M, one of the high schools, is divided into two separate facilities, one for boys and one for girls; there is one principal for the two parts of the school. The schools, with numbers of registered students and ethnic breakdown as of October 1977 are as follows:

| Intermediate Schools | Total No. of Pupils | Am. Ind. | Bl. | Asian | P.R. | Other Span. Surn'd | Other |
|---|---|---|---|---|---|---|---|
| P. 75Q (Queens) | 79 | | 49 | | 20 | | 10 |
| P. 23Q (Queens) | 199 | | 142 | | 35 | 3 | 19 |
| P. 9Q (Queens) | 102 | | 71 | | 17 | | 14 |
| P. 369K (Brooklyn) | 131 | | 113 | | 16 | 1 | 1 |
| P. 370K (Brooklyn) | 151 | 1 | 105 | | 24 | | 21 |
| P. 371K (Brooklyn) | 128 | | 61 | | 55 | 2 | 10 |
| P. 36K (Brooklyn) | 85 | | 48 | | 30 | | 7 |
| P. 12X (Bronx) | 76 | | 49 | | 24 | | 3 |
| P. 169M (Manhattan) | 106 | | 67 | | 36 | 1 | 2 |
| High Schools | | | | | | | |
| P. 8M (Manhattan) | 320 | | 201 | | 110 | 4 | 5 |
| P. 58M (Manhattan) | 329 | | 242 | | 81 | | 6 |
| P. 85K (Brooklyn) | 388 | — | 283 | | 101 | — | 4 |
| Totals | 2194 | 1 | 1431 | | 549 | 11 | 102 |

Since there are well over a million pupils in New York City's public schools, the day school population represents about two-tenths of one percent of the total.

Students generally attend day schools located away from their neighborhoods, sometimes in another borough. For the first 12 years of the program, all the schools

were for boys. Livingston School for Girls (P 8M) was opened in 1958. Vanderbilt (PS 141K), a second girls' school, was established in 1973 in Brooklyn but was closed in the fall of 1977, because of the gross inadequacy of its physical plant.

Children referred to the special day schools today have a history of aggression and disruption in their regular schools. Many suffer from an inability to suppress the desire for immediate gratification of their needs. Testimony of Dolores Goidel, transcript at 1941, 1962–63.

The child does not exhibit what is considered socially accepted behavior in a school. In other words, if I as a teacher, were to tell a child, to sit down and if he responded by uttering expletives, that is to be expected in the school. If the child responded by picking up a chair and throwing it at a teacher, that would be maladaptive and he would be better served in a special day school; [these are] management problems not so much . . learning problems.

Testimony of Helen Gritz, transcript at 2166–67.

In a sense, these children who lash out in their frustration may be easier to socialize than those who react to their almost overwhelming personal problems by quietly withdrawing. Nevertheless, the behavior of children who act out physically causes their own learning to be thwarted and, given large classes and often over-burdened teachers, creates grave difficulties for other children in the regular school system.

The purpose of the special day schools is not to offer academic programs which vary substantially from what the child would have available to him in the regular school. Rather, the schools are designed to change the method of learning, to focus on the individual needs of each child, to avoid unnecessary discipline and punishment, and to attempt to develop understanding and rapport between the students and staff. Small classes and Bureau of Child Guidance (BCG) and other support personnel are part of the program. The ideal is, in short, the creation of a total therapeutic environment in which the entire structure of the school is geared toward serving and helping each child.

Also significant, according to defense witnesses, is the informal atmosphere of the day schools. All the principals who testified emphasized that they maintain an open-door policy, so that students have easy access to them should complaints and problems or the desire to share some experience arise. From the initial tour taken by each child and parent of the school, usually accompanied by the principal or guidance counselor, efforts are made to achieve a congenial relationship between the pupil and all levels of the staff.

Almost all students in the special day schools are eligible for free lunch and breakfast on the ground of economic need. Eating together contributes to the "family" atmosphere described in the testimony. As one principal explained:

And what the school tries to do is be more than just a place of academic learning. Because that's only a very small part of it. We become and try to become—and it works both ways, between faculty and students—the family and the caring person which these children are looking for, and which they do not have. So what we develop is a school community. A community in the sense of the word that everybody cares for everybody else and everybody knows everybody else. And it is a family feeling. And as a slip of the tongue, very often we have teachers or students say, "I'm going home."

Home meaning school. Our students come in under great stress. A parent dies in the morning and the student comes to school. There is a murder the night before and the student is there. There are no clothes and the student comes in to be fed and clothed. It's home. And that is the essential of what makes the school a meaningful place for these students. And the academic learning is a part. It's one part of the total.

Testimony of Dr. Esther Rothman, transcript at 2924–25.

Several witnesses described this atmosphere in terms of providing milieu therapy. The testimony of a psychiatric social worker serving at two of the special schools is illustrative:

Q. Would you define the term milieu therapy?

A. I would feel that milieu therapy is any area of intervention in a patient or student's life which contributes to the therapeutic growth and healing of the patient. It could be through electives in a school program, it could improve parental groups meetings, PTA's, teacher conferences; it could be through subjects chosen—any milieu which is therapeutic surrounding the initial aim of being in school—if we are talking about school—which is to educate.

Q. So, would it not be correct to state in any special ed environment where there is an effort made to change educational or other forms of behavior that as to any one of these environments one of the efforts would be to develop a milieu in which therapy takes place?

A. That would be a goal that would be desirable. . . .

I think population numbers are important too. The special students have small classes and small school populations which gives a much different milieu to the therapeutic process because it is a smaller school with small population.

Testimony of Dr. Dorothy Kobak, transcript at 3335–37. Individual therapy for every child is not believed to be critical in providing a proper environment according to defense witnesses.

Virtually all of defendants' witnesses testified that in New York City the day schools are essential, that to eliminate them would be a disservice, not only to the children involved, but also to the community as a whole. Dr. Rothman testified:

Q. What do you think might happen were there no day school program for the students who were currently going to your facility?

A. I think most of these kids would be in the streets. I think they would be heavily involved in crime and drugs. I think we would be putting them on the garbage heap.

Q. Do you see the need for a day school program of the type being operated by the Board of Education in the future?

A. I certainly feel that we will always need hospitals no matter how healthy a community we are. And I certainly feel we will always be—we certainly need now special schools for those students who are extremely aggressive, who cannot be functioning in a regular school setting. . . .

Transcript at 2972–73.

New York City is not the only major urban school system which employs special schools as part of an educational program for emotionally handicapped children. In September, 1977 the New York City Board of Education conducted a survey of twenty-one school systems, requesting information on the use, if any, of a special school or center for such pupils. Of thirteen respondents, nine reported public special day schools for the emotionally disturbed and one contracted with private schools to provide this service to the public school population as needed. Plaintiffs' research on somewhat comparable school systems indicate that at least four major cities use resource rooms and special classes, but no special day schools, in handling the education of emotionally disturbed and socially maladjusted youngsters. These differences among school systems arise in part from considerable ideological disagreement among educators on the best way to deal with these problems. The peculiar nature of a given school system and the nature of the community from which it draws students are other factors weighed in choosing a particular special education framework.

Plaintiffs, however, charge that the day schools, at least as presently operated in New York City, are serving little if any constructive purpose. One of plaintiff's expert witnesses, Dr. Kenneth B. Clark, observed:

. . . [T]here is no indication that if these were seriously . . . emotionally disturbed children what is happening in the school is related to their emotional disturbance in any positive way.

Now, the realistic answer to that criticism could be it would be too expensive to really have a serious program in special day schools for emotionally disturbed children that require special programs. If that is true, that it is too expensive, that very statement is an admission of a kind of a fraud. A sort of a hoax. You have SMED schools that are really places to put these children, but not really places to help them. And that is my judgment, and I think that we shouldn't permit this. . . .

I sincerely believe that if these schools were really doing a solid professional job of helping disturbed children you would not have this racial imbalance. . . . If these schools really were helping human beings and helping children, they would not be predominantly Black and Hispanic.

Transcript at 1706–07

## C. *Statutory and Organizational Framework*

Critical to an understanding of the present system are the federal and state statutes and regulations. They are relatively new. Their design is to ensure adequate educational opportunities for all handicapped children and to avoid discrimination in the guise of special educational placement. This is an area of rapid development and change. New York's system, described below, is in a state of flux as it moves towards compliance with federal and state mandated requirements—many adopted since this suit was commenced in 1975.

### 1. *Federal*

#### a. *Education of All Handicapped Children Act*

The primary federal statute, the Education of All Handicapped Children Act, 20 U.S.C. §§ 1401 *et seq.* (1978) (EHA), repre-

sents the most recent statement of a strong federal policy favoring full education of all handicapped children. Congress first considered special problems involved in educating the handicapped in 1966 when it added Title VI to the Elementary and Secondary Education Act. P.L. 89–750. Title VI established the Bureau of Education for the Handicapped to function largely as a research center. In 1970, Congress repealed Title VI and created the Education of the Handicapped Act, P.L. 91–230, giving the Bureau of Education for the Handicapped power to disburse grants for studying and improving educational services for the handicapped. This funding was extended by Congress in 1973.

In 1974, Congress amended the Education of the Handicapped Act. P.L. 93–380. This represented a major change in direction. The federal government moved beyond the role of catalyst for state activities and increased its involvement in the control and funding of education for the handicapped. P.L. 93–380 set forth detailed due process procedures required for the placement and evaluation of handicapped children and required states to create programs to identify, locate, and evaluate handicapped children. In addition, the new provisions required states receiving federal funds to maintain a policy of educating all handicapped children.

Passage of P.L. 94–142 (EHA) in 1975 was meant to bring to fruition the plans and goals of the states required by P.L. 93–380. The report of the Senate Labor and Public Welfare Committee stated that EHA was designed to "carry these planning provisions into actual delivery of services." S.Rep.No.94–168, 94th Cong., 1st Sess. at 2; U.S.Code Cong. & Admin.News, p. 1427, (1975). Congress found that existing provisions had not had sufficient impact:

. . . [of] the more than eight million children (between birth and twenty-one years of age) with handicapping conditions requiring special education and related services, only 3.9 million such children are receiving appropriate education. 1.75 million handicapped children are re-

ceiving no educational services at all, and 2.5 million handicapped children are receiving an inappropriate education.

S.Rep.No.94–168, 94th Cong., 1st Sess., at 8; U.S.Code Cong. & Admin.News, p. 1432 (1975). Of the 1,310,000 emotionally disturbed children needing attention, over 1,000,000 or 82%, were unserved by special education.

The final cost of such neglect is far greater than the expense of providing an adequate remedy. The burden is borne ultimately by the children, their families, their communities and society as a whole.

The long range implications of these statistics are that public agencies and taxpayers will spend billions of dollars over the lifetimes of these individuals to maintain such persons as dependents and in a minimally acceptable lifestyle. With proper education services, many would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society.

There is no pride in being forced to receive economic assistance. Not only does this have negative effects upon the handicapped person, but it has far-reaching effects for such person's family. . . .

This nation has long embraced a philosophy that the right to a free appropriate public education is basic to equal opportunity and is vital to secure the future and the prosperity of our people. It is contradictory to that philosophy when that right is not assured equally to all groups of people within the Nation. Certainly the failure to provide a right to education to handicapped children cannot be allowed to continue.

Parents of handicapped children all too frequently are not able to advocate the rights of their children because they have been erroneously led to believe that their children will not be able to lead meaningful lives. However, over the past few years, parents of handicapped children have begun to recognize that their children are being denied services which are guaranteed under the Constitution. It should not, however, be necessary for parents throughout the country to continue utilizing the courts to assure themselves a remedy. . . . The Congress must take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity. It can no longer be the policy of the Government to merely establish an unenforceable goal requiring all children to be in school. [It is necessary to take . . . steps] to ensure that the rights of children and their families are protected.

S.Rep.No.94–168, 94 Cong., 1st Sess., at 9; U.S.Code Cong. & Admin.News, p. 1433 (1975).

The aim of the statute resulting from this concern was:

to assure that all handicapped children have available to them a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C.S. § 1401 at 442 (1976).

For the first time, the exact nature of necessary services were defined; the terms "adequate" and "free appropriate public education" were given precise content, setting a standard which must be attained.

The statute provides that:

(16) The term "special education" means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions.

(17) The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

(18) The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(16)(17)(18). This terminology represents a clear national commitment to meet each handicapped child's special needs in as integrated and complete a way as possible.

"Handicapped children" are defined in the Act as those who are:

. . . mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, *seriously emotionally disturbed,* orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services.

20 U.S.C. § 1401(1) (emphasis added). The federal regulations define "seriously emotionally disturbed" as follows:

(i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree which adversely affects educational performance:

(A) An inability to learn which cannot be explained by intellectual, sensory or health factors:

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(C) Inappropriate types of behavior or feelings under normal circumstances;

(D) A general pervasive mood of unhappiness or depression; or

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes children who are schizophrenic or autistic. The term does not include children who are socially maladjusted, unless it is determined that they are seriously emotionally disturbed. 42 Fed.Reg. No. 163, 42478 § 121.a.5(8) (1977).

To assist the states in educating the handicapped, fiscal grants are made to them. The money helps initiate, expand and improve programs and projects designed to provide full educational opportunities to all handicapped children at the pre-school, elementary and secondary school levels. 20 U.S.C. § 1411(a). Grant eligibility standards require the states to establish "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). *See also* 20 U.S.C. § 1414(a); 42 Fed.Reg. No. 163, 42479 § 121.a(b) 7–8 (1977).

Each state must develop a plan to assure that:

(A) there is established (i) a goal of providing full educational opportunity to all handicapped children, (ii) a detailed timetable for accomplishing such a goal, and (iii) a description of the kind and number of facilities, personnel, and services necessary throughout the State to meet such a goal;

(B) a free appropriate public education will be available for all handicapped children . . . .

(C) all children residing in the State who are handicapped, regardless of the severity of their handicap, and who are in need of special education and related services

are identified, located, and evaluated, and that a practical method is developed and implemented to determine which children are currently receiving needed special education and related services and which children are not currently receiving needed special education and related services; 20 U.S.C. § 1412. Moreover, the state must assure each parent and child adequate due process protections and each child's progress is to be periodically evaluated. 20 U.S.C. §§ 1412(2)(4)(5); 1414(a)(5). These features are discussed in more detail *infra.*

Of central concern to the legislature were practices and procedures which might result in misclassification of children or be discriminatory. Specifically, Congress aimed to ameliorate the following evils:

(1) the misuse of appropriate identification and classification data within the educational process itself; (2) discriminatory treatment as the result of the identification of a handicapping condition; and (3) misuse of identification procedures or methods which results in erroneous classification of a child as having a handicapping condition.

S.Rep.No.94–168, 94 Cong., 1st Sess., at 26–27; U.S.Code Cong. & Admin.News, pp. 1450–51 (1975).

To avoid such dangers—and believing that constitutional rights to notice and hearing, as well as to equal educational opportunity, were at stake (*see* S.Rep.No. 94–168, 94 Cong., 1st Sess., at 6; U.S.Code Cong. & Admin.News, p. 1430 (1975))—Congress provided for extensive due process guarantees whenever a change in educational placement is proposed, requested or refused. The input of parent and child in the classification decision is essential under the statute. An opportunity to challenge any placement decision is a necessary check against the possibility of abusive classification and inappropriate educational services.

Pursuant to 20 U.S.C. § 1415(e) any party may appeal a decision concerning a child's placement or education to a United States District Court after exhaustion of the state administrative procedures without regard to the amount in controversy. The district court is entitled to hear additional evidence and review the record below, providing a *de novo* hearing to the parties. The court's decision is to be based upon a preponderance of the evidence and the court may grant such relief as it determines appropriate. *See also* § 1412(5).

Aware that constant monitoring and reevaluation of pupils placed in special education programs is a necessary complement to these procedural safeguards, Congress created the "Individualized Education Program" (IEP), defined as:

(A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19).

The IEP is designed to afford instruction to fit a child's unique needs. Any state applying for funds must

provide for procedures for evaluation at least annually of the effectiveness of programs in meeting the educational needs of handicapped children (including valuation of individualized education programs), in accordance with such criteria that the Commissioner shall prescribe pursuant to Section 1417 of this title . .

20 U.S.C. § 1413(a)(11). *See* 42 Fed.Reg. No. 163, 42490–91 §§ 121a.340–345 (1977). Reevaluation was viewed as "an extension of the procedural protections guaranteed . . . to parents of handicapped children . . ." S.Rep.No.94–168, 94 Cong., 1st Sess., at 11; U.S.Code Cong. & Admin. News, p. 1435 (1975). In addition, the regulations provide that a clinical reevaluation of every child in a special education pro-

gram be made at least once every three years.

Of further concern to Congress were the inadequate standards and materials used in the process of evaluating students for special education programs:

> The Committee is alarmed about the abuses which occur in the testing and evaluation of children, and is concerned that expertise in the proper use of testing and evaluation procedures falls far short of the prolific use and development of testing and evaluation tools. The usefulness and mechanistic ease of testing should not become so paramount in the educational process that the negative effects of such testing are overlooked.

S.Rep.No.94–168, 94 Cong., 1st Sess., at 29; U.S.Code Cong. & Admin.News, p. 1453 (1975).

Finally, drawing upon contemporary sociological and educational thought, Congress wrote into the law a preference in favor of "mainstreaming", a concept discussed at greater length in section III(H), *infra*. In order to be eligible for federal funding, a state, in addition to fulfilling the requirements already described, must have established

> procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily . . . .

20 U.S.C. § 1412(5)(B). *See also* 42 Fed. Reg. No. 163, 42497 § 121a.552 (1977).

The detailed requirements set out in this federal statute take precedence over any local custom or statute. *See, e. g. Stuart v. Nappi,* 443 F.Supp. 1235 (D.Conn.1978).

### b. *Rehabilitation Act of 1973*

The salient features of the EHA are echoed in regulations promulgated by the Department of Health, Education and Welfare in conjunction with section 794 of the Rehabilitation Act of 1973. 29 U.S.C. §§ 701 *et seq.* (1975). Section 794 prohibits any discrimination against handicapped individuals:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any programs or activity receiving Federal financial assistance.

As originally promulgated, the Act focused primarily on assuring handicapped individuals vocational opportunities. But in order to assure nondiscrimination, steps must be taken prior to the actual hiring stage. Thus, in 1974, Congress amended the Act, broadening the definition of "handicapped" to extend beyond the employment context. The Senate report on the bill which contained these amendments acknowledged the importance of special emphasis on education of the handicapped:

> It was clearly the intent of the Congress in adopting section 503 (affirmative action) and section 504 (nondiscrimination) that the term "handicapped individual" in those sections was not to be narrowly limited to employment (in the case of section 504), nor to the individual's potential benefit from vocational rehabilitation services under titles I and III (in the case of both sections 503 and 504) of the Act.
>
> · · ·
>
> Section 504 was enacted to prevent discrimination against all handicapped individuals, regardless of their need for, or ability to benefit from vocational rehabilitation services, in relation to Federal assistance in employment, housing, transportation, *education,* health services, or any other Federally-aided programs. Examples of handicapped individuals who may suffer discrimination in the receipt of Federally-assisted services but who

may have been unintentionally excluded from the protection of section 504 by the references to enhanced employability . . . are as follows: *physically or mentally handicapped children who may be denied admission to Federally-supported school systems on the basis of their handicap*; handicapped persons who may be denied admission to Federally-assisted nursing homes on the basis of their handicap; those persons whose handicap is so severe that employment is not feasible but who may be denied the benefits of a wide range of Federal programs; and those persons whose vocational rehabilitation is complete but who may nevertheless be discriminated against in certain Federally-assisted activities.

S.Rep.No.93–1297, 93d Cong., 2nd Sess.; U.S.Code Cong. & Admin.News, pp. 6388–89 (1974) (emphasis added).

For the purposes of subchapters IV and V, which involve areas not necessarily employment related, the Act now covers "handicapped individuals", defined as:

. . . any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment.

29 U.S.C. § 706(6). H.E.W. has noted that: With this amended definition, it became clear that [the Act] was intended to forbid discrimination against all handicapped individuals, regardless of their need for or ability to benefit from vocational rehabilitation services.

H.E.W. Regulations, "Supplementary Information," 42 Fed.Reg. No. 86, 22676 (1977). *See* 42 Fed.Reg. No. 86, 22678–79 § 84.4 (1977).

Regulations promulgated under this section require, among other things, that every handicapped individual be provided with an appropriate education by recipients of federal funds. An "appropriate education" is the "provision of regular or special education and related aids and services that . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons . . ." Schooling must, in addition, meet requirements closely paralleling those of the EHA. Section 84.34 of the Regulations provides that a recipient of federal funds should provide for education for a handicapped individual in the least restrictive setting possible, *i. e.,* afford education, where feasible, with persons who are not handicapped. Section 84.35, dealing with evaluation and placement, requires that testing be administered by adequately trained personnel and that tests with more than a single intelligence quotient be used. In making placement decisions no one criterion or single individual's opinion is to be decisive. Section 84.36 requires recipients of federal funds to establish and implement procedural safeguards including "notice, an opportunity for the parents or guardians of the person to examine relevant records, an impartial hearing with opportunity for participation by the persons's parents or guardian, representation by counsel, and a review procedure." 42 Fed.Reg. No. 86, 22682–83 (1977).

These requirements reflect the same philosophy and concerns manifested in the EHA. This identity of purpose is specifically recognized in section 84.36 of the regulations providing that "[c]ompliance with the procedural safeguards of section 615 of the Education of the Handicapped is one means of meeting this requirement [of due process guarantees]." 42 Fed.Reg. No. 86, 22683 (1977).

The significance of the Rehabilitation Act regulations is that they make the requirements of specially tailored programs, nondiscriminatory evaluation and placement, and due process applicable to an institution receiving any federal funds. New York City schools receive substantial amounts of federal funds.

Recent cases have found violations of the Rehabilitation Act where a) a mentally retarded patient received less than adequate treatment in a state institution (*Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295, 1323–24 (E.D.Pa.1978); and

b) a mildly handicapped child was excluded from the regular classroom without a bona fide educational reason (*Hairston v. Drosick,* 423 F.Supp. 180, 184 (S.D.W.Va.1976)).

### 2. *New York State*

Article 89 of the New York Education Law (McKinney 1978) deals with the education of children with handicapping conditions. *See generally* V. Garfinkle, "Recent Developments in the Law on the Education of Handicapped Children in New York State" (unpub. paper for Columbia Law School Seminar on file in this case) (1978). New York's laws have been recently amended to reflect federal requirements and the concern that previous laws had provided "an inequitable and often ineffective system of meeting the basic educational needs of many of our children." Governor Carey's message approving 1976 amendments, McKinney's 1976 Session Laws of New York, 2448–49 (1976).

State law defines the "handicapped child" as:

a person under the age of twenty-one who is entitled to attend public schools pursuant to section thirty-two hundred of this chapter and who, because of mental, physical *or emotional reasons* can receive appropriate educational opportunities from special services and programs . . .

N.Y.Educ.Law § 4401(1) (McKinney 1978) (emphasis added).

The clear purpose of Article 89 is to assure that all handicapped children, including those suffering from problems faced by plaintiffs in this suit, be treated similarly for purposes of free education. In *Matter of Jessup,* 85 Misc.2d 575, 379 N.Y.S.2d 626 (Family Court, City of New York 1975), New York City was directed to pay school tuition costs for the petitioner's emotionally disturbed son pursuant to the New York State Family Court Act. The court noted that the State Education Law was amended in 1967 to eliminate the distinction between physical and other handicaps and to make explicit that children handicapped for "emotional reasons" were to be included. "The

purpose was to provide a simple definition which [was] intended to cover all handicaps, whether physical, mental or emotional." *Id.* 379 N.Y.S.2d at 630 (citations omitted).

The board of education or trustee of each school district is required by statute to furnish "suitable educational opportunities for handicapped children" through special services or programs to be determined by the "need of the individual child." N.Y. Educ.Law § 4402 2.a. (McKinney 1978).

Responsibility for identification and servicing of handicapped children is entrusted to a Committee on the Handicapped (COH) consisting of clinical staff educators and the parent of a handicapped person in each local district. N.Y.Educ.Law § 4402 1.b.(3) (McKinney 1978). It evaluates each handicapped child annually and recommends an appropriate educational program. 8 N.Y.C. R.R. § 200.3(b)(5) (1977). Also considered by the COH are claims that a modification or change in identification, evaluation, educational placement or provisions of free appropriate public education is not acceptable to the parent or guardian of a pupil. 8 N.Y.C.R.R. § 200.3(b)(4) (1977).

In order to facilitate prompt attention to the needs of all handicapped children the regulations · require determination of a child's eligibility for a special educational program within 60 days. 8 N.Y.C.R.R. § 200.5(d) (1977). Detailed procedures are set out in the statute, and regulations for challenges to placement. N.Y.Educ.Law § 4404 (McKinney 1978). They include appeals from the COH decision to an impartial hearing officer, review by the state Commissioner of Education, and appeal to the courts. *Ibid.* Similar protections are afforded for changes in placement. 8 N.Y.C. R.R. § 200.5 (1977).

### 3. *New York City*

Under New York City's partially decentralized school system primary responsibility for all pre-school, elementary and middle school programs for "normal" children—those who can be effectively educated solely in regular classes—is lodged in local community school districts. N.Y.Educ.Law

§ 2590–e (McKinney 1978). High school programs for such pupils are the responsibility of the central City Board of Education. N.Y.Educ.Law § 2590–h (McKinney 1978).

Programs for handicapped children, regardless of age, are administered by the New York City Board of Education through the centralized Division for Special Education and Pupil Personnel Services (DSEPPS). N.Y.Educ.Law § 2590–h (McKinney 1978). Through six bureaus DSEPPS currently organizes and administers 31 discrete instructional programs for the handicapped on the basis of categories defined by the nature and severity of the handicapping condition.

The only exception to this organizational framework is in the Bronx where recently there has been established a pilot program for regional administration of special education services. Regionalization presents a departure from the bureau-based approach of dividing children into specific handicapping categories. The goal of this experiment is to provide an amalgamation of services to deal with multiple handicaps. According to John Reehel, recently appointed Director of Special Education, Regional Administrator for Bronx County, the hope is to increase the effectiveness of services for children with multiple, overlapping handicaps, and to facilitate administrative efficiency in the consolidation of transportation, supplies and supervision. Transcript at 462. The Bronx project involves approximately 9,000 children in classes affording a range of services including hospital schools for pregnant teenagers, multiple handicap centers, itinerant services, BCG clinical services and evaluation units. The process of evaluation and placement for emotionally disturbed children described below has not, however, been materially altered in the Bronx.

The special day schools with which this suit is concerned are under the control of the Bureau for the Education of the Emotionally Handicapped (BEEH). This represents a recent change in terminology. Before the summer of 1977, BEEH was known as the Bureau for Education of Socially Maladjusted and Emotionally Disturbed Children (SMED Bureau). Similarly, the day schools were known as SMED schools (a change from the term "600" schools, which as indicated in Part III A, *supra,* had developed a bad connotation); these schools now are merely referred to as special day schools. Nomenclature changes reflect an effort to avoid strict categories, as well as the stigmatization of exceptional children. This is representative of a nation-wide trend away from narrow categorization of children according to perceived deficiencies.

The least restrictive programs for emotionally handicapped children are resource rooms in the regular school. The spectrum then ranges through special classes in the regular school to the special day schools, juvenile centers for children held pending adjudication of their cases by the Family Court, detention centers for children who are awaiting disposition of other courts or are on parole, and residential institutions.

The resource rooms and special classes treat children whose problems most closely resemble those of the special day school population. The resource room program is designed "to serve children who cannot function productively in their right classes for a continuous school day." N.Y.C. Board of Education, "Resources in Special Education and Pupil Personnel Services in New York City Public Schools," 27 (1974). These are pupils who become frustrated at the regimentation and discipline in most large classes. Some have periodic blow-ups; others need more time or different teaching methods to learn essential skills, are too easily distracted by the group, or have fallen so far behind in academic achievement that they have lost contact with their class and abandoned all effort. The resource room program is administered by a special education teacher who, aided by a para-professional, serves the children for limited periods during the school day, in cooperation with the regular class teacher.

The special classes for the emotionally handicapped (CEH classes) are of two types. "A Centers" serve children found by autho-

rized clinicians to have profound emotional handicaps. They are established on elementary, junior high and secondary school levels. The children exhibit such characteristics as thinking disorders, bizarre behavior and severe emotional crises. "B Centers" serve children who have been clinically diagnosed as having a moderate degree of emotional handicap, preventing them from functioning up to their potential in regular classes in the public elementary, junior high or secondary schools.

Students in both "A" and "B" program have average or above average intellectual capacity, no major neurological defect, and the ability to profit from group experiences without damage to themselves or others. N.Y.C. Board of Education, Division of Special Education and Pupil Personnel Services, Bureau for Socially Maladjusted and Emotionally Disturbed Children "An Overview of Programs," 2–3 (1977). Although in theory the special classes are a less restrictive environment than special schools with self-contained facilities, various witnesses testified that they are not really "more mainstreamed" than a special school. E. g., testimony of Dr. Dorothy Kobak, transcript at 3340–41; testimony of Dr. A. Tannenbaum, transcript at 3618. Distinctions between students referred to CEH (B) classes and those in the special day school will be explored in section III F 3, infra.

In carrying out its function the BEEH utilizes the services of DSEPPS's Bureau of Child Guidance (BCG). This is the mental health service agency for the New York City public school system. The BCG is composed of licensed school psychiatrists, school social workers, school psychologists, and school mental health workers. They provide a range of services including (1) individual, group, family and educational therapy; (2) consultation services to guidance counselors, administrators, teachers and other school personnel concerning individual troubled children, mental health issues in the classroom, school management and adaptation of the curriculum and teaching methods to the special needs of referred children; and (3) coordination of activities with community-based mental health and social service programs for troubled children.

BCG professional teams are used by regular and special day schools. Effective October 1977 each school district was to be assigned, as a minimal team, a BCG program supervisor, two social workers, and two psychologists. Priorities with regard to allotment of BCG services within a district are developed by the BCG program supervisors along with the community school board superintendent.

Prior to September 1976, primary responsibility for the identification, psycho-diagnostic evaluation and educational placement of emotionally handicapped children rested with the BCG. In September 1976 referral procedures were altered and the screening and placement functions lodged in DSEPPS's Office of Evaluation. It maintains evaluation units (EUs) staffed by learning disability specialists, speech and language therapists, psychologists, social workers, psychiatrists, pediatric neurologists, guidance counselors and paraprofessionals. The EUs continue to utilize the services of BCG personnel to augment their own staff in the evaluation process.

The EUs were formerly known as evaluation and placement units. At present, as required by recent modifications in the state law discussed in section III C 2, supra, and Appendix C, the district COH is responsible for placement; hence the change in name from evaluation and placement unit to EU.

There are now twenty-six EUs. Eighteen serve districts with populations of between 24,000 and 40,000 children. Each is staffed by a unit coordinator who is an administrator and usually has a license in special education, psychology, social work or guidance; three psychologists; three social workers; five special education teachers trained in educational evaluation; and support and clerical staff. There are, in addition, eight modified units, serving smaller districts with pupil populations of below 24,000. Each of these smaller units operates with a staff of two social workers, two

psychologists, and four educational evaluators along with support and clerical help. There are thirteen psychiatrists whose services are spread among all the units.

The EUs evaluate children referred to them primarily by the students' regular schools. The professionals at the center assess the need for, and type of special education appropriate in a given case. According to the testimony of Elaine Thompson, assistant to the director of the EUs, the units have a psycho-educational, as opposed to a purely clinical, orientation. The intent of the shift of responsibility for evaluation and for placement recommendations from BCG staff to the EUs was to focus less on the clinical defect of the child and more on his educational style and his learning strengths and weaknesses. Transcript at 1745–55. The EU, therefore, includes an educator and social worker as well as "the more old-fashioned clinical medical team." Transcript at 1755.

EUs use a variety of techniques to avoid cultural and racial bias:

> The Evaluation Unit uses a pluralistic model of education and assessment in its diagnoses and placement recommendations. This is done by not limiting oneself to test data alone in the decision process. Information obtained from the parent is included. Comparisons are made between the child being evaluated and the other children in the family, using Social Maturity Scales. Activities of daily living are included in these scales in addition to social maturity. The Evaluation Unit's decision-making process likewise reaches out into the classroom. In essence, the evaluation process is one of broad scope encompassing numerous parameters. This model is in accord with the generally accepted educational philosophy as is evidenced by the following statement from a special report issued by the Center for Advanced Study in Education: The Graduate School and University Center of the University of New York (New York Regional Resource Center):
>
> A pluralistic model of education and assessment has been offered as an alternative to current practices. . . This model recognizes the cultural diversity within our population, so that children are assessed within the context of their own culture. The norms of that sub-culture would be considered before inferring the child's "deviance" i. e. sub-normality . . . Information concerning the socio-cultural background of a pupil, daily behavioral observations, and an evaluation of the child's "adaptive behavior" in the non-school environment, would be used as evidence of the child's coping abilities and competence. . . .
>
> Under a pluralistic model of education the tests as well as the criterion measures which they are designed to predict would be re-evaluated and expanded to encompass a multi-dimensional view of intelligence. The failure of the schools to educate children from different cultural backgrounds has not been recognized as a failure of our school system but has been attributed to the inherent deficiencies of non-dominant cultural groups. In the present social context of the U. S. the great power of the middle class has rendered differences into deficits because middle class behavior is the yardstick of success.

N.Y.C. Board of Education, "Response to Inquiry of H.E.W. Office of Civil Rights," Issue V p. 4 (mimeo. 1977) (citations omitted).

As a result of another recent structural change, each of the City's 32 school districts now maintains a COH composed of a school psychologist, a teacher or administrator of special education, a school physician and a parent of a handicapped child residing in the school district. *See* N.Y.Educ.Law § 4402 (McKinney 1978).

The COHs are responsible for seeing that pupils are diagnosed and provided with a program appropriate for their needs. They are also supposed to conduct an annual review of students in special education programs and to assure that triennial reevaluation of these students takes place as required by the federal regulations promulgated under the EHA.

Some of these structural changes were mandated not only by state and federal statutes and regulations but also by order of the New York State Commissioner of Education in *In The Matter of Riley Reid,* N.Y.Com.Ed.Dec. No. 8742 (1973); No. 9526 (1977). As noted in section II B 1, *supra,* the Commissioner found that handicapped children were receiving inadequate services in New York City, caused by, among other factors, excessively long waiting lists of pupils for evaluation for special education services. He ordered that these "unserved" children be attended to quickly. They have, therefore, been given priority for service from the EUs. According to established goals, the full size units are to complete 80 evaluations per month and the smaller units, 60 per month. A portion of these will be the triennial reevaluations of students already in special education programs.

Whether the EUs have been able to comply with the Commissioner's orders is unclear from the evidence presented. One EU supervisor testified that students could be on waiting lists for as long as five months. Testimony of Dr. Gerald David, transcript at 2095. Another witness testified that the average waiting list was at least two to three months. Testimony of Margaret Whelan, transcript at 3521. However, in answer to H.E.W. charges that excessive waiting lists constituted inadequate educational service for handicapped students, the Board of Education has explained that the concept of waiting lists is misleading, since the same students are not always on the lists. Moreover, there is apparently in effect a DSEPPS plan designed to reduce waiting time per child and to attend to all children "at the earliest practicable time." In addition to expansion of EUs and the shift in responsibility for placement from the EUs to the COH, the plan places EUs and COHs in common facilities. This enables them to share resources and administrative time. Furthermore, it calls for collection of statistics on the number of children evaluated, placed and awaiting diagnosis, and implementation of resource rooms so that moderately handicapped children can remain in the mainstream with

supportive service and need not be referred for evaluation in the first place. N.Y.C. Board of Education, "Response to Inquiry of H.E.W. Office of Civil Rights," Issue V pp. 5–7 (mimeo. 1977). Nevertheless, criticism of the backlog in EU work continues despite substantial efforts to increase their size, number and efficiency. *See* Touche Ross & Co., Report, "Business Review of Division of Special Education and Pupil Placement Service," 3–7 (1978).

### D. *Diagnostic and Placement Procedures*

#### 1. *Generally*

Procedures for identifying emotionally disabled students are initiated when a teacher, counselor, or BCG case worker at a regular school finds that a pupil manifests bizarre, maladaptive, disruptive or aggressive behavior. A standard referral form is used to request evaluation for possible placement in a discrete special education program. The form requires a description of the problem and evidence that substantial attempts have been made to resolve it without special services. A DSEPPS directive requires that before a referral for possible special education takes place the regular schools are to exhaust every resource, including class transfer, BCG services, community agency referral and parental involvement, in an effort to keep the child in the mainstream. Memorandum To: Community School Board Chairpersons, Community School District Superintendents, All Principals, DSEPPS Bureau Directors/Program Coordinators, Assistant Directors, Supervisors, Chairpersons of the Committee on the Handicapped, Department of Health Personnel, Principals/Administrators of Non-Public Schools; From Helen M. Feulner, Executive Director, DSEPPS, II 2.1, (Oct. 7, 1977). Any referral must be approved and signed by the principal of the regular school. There is, in addition, a requirement that parents consent, in writing, to any referral for evaluation. Testimony of Delia Duggan, transcript at 3431.

Referral may also come from parents or from outside agencies which have seen the child privately. Most of the referrals, however, come from the regular public schools. Testimony of Dr. Gerald David, transcript at 2016. The City has recently instituted a federally sponsored "Child Find Project" to help identify children who need special education services. Information is disseminated through newspapers and advertisements in order to encourage parents to come to the City Board of Education and determine whether their child needs help. This procedure encourages referrals from sources which would not normally come to an evaluation unit, agency or hospital. In its first year of operation the project has reportedly found and referred 900 children. Transcript at 1805–06.

The COH logs all referrals, reviews the form and any accompanying reports made by outside agencies or individual professionals, and then sends them to an EU. The New York State Commissioner of Education requires every evaluation for placement in a special education setting to be accompanied by a diagnostic work-up composed of reports by a social worker, psychologist or psychiatrist, and educator. 8 N.Y. C.R.R. § 200.3(d) (1977).

If all of the required components have been provided by outside professionals, are sufficiently current (three years or less from date of referral), and a professional recommendation for placement has been made, the file need not be forwarded to an EU. Rather, the case will be reviewed directly by the COH as if the full EU work-up had been completed. There are no specific standards given to outside specialists for use in their recommendations, but agencies which recommend placement are ordinarily provided with information about available Board of Education programs. It is assumed, according to defense witnesses, that private professional reports are sufficiently standardized in format and approach so that they need not be duplicated by the EU team. E. g., testimony of Joyce Coppin, transcript at 2536–38.

Middle class parents are more apt to take advantage of these outside evaluations than are others. This follows in part from their ability to afford private consultations and from greater familiarity with, and initiative in using, community resources outside the school system.

Present procedures for initiating evaluation are relatively new. They are designed to guard against prejudgment of a child by teachers and other personnel insufficiently trained in special education and to forestall any tendency to use referral to a special school or class as an escape by teachers who find it too difficult to deal with behavioral deviance or disruption. Thus the referral forms do not distinguish between special education programs.

According to the testimony of Helen Gritz, coordinator of the Bronx Regional Office for Special Education, some old forms which called for teacher recommendations for placement in a special day school prior to any evaluation, are still in use. The policy of the EUs is to ignore such prejudgment. Transcript at 2163–64. Moreover, several of the EU coordinators testified that should an inordinate number of referrals come from a particular school, the personnel responsible would be contacted in an attempt to determine whether sufficient efforts are being made to solve problems within the framework of the regular school. See, e. g., testimony of Dr. Gerald David, transcript at 2083, 2108–09; testimony of Dolores Goidel, transcript at 1974–75. In sum, there is an effort to guard against excessive and improper referral for possible special education placement.

Once the EU has received a referral, its coordinator reviews the referral form, along with any documents containing outside work-ups, in order to determine which members of the evaluation team must see the child. Written notice is then sent to the parents so that examinations and interviews for a period of two days or more can be scheduled. Each child does not necessarily see every member of the team. This depends on the extent and currency of the data in the file.

Accompanying the notice sent by the EU to the parents is a Parental Consent and Waiver of Confidentiality Form. It explains that information about the child's condition will be discussed by professionals in the course of the evaluation process and it apprises the parents of the opportunity to meet with the COH to discuss recommendations and to present additional information. The child's parent or guardian must consent by signing the form before any evaluation takes place.

If the parent, for whatever reason, does not sign the consent for evaluation the child must remain in the regular school or wherever else he might be at the time. In extreme cases, where it becomes obvious that the parent is ignoring the child's welfare, an EU member may institute proceedings before the Bureau of Child Welfare with a view to court proceedings charging neglect. Testimony of Delia Duggan, transcript at 3429–30. *Cf.* 8 N.Y.C.R.R. § 200.-5(a)(2)(i)(ii)(iii) (1977).

The requirement of written notice to parents prior to referral and evaluation represents another recent change. Before July 1976, although some schools may have had a policy of requiring parental consent prior to any referral for evaluation (transcript at 1848–49), there was no requirement of written notice and consent at this stage. The new form is executed in compliance with state laws promulgated to conform to the EHA. Testimony of Elaine Thompson, transcript at 1849.

A directive issued by DSEPPS, effective October 1977, requires that parents be advised by school personnel and chairpersons of the COHs and EUs of procedural due process rights with regard to placement of students in special education programs, the parents' right to withdraw their child from an evaluation process at any time, and that information received prior to and subsequent to a referral will be shared with the professional responsible. Although, as noted above, the EU does send the parents a waiver form containing some of this information, there was, before the trial was concluded, no single, relatively simple written document issued to parents at this stage by either the EU, the referring school, or the COH, which explained the entire process, including a discussion of due process rights and exactly how to obtain a hearing or to appeal. *But see* reference to a subsequent change in section VII, Conclusion, *infra*; section III D 8, *infra*.

Once the child and parents arrive at an evaluation center they are seen by members of the evaluation team. The process is best described by considering the functions of each of these professionals.

### 2. *Social Worker*

The social worker serves a variety of functions in the evaluation process. First, she meets with the parent at the initial EU session. She checks the basic data already in the file and attempts to establish rapport with the parent. It is the social worker who is primarily responsible for explaining the due process rights of parent and child. The parent is given a booklet, prepared by the State Education Department, entitled "Your Child's Right To An Education—A Guide For Parents of Handicapped Children In New York State." One of its purposes is to describe methods of challenging any determination on special education placement. The social worker is also instructed to describe to the parents the evaluation process and to determine whether special education placement would be acceptable to them.

A brief history is obtained. It includes an educational background of the child and his developmental background and family circumstances. The social worker will try to discover any immediate influences on the child that may influence his reactions, such as whether there have been any recent traumatic experiences, and whether he had an adequate night's sleep before coming to the center. Finally, following the case conference, at which a placement decision is made it is the social worker who again contacts the parents to discuss the findings.

### 3. *Educational Evaluator*

The educational evaluator assesses the child's learning strengths and weaknesses in

an attempt to discover his mode of learning. He tries to pinpoint the cause of the youngster's difficulties and discern how he can best be taught.

The evaluation always includes an "individual" session during which examination of visual, auditory, motor and academic areas is conducted. Most of the educational evaluators have backgrounds in learning disabilities or in speech and language pathology. Achievement tests, distinct from those given in regular schools, as well as learning disability tests are administered. If the child has speech and language disabilities, language developmental and speech articulation tests may be included. Supplementing these formal tests are tasks which the educational evaluator will ask the child to perform and informal observations of the child's reactions to the process itself. The individual session normally lasts two to three hours.

Usually, there is also a "group aspect" of the evaluation, during which approximately eight children of the same age are brought together in what is known as the diagnostic classroom. The purpose of this session is to observe how the child interacts with his peers and how he relates to authority in a group situation. Here, too, the children will be given various tasks to perform. The amount of time spent by the child in the diagnostic classroom may vary according to the individual child as well as the adequacy of staffing of the particular EU. It usually runs about a day and a half.

Not all children receive the complete educational evaluation. This may result from a failure to keep appointments, especially where the necessity to come back to the center over a period of several days poses difficulties for the parent. Testimony of Elaine Thompson, transcript at 1768. Moreover, according to the testimony of one EU coordinator, staffing shortages prevent the Units from placing every child in a diagnostic classroom. Consequently, this part of the evaluation takes place only in cases where observation of the child in a group is believed to be useful. This would include cases where the referral report

stressed problems in the child's ability to get along with adults or peers. Testimony of Dr. Gerald David, transcript at 2021. Another witness testified that, although the diagnostic classroom is useful for relatively young, elementary age pupils, it does not work well with adolescents, and is therefore intentionally left out of the evaluation of older children. Testimony of Helen Gritz, transcript at 2161.

### 4. *Psychologist*

An essential part of the diagnostic workup of every student is the psychological study. This report contains several elements. First is an intellectual evaluation designed to measure the child's ability to function intellectually in comparison with other children. Testimony of Dr. Gerald David, transcript at 2021–23. In making this determination the psychologist administers an I.Q. test, the results of which become one part of the data on the child's intellectual ability. The psychologist also attempts to describe such matters as how a child thinks, weaknesses and strengths in abstract conceptualization, and the degree of difficulty with arithmetic problems. There is a non-verbal scale used in intelligence testing; included are both construction of a puzzle or block design and the Bender Gestalt test, to measure motor functioning and help detect neurological impairment. In addition, an emotional evaluation is made. The psychologist may elect to measure this aspect of the child's personality through a variety of devices, including figure drawings with stories, an apperception test, the Rorschach test and projective tests. Data also is sought on the child's functioning in social settings. Finally, the psychologist will make observations about how the child functioned at the testing, the relationship established with the child, and other matters deemed significant.

### 5. *Psychiatrist*

The psychiatrist consulted in the evaluation conducts a brief screening of the child to determine if there is any necessity for further psychiatric diagnostic and therapeu-

tic work. If more extensive psychiatric help is considered necessary, the child will be referred to an outside agency or hospital.

The stated policy of DSEPPS is to have every child who may be recommended for special education placement seen by a psychiatrist. Testimony of Dr. Joel Rosenshein, transcript at 211. In practice this plan is not followed, primarily because of a shortage of qualified consultants. Usually an attempt is made to have every child obtain some kind of psychiatric review, even if this is done by referral to an outside source. There is, however, no federal or state provision mandating psychiatric review prior to placement in any special education program.

Professional opinions differ on the importance of psychiatric information in the diagnostic process. According to Dr. Gerald David, a psychologist now serving as head of one of the EUs, the child will be seen by a psychiatrist only "where we suspect that there might be a serious emotional problem, where we have certain questions that we would like the psychiatrist to answer for us. . . . [Where] the psychological and projective material seems to be rather clear, we will not necessarily request a psychiatric." Transcript at 2027. Dr. David felt that, despite the shortage of psychiatrists, the system does permit adequate evaluation. In contrast, another defense witness, Helen Gritz, presently director of The Bronx Regional Office of Special Education, formerly an EU coordinator and educational evaluator, testified that she deemed a psychiatric interview essential in every diagnosis. In her opinion, a decision on special education placement based on the emotional status of a child can be made only by a psychiatrist. Testimony of Helen Gritz, transcript at 2176, 2179–80.

### 6. Neurological Evaluation

The child may be referred for neurological screening if seizure activity is discerned or if there are neurological symptoms of a severe kind which have not been diagnosed. If necessary, the child will be referred to a hospital for further neurological work. Every member of the evaluation staff is instructed to look for "soft signs" of neurological impairment, including hyperactivity, short attention span, clumsy movements, and difficulty with fine motor control and coordination. Testimony of Elaine Thompson, transcript at 1770–71; testimony of Helen Gritz, transcript at 2156.

### 7. Case Conference

At the end of the evaluation sessions there is a case conference at which all of the members of the team review the information in the file and attempt to reach a mutual decision on classification and recommended program placement. Sometimes an outside psychologist or medical doctor will attend the conference along with members of the EU staff. A representative of the referring school or agency may also be present to ask questions and raise issues with the conference members. The conference technique is used in the hope of eliminating individual bias.

If a consensus cannot be reached in a given case it may be held over for further evaluation. In some cases indecision will lead to the use of "pre-placement classes." These are diagnostic classrooms used primarily for children of elementary school age. They are located at about 30 sites close to the EUs. The children are sent to these classes for a period of anywhere from six weeks to six months for remedial help and behavioral observations designed to determine whether a child requires any of the special education programs.

Approximately 10% of the new referrals will be sent back by the EUs to the COHs with a recommendation that the child should remain in the mainstream, perhaps with ancillary treatment by an outside agency or remedial work available in the school itself. Testimony of Elaine Thompson, transcript at 1804–05; cf. testimony of Dr. Gerald David, transcript at 2083, (3% of referrals are recommended for return to the mainstream).

When the EU finishes its work it sends a letter with its recommendations to the parent. Accompanying this letter is a com-

plete statement of procedural due process rights. Included is: notice that the parent is entitled to a description and explanation of recommended placement, information on tests used in evaluation, an independent evaluation by outside professionals, and a description of rights to a hearing and appeal should a decision adverse to the parent be rendered at the hearing. Parents are also informed that they may keep their child in his current placement until all due process proceedings are completed. All of this presumably reinforces the explanation of due process rights given the parents by the social worker at the initial EU interview. Testimony of Delia Duggan, transcript at 3388–89.

### 8. *COH Review*

Following the recommendation of placement by the EU, a copy of all the information used in making the diagnostic decision is sent to the appropriate COH. The recommendation is then reviewed and evaluated, together with any other pertinent data, by a subcommittee of the district COH. The psychologist member of the COH, usually the same individual who examined the child at the EU, acts as liaison between the EU team and the COH.

Prior to its review, the COH notifies the parent of the EU recommendation. This notice is sent to the parent in the form of an "Option Letter." It informs the parents of the recommended placement and presents them with two options—(1) agreement or (2) request for immediate review of the placement decision.

Up until very recently, the Option Letter contained little more than a description of the two options; it did not explain all the steps which might have been taken to challenge the placement decision. One of plaintiffs' witnesses noted that only the sophisticated parent would be likely to challenge the EU determination by checking Option Two:

Well, I think that the—most of the parents that I have seen at the COH . . . are people who are very unsophisticated about the system, who are weighed down

with real life problems . . . people with very little income, very upset about their children's problems. Often there are two or three children in a family with problems. I think . . . they are not assertive parents and I think that a parent would have to be rather assertive to take advantage of option 2 unless there were something very, very obviously wrong.

Testimony of Margaret Whelan, transcript at 3520.

Effective April 17, 1978, DSEPPS issued a revised Option Letter. The present letter differs from the earlier one in that it includes the address and telephone number of the COH which the parent can contact with any questions. In addition, the COHs and EUs are now required to attach to the Option Letter a list of due process procedures explaining the evaluation and placement process, the role of the COH, and the steps which must be taken to challenge its determination. Also attached is a partial listing of agencies which parents can contact should they desire an independent evaluation.

Choice of Option One indicates parental agreement with the classification and recommendation for placement. If this is checked, a COH review of the file will take place, but it may not occur until within 45 school days *after* the child has been placed in the special education school or class. Placement will not, however, become final until approved by the COH. Should the Committee determine that the EU diagnosis was incomplete or its recommendation for placement invalid, the child could be taken out of the program and placed in another one recommended by the COH.

If parents disagree with the EU recommendation and do not want the child moved until the COH has met and reviewed the information, they may check Option Two. In this case the COH must meet within ten days. If the COH, after completing its review, concurs with the EU recommendation, the parents will be informed of their right to pursue an impartial due process hearing.

Parents are invited to attend the COH meeting regardless of whether Option One or Two is checked. Efforts are made to encourage this participation. Testimony of Joyce Coppin, transcript at 2523. At the meeting the due process rights of parents and child are again explained; the parents are given another copy of the booklet "Your Child's Right to an Education" as well as a written list of steps to follow should they desire to appeal the final COH determination.

The Court observed COH review of three cases, each reflecting the practical operation of the system providing a fair and sympathetic hearing to parents. It may be of significance that in each of the cases observed—selected before it was known that the Court would visit—the parents were highly articulate and well-informed members of the middle class.

In the first case the child was a 19-year old girl of superior intellect, highly motivated by middle class standards. Severe emotional problems and possible neurological difficulty had resulted in the termination of her formal education at the ninth grade level. The last three and one-half years of her life had been spent in mental hospitals. Various clinical reports indicated that the child was ready for full schooling at a residential institution where psychiatric care would be available. The purpose of the meeting was to consider the parents' request for public reimbursement of tuition at such a facility. The parents, obviously well-informed and concerned about their daughter's welfare, had canvassed all the better private and public institutions. Finally, after their daughter had been denied admission at five New York State facilities, they had arranged for her acceptance at a well thought of but extremely expensive institution in Pennsylvania. It was agreed that this private institution was the one to which the child would be sent at public expense. When the question of cost was raised in conference it was apparent that the parent members of the board, deeply empathetic, fully supported any expenditure necessary to help the child and relieve the parents of their heavy financial burdens. (A $250,000 medical policy had just about been exhausted by the costs of private psychiatric care.)

This general pattern was reflected in the second case, involving a child with a serious speech defect. Both parents were fully employed; the father had three years of college and the mother two years. They, too, had canvassed all available institutions, both private and public, and concluded that placement in a special program at a public school was best for the child. The mother was present at the meeting to make certain that the board would recognize her right to change placement should the program fail to operate in accordance with her expectations. It was obvious from the discussion that she had, in her words, "continually nagged" all those involved and that she would not accept a "run around"; if satisfactory arrangements were not made, she would "take it up with our lawyer". She was advised that she could request a reevaluation at any time. It was clear from the discussion that no request of hers would be ignored by the chairperson or anybody else in the system with whom she had contact.

In the third instance, a young middle class teenager with emotional problems had been recommended by the EU for placement in a CEH (B) class. The mother had observed the class and felt that the "program was not as wonderful as it sounds". She complained about the lack of clinical help in the class and insisted that her son be kept in the regular school. She presented a letter from a private therapist who had been working with the child and the family, indicating his recommendation that the child not be taken out of his regular class. The therapist was known to the psychologist and it was obvious that his recommendation would override that of the EU.

In all these cases the aggressive and knowledgeable assertion of rights by members of the middle class proved effective in gaining the assistance and sympathy of the COH. The system works extremely well for those who can use it.

### 9. Due Process Hearing

Assuming that Option Two is chosen and that the COH concurs with the EU recommendation, the parents can file a written request with the Impartial Due Process Office indicating disagreement and the desire to be afforded a hearing. State regulations require a request for a hearing within ten days after receipt of notice of placement; this requirement is included in the COH's notice to the parents. 8 N.Y.C.R.R. § 200.-5(c) (1977). If the request for a hearing is not timely, it will be denied.

Where timely request is made, the parent is notified of the date of the hearing and given additional information to prepare for it, including: copies of documents, subpoenas for witnesses if necessary, notification to the hearing office indicating representation by an attorney, and requests for an interpreter. As of April 1978, parents will be sent a list of free or low-cost legal services which may be available to represent children at the impartial hearing. According to the testimony of Grace Cavanagh, Chief Administrator for the Hearing Office, the parent will already have been advised by the COH of the right to examine and to duplicate all materials used by the COH and EU in making recommendations. Transcript at 2202. The COH and DSEPPS staff will also be notified of the hearing.

Present at the hearing are the impartial hearing officer, the chairperson of the COH, a supervisor knowledgeable about the program that is being recommended for the child, any witness requested or subpoenaed by the parents, the parents, and the parents' attorney if they are represented. The parents decide if the child should attend. 8 N.Y.C.R.R. § 200.5(c)(9) (1977). If the parents have no attorney, the Board of Education will not have legal counsel representing the DSEPPS staff.

All but two of the hearing officers are attorneys. These non-lawyers are trained in special education. Before they participate in a hearing, the officers observe other, more experienced hearing officers and become conversant with the applicable state and federal laws and regulations on education of the handicapped. They are also given the opportunity to read about and observe the various educational programs.

The hearing commences with the introduction of the case by the hearing officer. He explains that the burden of proof is on the Board of Education to show that the suggested program is one suited to the child's needs. The Board is then given the opportunity to present its case. The parent is allowed to cross-examine any of the Board's witnesses.

Transcripts of the hearing are made available to the parents or their attorneys. The impartial hearing officer is required to render a decision and mail a copy of that decision to the parents and the Board of Education not later than 45 calendar days after the receipt by the Board of Education of a request for a hearing. The hearing officer's decision is final. The notice of the decision includes information on the right to appeal the decision to the Commissioner of Education. 8 N.Y.C.R.R. § 200.5(c)(10) (1977). According to testimony of Grace Cavanagh, information on the right to appeal is given at the beginning of the hearings as well. Transcript at 2207.

This procedure is relatively new. Prior to November 1977 the hearing officer's decision was not final. He would make a recommendation to the Board of Education. Parents would receive a copy of the recommendation and be given five days to file an objection. The matter would then go to the Board of Education along with the transcript of the hearings and any evidence which had been presented. The Board would render a final decision at one of its public meetings.

### 10. Appeals

The hearing officer's decision is appealable to the New York State Commissioner of Education. He may review and modify any determination. The Commissioner's final determination or order is subject to judicial review in an Article 78 proceeding. N.Y. Educ.Law § 4404 (McKinney 1978).

For those with the skill, initiative and tenacity to enforce their rights, these due

process procedures, culminating in an appeal to the State courts, afford impressive protections. The testimony indicates, however, that it is primarily the White middle class that has the capacity to take full advantage of these rights to keep its children out of special day schools. Thus, proportionately more minority than majority group children are screened into special day schools.

### 11. *Reexaminations*

As noted in sections III(C)(1) and (2), *supra*, federal and state laws mandate that each child in a special education program be reexamined at least once every three years by a clinical team. This requirement is designed to insure that the youngster is being maintained in the most appropriate and least restricted environment suitable to meet his current needs.

The reexamination process includes the gathering of information about the child's functioning in a given program. The school provides the EU staff with the child's record and any other available material. The parent is seen again by the social worker; the child is given a psychological work-up; and an attempt is made to have a psychiatric and educational evaluation. Optimally, the child is to be given a full work-up. It is the responsibility of the COH to assure that every child has this triennial reevaluation.

In addition to the triennial clinical evaluation, an annual review of each child's progress is required in conjunction with updating of the IEP. *See* sections III(C)(1) and (2), *supra*. The EU initially fills out one portion of the plan, which is then updated every three months during the school year. At least once a year the parents are invited to participate with the teacher in revising and rewriting the IEP. The COH receives the completed IEP annually and uses it in its review of the appropriateness of a given placement.

### E. *Changes in Placement; Decertification*

In principle, any change in placement from one special education program to another is treated as a new referral. Before any transfer is made, the child is supposed to be given a full diagnostic work-up (although some parts may be left out if sufficiently fresh data is already available). The COH must also review any new EU determination. One of defendants' witnesses indicated that, although it is preferred procedure to see a child prior to any change in placement, she was aware of no written regulations requiring this procedure. Testimony of Dolores Goidel, transcript at 1987. Another witness, a school psychologist, noted that children referred from a CEH "B" class to her day school need not, as far she she knew, go through the EU program. Testimony of Dr. Dorothy Arnsten, transcript at 2884–85.

As is true of initial placement, there are no written criteria to be considered prior to a change from one program to another. There are merely descriptions of each of the programs. A perceived lack of adjustment to one program may suggest referral to another thought better suited to the child's needs. Testimony of Joyce Coppin, transcript at 2574–75; testimony of Dr. Gerald David, transcript at 2099.

Decertification—the return of a child to the mainstream from a special education setting—occurs when special day school teachers or BCG personnel perceive that a child has been "rehabilitated". The judgment is based on findings of social, emotional and academic growth. A report of the child's development, along with the entire file—including the initial evaluation and records of the special day school experience—is then referred to the COH. The COH determines whether any EU review is necessary.

It is unclear whether EU review is mandated in every case prior to decertification. There was testimony suggesting that the COH may proceed with mainstreaming in the absence of a new EU report. Testimony of Dr. Gerald David, transcript at 2102–03; testimony of Dr. Julian Schtierman, transcript at 2815. It appears that some-

times neither COH approval nor an EU review is obtained. One witness testified that the EU staff often receives the teachers' reports, talks to the parent and child, and refers the child for decertification without testing. Formal testing is dispensed with to circumvent EU waiting lists and facilitate movement into the mainstream. Testimony of Dolores Goidel, transcript at 1987–88. Other witnesses disputed this. For instance, Joyce Coppin, Assistant to the Director of DSEPPS, testified that decertification represents a formal change in placement and must, in every instance, be accompanied by a full EU study and COH approval. Transcript at 2577–78. Another witness observed that to her knowledge an evaluation was always done in such a case. Testimony of Dr. Dorothy Kobak, transcript at 3318.

As in the case of changed placement or initial entry into a given program, there are no written criteria for decertification. Testimony of Dr. Martin Groveman, transcript at 2327; testimony of Dr. Julian Schtierman, transcript at 2814–15.

### F. Plaintiffs' Criticism of Procedure

#### 1. Lack of Unbiased Tests

In making their evaluations, both the educational evaluator and the psychologist rely on standardized written tests, along with informal observations and oral tests. Plaintiffs point to socio-economic and cultural bias in ability and I.Q. tests and criticize what they perceive to be excessive reliance on such tests. E. g. Clark, Phipps, Clark & Harris, Report, "Lora v. Board of Education," 13–15 (mimeo. 1977); testimony of Martin Gerry, transcript at 126–130. Cf. D. L. Kirp, P. J. Kuriloff and W. G. Buss, "Legal Mandates and Organizational Change," in II N. Hobbs, Issues in the Classification of Children, 363 (1975) (Black and Mexican American children heavily overrepresented as students in classes for the educatable mentally retarded, allegedly due to the use of culturally based, English Language I.Q. tests).

Defendants' answer to this criticism runs along two basic lines. First, several witnesses testified that when considering a child, all diagnostic staff are instructed to factor in the possibility that poor performance may be traceable to background and cultural gaps. E. g., testimony of Dolores Goidel, transcript at 1937–38; testimony of Dr. Gerald David, transcript at 2028–29. Second, it is claimed that inasmuch as the test results constitute only a portion of the total evaluation process, cultural or socioeconomic bias is not a serious danger. Testimony of Helen Gritz, transcript at 2160.

Some difference seems to exist among the EUs with regard to the extent of reliance on standardized tests. As a minimum every child must be given an I.Q. test since placement in a program for emotional disturbance requires an I.Q. of at least 75. Special Circular No. 35, To: Community School Board Chairmen, All Superintendents, Executive Directors, Directors, Heads of Bureaus and Principals of All Day Schools, From: Office of the Chancellor, Board of Education of the City of New York (mimeo. 1975). Beyond this, the amount of standardized testing which takes place varies. Helen Gritz testified, for example, that in her opinion standardized tests are biased for every potential special education child and she directs them to be used at a minimum. She did admit, however, that she knew of colleagues in other boroughs who rely on them more heavily than she feels is appropriate. Transcript at 2160–61; 2179–80.

This Court's limited observation of EU conferences suggests that at least some EUs are wary of standardized tests. For example, the Court noted that low test scores of children with Spanish and Italian backgrounds were discounted because of language problems and nervousness. The educational evaluators and psychologist relied upon their own experience and contact with one such child in concluding that he was substantially brighter than the objective test scores would indicate. The clinicians seemed cognizant of the limitations of their clinical tools and the need to take into account "socio-cultural pluralism". Cf. J. R. Mercer, Labeling the Mentally Retarded,

*Clinical and Social System Perspectives on Mental Retardation*, 271 (1973); N. Hobbs, *The Futures of Children*, 6–8 (1975).

### 2. *Lack of Regular Classroom Observation*

In every case, following the series of EU sessions, a report form is sent to the referring school requesting additional information from the principal or guidance counselor and the child's teacher. Only in rare instances, however, will evaluation include direct observation of the child in his regular class by a member of the EU diagnostic team. Several of plaintiffs' witnesses cited this, along with what they perceived as insufficient efforts at assuring that the regular school made serious attempts to accommodate the child in the mainstream, as serious deficiencies in the process. *E. g.* testimony of Dr. Rachel Lauer, transcript at 1124–25; 1128–29; testimony of Dr. Kenneth Clark, transcript at 1653–59; testimony of Margaret Whelan, transcript at 3550–51.

Prior to the development of the EUs, evaluation of the child was conducted by BCG staff primarily in the regular school. Recommendations were based on data derived from observation over a period of days or possibly weeks, direct talks with the regular school teachers and principal, and inspections of records. Testimony of Dr. Rachel Lauer, transcript at 1121.

The replacement of the BCG staff by the EUs was designed to prevent extensive involvement of the regular school in ultimate decisions on special education placement and to avoid the possibility of racial or cultural bias at that primary level. *See* testimony of Dr. Helen Feulner, transcript at 958. However, certain of plaintiffs' witnesses testified that (1) the lack of contact with the referring school may well encourage referrals to the EU before intensive efforts have been made within the regular schools themselves and (2) the off-site diagnosis is skewed against the child. In other words, there is more of a chance that the child, diagnosed apart from his normal school environment, will be termed handicapped. According to Dr. Lauer:

Most of us are well aware that the children's learning problems, children's emotional and behavior problems are a product, not only of differences or deviations in the structure of a child, but also a product of a) what the school is doing to them and b) what the school is not doing for them. . . . If the diagnosis of handicap includes only an examination of the deviation of the child and includes no examination of the adaptive power or the adaptive processes of the school, the entire burden of the handicap is placed upon the child. The diagnosis of handicap is very likely to be made simply because it is very easy to find something wrong with nearly everybody.

Transcript at 1128–29. Moreover, the point was made that children are likely to be uncomfortable and anxious in the unfamiliar EU environment. This may also influence test results.

Defendants have several answers to these objections. First, on-site evaluation at the referring school will, in some instances, take place. Members of the EU staff may visit the referring school and observe the child in his regular class if they feel, because they find no evidence of behavioral problems, that there is a possibility of discrimination in the referral, a failure on the part of the referring school to attempt to change classes, or excessive strictness of behavioral standards in the regular school. *See* testimony of Dolores Goidel, transcript at 1974–77. Limited staff prevents more extensive use of this technique. Every file is, however, as indicated *supra*, accompanied by a report form filled out by the referring school.

Second, defendants' witnesses argued that, despite the comfort of a familiar setting, on-site evaluation does not necessarily yield a fair picture of the child, because he often acts to fill a role he has developed in the context of that class. Testimony of Helen Gritz, transcript at 2154. Another witness testified that normally an EU is able to gain sufficient information about the source of the behavioral problem with-

out observation of the child in the regular class. Testimony of Dr. Gerald David, transcript at 2110.

During the course of the EU conferences observed by the Court extensive notes from classroom teachers and guidance counsellors at the referring school were considered. There were also penetrating evaluations of the child's reactions during a period of a day or more in a diagnostic classroom.

### 3. *Lack of Fixed Criteria for Placement*

The testimony indicates that professionals in the City's system see a variety of distinctions in children's behavior and problems which will determine what placement is appropriate. They assert that it is impossible to reduce a combination of professional judgments, of necessity subjective to some degree, to precise criteria. Plaintiffs, on the other hand, charge that the lack of criteria constitutes a serious deficiency in the evaluation process.

In a pamphlet describing the range of services available for children with emotional handicaps, students in the special day schools are described as "in the great majority of the acting-out type, whose primary behavior disorder has manifested itself in repeated disruptive and aggressive behavior, extensive in scope and serious in nature." Bureau for Socially Maladjusted and Emotionally Disturbed Children, "An Overview of Programs," 5 (1977). There is not, however, any single document containing objective criteria to be used in referring a child for placement in a special day school. Special Circular No. 35 issued by the Board of Education in 1975, although obsolete in part, includes only a listing of criteria to be used in the clinical determination of eligibility for all programs for the emotionally handicapped. The requisite criteria are:

a) Intelligence level which is above that provided for by the Bureau for Children with Retarded Mental Development.

b) History of repeated maladaptive, disruptive or aggressive behavior, extensive in scope and serious in nature.

c) Chronic inability of the student to respond positively to intensive efforts by the school to help him cope within the normal school setting.

Special Circular No. 35, To: Community School Board Chairmen, All Superintendents, Executive Directors, Directors, Heads of Bureaus, and Principals of All Day Schools, From: Office of the Chancellor, Board of Education of the City of New York 1 (mimeo. 1975).

These criteria, which apply to CEH classes as well as to the special day schools, superseded those outlined in an earlier document, Special Circular No. 47. In the earlier circular, the criteria were essentially the same except that "[a] history of truancy, if coupled with aggressive and disruptive behavior" was also to be considered. Special Circular No. 47, To: Community School Board Chairmen, All Superintendents, Executive Directors, Directors, Heads of Bureaus and Principals of All Day Schools, From: Office of the Deputy Chancellor, Board of Education of the City of New York 1 (mimeo. 1972). While witnesses for the defense have testified that truancy is often a problem with many of the children ultimately referred to special day schools, theoretically the current policy is not to consider truancy as a factor in the diagnosis of social maladjustment and emotional disturbance. Testimony of Dr. Martin Groveman, transcript at 2223–24.

These written criteria present only rough guidelines. Testimony of witnesses involved in the evaluation and placement process indicates that there are many more less easily articulated factors taken into account in evaluation and recommendation for placement. In the course of the trial criteria listed in Special Circular No. 35 were termed "vague", "insufficient" and "incomplete". Testimony of Dr. Gerald David, transcript at 2117; testimony of Helen Gritz, transcript at 2174. It appears, therefore, that the document is in no way central to the evaluation process.

There are, in addition to the special day schools, classes for the emotionally handi-

capped of two types: (1) CEH (A) classes, designed to serve children whose handicapping condition is manifested in thinking disorders; and (2) CEH (B) classes, designed for children with moderate, as opposed to severe, emotional handicaps. The behavior of those in the (A) classes may be termed bizarre in that it reflects a lack of touch with reality, caused by severe emotional crises. Many of these children may be schizophrenic, autistic, or psychotic. Testimony of Dolores Goidel, transcript at 1940–41. The CEH (B) children, on the other hand, have difficulty handling themselves in the regular learning situation and in relating to peers and authority figures. Their problems are closest to those of the pupils referred to special day schools. *See* discussion in section III C 3, *supra.*

The way that placement choices are made was illustrated in the course of testimony describing the difference between the CEH (B) and the special day school child. Apparently, the CEH (B) student is one who poses no danger to himself or others; he causes less disruption than the more aggressive, disruptive child who will be referred to the more confined setting of a special day school. One witness summarized the difference as follows:

If there is repeated severe disruptive behavior, aggressive and hostile, physically toward peers and/or towards teachers . . . [i]f this behavior is very severe or occurs over a long period of time without intervention of any kind being at all successful in modifying it, then that child might well be suited for a special day school where he would get a total structured environment. If a child does have some emotional problems, some behavioral problems but can be contained in a special education class with a lower register of children, some individualized work in reading and math with the special teacher and will more or less be able to fit into the class and function in the . . . regular school relatively appropriately, then the child would be referred to a CEH (B) class.

Testimony of Elaine Thompson, transcript at 1835–36. In technical jargon, the special day school child has more "ego-strength" than one in a CEH (B) class. Testimony of Dr. Gerald David, transcript at 2136–37.

Defendants' witnesses denied the validity of charges made in the course of questioning that the lack of clear criteria and the existence of waiting lists for CEH classes produces pressure to place more children than appropriate in the special day schools. One witness did suggest that if a child were at home on a waiting list for a CEH class, and special day school placement was found clinically appropriate—that is, at least "some of the child's needs could be serviced adequately"—a child might be placed in a special day school. If a CEH class were then to become available the child would be switched out of the school unless it was felt that he was functioning optimally. Such a change would be made sooner if a review revealed that the child was having problems in the special day school. Testimony of Dr. Gerald David, transcript at 2061.

Plaintiffs' and defendants' witnesses are not far apart on what they believe to be theoretically proper criteria. The following colloquy between plaintiffs' expert witness, Dr. Kenneth B. Clark, and the Court is significant:

THE COURT: . . . are there any objective criteria [for placement in special day schools]?

THE WITNESS: Yes.

THE COURT: What are they?

THE WITNESS: The criteria are . . . the behavioral history. There is evidence that there is something about behavior that persists in the face of various attempts to modify it. Evidence that it is really persistently nonadaptive behavior or self-destructive behavior over which the individual has no control.

I guess in terms of the clinical factor for the child himself, the noncontrollability of the behavior and the danger of the behavior towards self or towards others, and evidence that usually—the usual methods of containing that behavior don't work.

THE COURT: And persistence in a variety of settings?

THE WITNESS: Right.

THE COURT: You see now, you're stating in slightly different words, but essentially what the experts in charge of this system said. What they have said to me is that . . . you have to ultimately get down to the judgment of good clinical people . . . [They] get together after they [test] and go into all the educational and other history and [sit] together in good faith and [use] their best joint judgment.

Transcript at 1703–04.

The problems of classification have just begun to receive national sustained attention. As Elliot L. Richardson, then Secretary of H.E.W., noted in calling for a systematic review:

The inappropriate labeling of children . . . has serious consequences for the child. Although experts in the various disciplines concerned with exceptional children have undertaken useful studies on appropriate diagnostic procedures and practices, there is lacking sufficient dissemination of their findings to professionals and the public and nationwide standardization of appropriate diagnostic procedures.

I B. Hobbs, Issues in the Classification of Children vii (1975). While the Project on the Classification of Exceptional Children, sponsored by ten federal agencies, may have resulted in substantial movement towards consensus, it is too early to expect professional agreement on standardization in the field. *See id.* vols. I and II; Report of the Project on Classification of Exceptional Children, The Future of Children, Categories, Labels, and Their Consequences (1975). Courts are not in a position to lead the most advanced of the educators, clinicians and theoreticians in enforcing non-existent standards.

4. *Excessive Class Size*

Enrollment in each of the special day schools covering the intermediate grades is approximately 100 to 150 children; in the high schools the average enrollment is about 225. (Figures as of March 1978.) This is a small fraction of the size of the regular schools. Recently, moreover, enrollment in the intermediate schools has been dropping. This may be explained, at least in part, by the trend towards placing children in the least restrictive environment possible. Testimony of Dr. Helen Feulner, transcript at 866–68. For example, Dr. Martin Groveman, principal of P.S. 36, Nathaniel Green School for Boys, testified that in May of 1976 he had 131 students on his register. At the time of his testimony (December 1977) there were only 87 enrolled in that school. Transcript at 2238.

As of March 1978, the average student-teacher ratio in the special day schools was approximately 13:1. One of the things which many of defendants' witnesses regard as a virtue of the special day schools is their small class size, which facilitates a degree of individual attention unavailable in the regular public schools in New York City.

The State Commissioner of Education establishes ten as the maximum class size for severely emotionally disturbed children. 8 N.Y.C.R.R. § 200.4(b)(2)(ii) (1977). Children in the special day schools are classified as severely emotionally disturbed for purposes of state law. Testimony suggested that at least in some of the schools this policy is technically violated. For example, Marjorie Louer, principal of Sterling High School in Brooklyn, testified that class size in her school ranges from between twelve to fifteen students, although it is sometimes as low as ten. Fluctuating rates of attendance account for the disparity. Transcript at 2454. Another principal, Alexander Walker of P.S. 58M, Manhattan High School, testified that the average class size was about fifteen, although if one factors in rates of non-attendance the day to day average was probably about ten students per class. Transcript at 2734.

Most of the classes the Court observed in the four schools it visited were quite small. Whether because of truancy or other reasons, there were many classes where teachers were dealing with one to five students at a time. During its visit to Sterling High School, the Court observed some large classes, as for example, the music classes, where a large band was practising and

some small groups of about five students working on academic subjects. Excessive class size does not appear to be a serious problem.

### 5. *Lack of Adequate Support Services*

Each school offers some support services. The testimony reveals, however, that the amount varies erratically from school to school.

Virtually every witness involved directly with the schools admitted that the BCG support staff was, if not inadequate, at least in substantial need of supplementation. *E. g.*, Testimony of Marjorie Louer, transcript at 2481; testimony of Dr. Esther Rothman, transcript at 2988; testimony of Dr. Florence Halpern, transcript at 3095–96. Although the witnesses involved in the evaluation and placement process stated emphatically that referral to a special day school is undertaken with the expectation that each student will benefit from professional therapy in that setting (*e. g.* testimony of Dolores Goidel, transcript at 1979–80; testimony of Helen Gritz, transcript at 2171), the evidence seems clear that there is insufficient clinical staff available to carry out individual therapy at an optimal level. A substantial amount of group therapy, is however, afforded.

All schools are supposed to have a full-time guidance counselor aided by a BCG psychologist and social worker, each of whom is to be available approximately two to two-and-a-half days per week. The schools are also to have access to a psychiatrist on call at least once a week. The evidence suggests that even this minimal level of therapeutic staff is not always available.

A few examples of deficiencies are worth noting. Two students, each of whom was attending a special day school at the time of his testimony, stated that they had had no contact with any member of a BCG team. Testimony of Alfred Avant, who had attended the special day school approximately two-and-a-half years, transcript at 1061–62; testimony of Mark Birt, who had been in special day schools about three years, transcript at 2431–32. One witness, the principal of P 58M, stated that he has the lowest amount of support staff services of the day schools—a psychologist one day a week, a social worker two days a week, one guidance counselor and one crisis teacher. His school, with a register of 329 students, is the second largest of the special day schools. Two other principals testified that they have essentially no psychiatric aid at all. Testimony of Dr. Martin Groveman, transcript at 2296–97; testimony of Marjorie Louer, transcript at 2353.

On the other hand, in P 12X, with a register of approximately 90 pupils, BCG staff includes a psychologist five days a week, a social worker five days a week, a psychiatrist one morning a week, one full-time guidance counselor and a speech therapist one day a week. The psychologist at that school testified that each student receives some therapy. Testimony of Dr. Dorothy Arnsten, transcript at 2844. She also noted that to have a register of 388 students and support services including a social worker two days a week and a psychologist two days a week (precisely the situation at P 85K) would not provide delivery of adequate clinical services. Transcript at 2878–79.

Dr. Howard Weiner, the psychiatrist at P 12X, testified that psychiatric time is necessary for each of the special day schools. He reviews personally the EU work-ups of each child referred to P 12X and feels that this, along with ongoing psychiatric attention, is an essential part of a special day school program. Transcript at 2375–76. He noted that to offer adequate service in a school of 150 students there should be a psychologist and social worker, each available full-time, and a psychiatrist at least one to two half days per week. Transcript at 2385.

As of March 1978, five of the schools were listed as having "crisis teachers." They act in cases where a child has a sudden emotional flare-up and is not able to get himself to return to the classroom. Many of the students in the special day schools operate on what, in Freudian terms, is apparently known as the "primary process." That is, they cannot delay gratification and any experience that may cause anger or frustration triggers an almost im-

mediate impulsive reaction. The crisis teacher is there to deal with the child in this state and determine when it will be best for him to return to class. Where there is no crisis teacher, this function is assumed by other available staff. The hope is that these problems can be worked out within the program's framework, rarely necessitating punishment such as suspension (often a step taken in the regular school), that might drive the child even further away from the educational process.

In P 36K the crisis teacher doubles as a guidance counselor. Dr. Martin Groveman, principal of that school, testified that the crisis teacher had been the school's licensed guidance counselor until budgetary slashes caused him to lose the official guidance line. According to Dr. Groveman, the teacher continues to perform all of the functions of a guidance counselor, including orienting the child and parent when the student enters the school, helping to plan the student's individual program, and providing ongoing counseling and "crisis intervention." Transcript at 2230–33.

Five of the schools (as of March 1978) have attendance teachers, at least part-time. These individuals follow up on absenteeism by attempting to contact the parents, to find out about problems at home which may generate truancy, and to motivate better attendance. Although truancy is no longer a criterion used in referral to a special day school, it is clear that many of the day school students do have poor attendance records. Several principals who testified noted improvements in attendance by students in their schools. Current research seems to suggest that ignoring truancy tends to make the truant feel that no one in the school really cares and that he is not being missed, thus reinforcing a drift out of the school's orbit, often resulting in dropping out completely. Testimony of Susannah Doyle, transcript at 3648. In the special day schools the administration and staff really do care; this is communicated to the student.

However, even as to truancy, attention is spotty. As of March 1978, P 169M, P 36K, P 23Q, P 75Q, P 9Q, P 58M, P 8M (for girls) and P 85K have no attendance teacher. P 369K has one three days a week; P 8M (for boys), P 371K, P 370K, P 12X each have one.

Fiscal cutbacks have affected the availability of school doctors and nurses in the special day schools. One defense witness testified that while visiting several of the schools she recalled being shown rooms, formerly used by medical staff, which were closed in their absence. This witness, a psychologist, noted that the restoration of such services is of major importance for students in the special day schools: ". . . if a kid has a toothache he won't learn and if he's malnourished he isn't going to learn." Testimony of Dr. Florence Halpern, transcript at 3118.

Another witness, a school psychologist at P 12X, noted that the school used to have a doctor, dentist and nurse, but that presently none are available, despite the fact that in the 1976–77 Annual Report for that school, the lack of these professionals was listed as one of several "unmet needs." Testimony of Dr. Dorothy Arnsten, transcript at 2894. Still another witness, a guidance counselor at P 58M, noted that to his knowledge there is a school nurse in attendance every other week, but that he would "love a full-time nurse in the school." Testimony of Dr. Julian Schtierman, transcript at 2773.

These clinical inadequacies are serious since the special day schools purport to provide a therapeutic environment and treatment. The claims of inadequacy must be judged in practical as well as legal terms. *See* section IV A, *infra.* Defendants pointed out that the cuts in support services have been far greater in the regular public schools of the city. Given the city's fiscal constraints, they claim an inability to do more for the special day schools. *See* Part VI, *infra.*

### 6. Lack of Curriculum, Extra-curricular Activities and Special Programs

While facilities vary widely from school to school, each one maintains at least some form of academic program emphasizing reading and mathematics. There are additional offerings in social studies, science and hygiene.

The handling of curriculum varies from school to school. Some principals have instituted unorthodox patterns in an effort to accommodate the peculiar needs of their student populations. For instance, Dr. Martin Groveman, principal of PS 36K, an intermediate school with pupils ranging in age from approximately ten to fifteen, runs an ungraded program. Although all the students fall within a grade range of five through eight, they are not necessarily grouped in classes corresponding to these ages and grades. Rather, placement is dictated by the child's individual needs. Factors such as the student's and teacher's personalities are considered. Often the aim is to neutralize students' acting out by putting aggressive children together and protecting the less aggressive from the others. Testimony of Dr. Martin Groveman, transcript at 2241-42.

Marjorie Louer, principal of PS 371, allows the students to work out their own choice of curriculum, beyond basic prerequisites, in an effort to generate interest and participation. Transcript at 2361-63.

In P 8M, Dr. Esther Rothman's school, there is also freedom to work out individual courses of study, but in an even more unorthodox fashion. When questioned about the organization of curriculum in her school, Dr. Rothman testified:

> . . . there are no schedules and no 45 minute periods. The teachers are in their room, it is like a schmorgasbord, the cafeteria here, I am to teach this, and the students come in and decide where it is they are going to go. After they have planned it they can go from one room to another, one student can decide to spend two hours in the gym and then can go to reading for a half hour and go somewhere else for English, and the students move in and out of the classrooms as they have planned their day in the morning, which makes teaching extremely individualized and very difficult.
>
> Q. What is your approximate teacher-student ratio at any given time?
>
> A. It can range from one to one, because at that time the teacher is working alone with a child, to ten in a room and

above ten, I would say is too high, we can't do it because you cannot give that intense individual instruction.

> Q. Why is it that type of individualized program that you offered to your students?
>
> A. Because again it is a matter of finding first what they can learn, getting self-esteem through learning, finding a relationship with the teacher through a subject matter, and most importantly because it is a decision they have made to learn for the first time. Many of the students feel they can really work, they choose, they have power over what it is they decide to learn, so even if the student, you know, goofs off and decides to roam the halls, which certainly happens, or decides to do anything else, the answer then is—and they will come in screaming, you know, you make me sick, I'm not going to do this, well, the answer is who made you do it, you made the decision, not to go to class. We work with every behavioral decision that a student makes because a part of their problem is that not understanding and not realizing that everything that they do is really something they have decided to do and that nobody can make them do anything, and that is what we work with.
>
> Q. Did I understand your testimony correctly to be that the key element to insure academic success among your students is to make sure that they feel good about themselves and that they do succeed at their academic work and that they are listened to and that there is a voice to listen to their feelings.
>
> A. Yes, that is . . . [the] key. . . .

Transcript at 2956-58.

English and mathematics are core areas requiring great attention. Many of the children referred to the schools are seriously deficient in these basic skills due to poor attendance and lack of attention and motivation in the regular schools. *See, e. g.,* "Anker Acts to Raise Diploma Standards," N.Y. Times March 22, 1978, p. 1, col. 2 (citing dissatisfaction with lack of graduates' competence in reading and mathematics by colleges and business).

To help ameliorate these problems, all schools are supposed to have some form of remedial reading laboratory staffed by special reading teachers and some special mathematics laboratories. The programs, however, have been the victims of fiscal constraint. Testimony of defendants' witnesses indicates that at present the facilities are inadequate to meet the needs of all students.

For example, Ms. Louer's, Dr. Groveman's and Dr. Walker's schools have recently lost their mathematics laboratories because of monetary cutbacks. This leaves only three schools with functioning mathematics laboratories. Similarly, Ms. Louer testified that she can no longer operate the reading laboratory at her school as often as would be desirable because of cutbacks in the remedial reading staff. Transcript at 2471.

None of the principals were willing to state that these shortages made their programs ineffective or totally jeopardized a therapeutic atmosphere. They did admit, however, that the loss of these special services makes it more difficult to maintain effective programs for every child.

Each school offers some non-academic programs. These include: music and art, shop and home economics, animal care, auto shop, typing, and a multi-media program. As of March 1978, four schools have a fine arts program and eight have instrumental music. The shop offerings vary. Ten schools have woodworking; five ceramics, two metal work, seven general crafts and one upholstery making. In home economics one school offers a program in dressmaking, one in baking, one in sewing, one in beauty culture and one in home maintenance.

Some schools have special programs involving out of school experience. In P 8M there is a work-study program and driver's education; P 36K offers a swimming program at a neighborhood pool. These programs are aimed at increasing motivation by integrating learning with practical and appealing activities. Students may be rewarded for particularly good behavior or attendance by the opportunity to participate in one of the special programs.

The evidence suggests, however, that the existence of a program on paper does not necessarily reflect the day-to-day functioning of the school. Here the vicious cycle of crime that impoverishes so many aspects of city life has an impact. Dr. Groveman, principal of P 36K, for example, testified that because of a break-in resulting in the theft of many instruments, his instrumental music program has been discontinued. The instruments have not been replaced although the break-in occurred two to three years prior to his testimony. Other break-ins have resulted in the loss of typewriters and shop equipment in his school. Transcript at 2316–17. In one school for girls the Court observed typewriters and sewing equipment locked up so that students could not practice at will, all because of frequent break-ins and thievery.

Dr. Alexander Walker, principal of P 58M, testified that in his 1976–77 Annual Report submitted to the Board of Education last year, he expressed a need for several staff positions, including an employment counselor to help the students find part-time jobs which Dr. Walker sees as a necessary part of their development. He also needs a general mechanics teacher and a photography and a communications laboratory teacher. Each of these individuals are needed to conduct a special activity but none of the positions have been filled. Transcript at 2713–21. Dr. Dorothy Arnsten, psychologist at P 12X, testified that the ceramic and metal shops at that school are not functioning at present because of inadequate staff. Transcript at 2895.

Each school offers some kind of physical education program and has an interior play area. However, four of the schools, P 36K, P 369K, P 9Q and P 8M (girls), are not equipped with bona fide gymnasiums. P 370K has no physical education teacher. The importance of physical activity as part of a total therapeutic environment for these children is recognized. Testimony of Dr. Florence Halpern, Transcript at 3118–19. *See also In the matter of the Appeal of Louise M.*, N.Y.Comm.Ed.Dec. No. 9468,

(1977) ("it is clear that the education of the handicapped child encompasses more than core curriculum instruction"), *cited in* V. Garfinkle, "Recent Developments in the Law on the Education of Handicapped Children in New York State," 22 (1978) (unpub.).

The lack of staff and facilities in these schools is disturbing. Fiscal constraints are relied upon as the main justification.

### 7. *Lack of Use of Private Institutions by Minorities to the Same Extent as the Middle Class*

The evidence reveals that self-selective factors account, at least in part, for the racial disparity in the special day schools. In particular, middle class parents are more likely than others to have the wherewithal to contest placement in a special day school. Their reasons for doing so sometimes include a reluctance to place their children in a school populated overwhelmingly by poor minority students. The result may be that the child remains in the regular school. Alternatively, the parents may place their children in private schools. To the extent that tuition is paid by the parents, this phenomenon is an unavoidable result of their constitutional right to select a school for their children.

Substantial testimony was developed, however, indicating that the middle class is able to manipulate the system to provide public funding for this escape from public schools. Since the White middle class is proportionately greater than the Black or Hispanic middle class, this results in a greater concentration of minorities in the special day schools. A good illustration of the way in which this self-selection takes place was provided by a lay member of a COH. Ms. Margaret Whelan, herself the parent of a learning disabled child, testified that most often it is the White middle class parents who select Option Two of the Option Letter and object to recommended special education placement. If they then can prove successfully that alternative placement is better for the child, funding will be provided:

I remember several cases where there was a misdiagnosis by the evaluation unit and the parents brought in private diagnosis which refuted that diagnosis.

Q. Let me ask a question on that. Do you find that white parents more readily go out and obtain private diagnosis, to back up their . . . argument that contracting out is appropriate?

A. I find middle income parents, yes.

. . . . .

Q. Those are more whites than Blacks?

A. Yes.

. . . . .

Q. Do you find that the appeals are predominantly white or middle class?

A. Yes, generally.

Q. Do you believe that's also based upon the white parents' or middle income parents' ability to manipulate the system?

A. I think so.

Transcript at 3542–43, 44.

Ms. Whelan stated that White parents may also place their children in private schools while an evaluation is proceeding and then argue, in an attempt to secure reimbursement rather than public special school placement, that the child's education should not be disrupted. Transcript at 3543.

Similarly, White middle class students may find themselves treated privately because their parents are more likely than others to understand that, according to the Commissioner of Education's mandate in the latest *Riley Reid* order (section II B 1, *supra*), if a child is not evaluated and placed within 60 days he is eligible for private placement at Board of Education expense. Ms. Whelan testified that parents who are sufficiently informed can take advantage of the two to three month backlogs at most EUs to effect private placement of their youngsters. These parents, most often White and middle class, use the 60 day rule to avoid placing their children in largely minority special schools:

[D]o you find that white parents or middle class, who are more white I assume, more readily take advantage of the 60 day rule?

A. Oh, absolutely.

Q. More than the minority parents?

A. I don't think the minority parents are aware of it.

Q. Why do you think they're not aware of it?

. . . . .

A. I think perhaps they're less aware of the whole process. Because of the problems with their lives.

Q. Do they have more difficulty in dealing with the—let's say educational bureaucracy?

A. I think they. definitely do.

. . . . .

Yes, parents who understand the law know that if a child is not placed within 60 days, that they can use that as a basis for asking for funding for private—special private school, and quite often when we have been approached by parents for that type of funding, they have used that flaw in the process.

Transcript at 3541–42, 3521–22.

There is, moreover, little financial disincentive to placement of children in a private school. A report issued in 1978 by the Officer of the Comptroller of the City of New York established that the effect of the New York State system of fiscal grants to the City is to favor education of the handicapped in private schools because a far greater proportion of aid is furnished by the state for the privately educated handicapped child than for the publicly educated handicapped child. *See* Report, Comptroller of the City of New York, *Policy Analysis of the Cost and Financing of Special Education to Handicapped Children in New York City* (mimeo. 1978). Even though the educational cost per handicapped child may be greater in private than in public schools, the City apparently saves funds by having handicapped children transferred from public to private schools. Thus, although the state system itself is not intended to favor White, middle class children, the program of state grants may encourage transfer of non-minorities out of the public system.

The Court took cognizance of the dangers involved in this tendency. It requested counsel for the defendants to bring the Court's concern with this possible misuse of public funds to the attention of the appropriate city, state and federal authorities. In response to this request defense counsel wrote to the New York Regional Director of the Office of Civil Rights of H.E.W. and to the New York State Commissioner of Education. Each letter referred to Ms. Whelan's testimony and the Court's concern over the questions raised by it. In their responses neither state nor federal authorities acknowledged any power to affect this situation. Nevertheless, the State Commissioner of Education appears to be cognizant of the problem. Outside the City of New York, where waiting lists apparently are not as long, he has strongly discouraged use of private schools at public expense. *See* V. Garfinkle, "Recent Developments in the Law on the Education of Handicapped Children in New York State," 52–53 (1978) (unpub.).

A specific example of how members of the middle class, who tend to be more aware of their rights, act to increase the proportion of White children assigned to private schools at public expense was given by Ms. Whelan:

Q. Have you ever had occasion where you have recommended private school placement where a family or child refused to be placed in a class for the emotionally handicapped?

A. Yes, we had one case which was very troublesome to us. It was a teenage boy, high school age, who had various problems. He had been certified as emotionally handicapped and the recommendation from the evaluation unit was a class for the emotionally handicapped in a large public high school. He had . . been in and out of school. He had attended private schools and public schools, and he apparently had had very bad experiences in public schools. He was a

white middle-class boy and I don't know how much was perhaps his problem, his personality problem but he seem to get into trouble with low-income minority group children. He was afraid to go to a large public school and he refused to go and he actually had been out of school for about, I think six months and the parents didn't seem to be able to make him go.

And on that basis the parents asked for funding for the Robert Louis Stevenson School, which is a private special school, and we were extremely reluctant to give the funding. We felt that somehow we were aiding the segregation of the public school, but our job is not to integrate the schools. Our job is to look at the welfare of the individual child, and as such we felt we had no choice. The boy simply would not have gone to school. There was no question in our minds about that.

So we felt that the only way to get him back into school was to put him into the private school. Very reluctantly we did that.

Transcript at 3527–28.

Another factor contributing to this problem is a tendency of some members of minority groups to be inhibited in disagreeing with authority, particularly when that authority is White. *See, e. g.,* I. Katz, "Effects of Desegregation on the Intellectual Performance of Negroes," in A. H. Passow, M. L. Goldberg, A. J. Tannenbaum, *Education of the Disadvantaged, A Book of Readings,* 140–143 (1967); J. I. Roberts, *School Children In the Urban Slum,* 209 (1967) (higher status people tend to be more aggressive in interviews). This pattern of not contradicting Whites in authority may have substantial effects when the parents are overwhelmingly minority group members and the professional staffs are just as disproportionately members of the White middle class.

The results of these factors are revealed in the statistical tables set out below. They show a much higher proportion of White students receiving public funds in the private schools than Whites in the public special day schools. Defendants argue that in the private schools the students' emotional problems may be more complex and the proportion of students with multiple problems greater than in the public schools. But such factors do not reduce the probative force of these statistics. The evidence suggests that minority pupils have more complex and more multiple problems than Whites. *See* Part III G, *infra.* The statistics for private schools set out below, compared to those for the public schools referred to earlier, in addition to other evidence in the case, strongly suggest that public money is being used to support private schools utilized by relatively higher proportions of White students who wish to avoid the segregated special day schools.

Catholic Archdiocese Schools

| | Students in special education classes | | Students publicly funded | |
|---|---|---|---|---|
| | No. | % | No. | % |
| Hispanic | 68 | 46 | 17 | 44 |
| Black | 30 | 20 | 8 | 20 |
| Asiatic | 3 | 2 | 3 | 8 |
| White | 48 | 32 | 11 | 28 |
| | 149 | 100% | 39 | 100% |

The following table includes data from the following non-archdiocese schools: Henry Street School, Linden Private School, Horizon School, Institute of Applied Human Dynamics, Kaliski School, The Lorge School, Madonna Heights School, Murray Hill Classes, New York University School of Continuing Education and Extension Services: The Reading Institute, Staten Island Aid to Retarded Children, Inc., United Cerebral Palsy of New York City, Inc., Association for the Help of Retarded Children, Northside Center for Child Development, Inc., the Alternative School and Day Treatment Center, Association for the Advancement of Blind and Retarded, Inc., Brooklyn Hebrew School for Special Children, The Buckingham School, Educational Institute for Learning and Research, Stephen Gaynor School, Hebrew Institute for Deaf and Exceptional Children.

Children in Twenty Private Non-Archdiocese Schools
(Based on raw data estimates supplied by schools)

| | Total Register | Black No. | % | Hispanic No. | % | Oriental No. | % | White No. | % |
|---|---|---|---|---|---|---|---|---|---|
| Total School Register | 2073 | 729 | 35% | 356 | 17% | 14 | 1% | 974 | 47% |
| Publicly Funded Handicapped Children | 1476 | 546 | 37% | 309 | 21% | 14 | 1% | 607 | 41% |

Private schools which were requested to furnish data but have not responded include: Reece School, Robert Louis Stevenson, Rugby School, Lowell School, Martin de Porres School for Exceptional Children, High Valley School, M.E.N.D. School for Exceptional Children, Churchill School, Hebrew Academy for Special Children, Guild for Exceptional Children, Hallen Center for Education, Harlyn School, Archway School, Avard Learning Center, Institute for Industrial Rehabilitation, Maimonides—Far Rockaway, Beaumont School, St. Vincent's Private School, Summit School, Samuel Field YM—YWHA, and Shield Institute for the Retarded. A number of the private schools which have not responded to the Court's request for an ethnic census are predominantly or wholly White.

It is true that the above figures are somewhat ambiguous in that the private schools serving students through "contract aid" have pupils with a variety of handicaps, including, but not limited to, the emotional and behavioral problems suffered by those referred to the special day schools. This point was emphasized by defendants, who illustrated it by reference to the Adams School, recently closed for reasons unrelated to this lawsuit. The school enrolled four types of handicapped children in their "contract aid" program: emotionally disturbed children (similar to those in the special day schools), NIEH children, children with retarded mental development, and HC–30 children. The table which follows reveals that the total Adams School population was 73% minority (49.5% Black, 23.5% Hispanic) and 25.6% other (White). When we focus, however, on the special day school population of the Adams School (those with emotional disturbances only), we find that 91.8% of such students are minority (62% Black, 30% Hispanic) and 8.2% other (White).

ADAMS SCHOOL

| | Black | Hispanic and Hispanic surname | Other | Oriental | Total |
|---|---|---|---|---|---|
| Total Population | 137 49.5% | 65 23.5% | 71 25.6% | 4 1.4% | 277 100% |
| Special Day School Eligible Population | 46 63.0% | 21 28.8% | 6 8.2% | – | 73 100% |

Thus, while reference to racial statistics for the total Adams School population seems to indicate that a certain percentage of White students do in fact "escape" from the special day schools through the contract aid program, once we focus on those racial statistics which concern only the special day school population we find a far closer correlation between the minority population in the special day schools (95%) and the minority population in this particular publicly funded program (92%).

Despite defendants' contentions, we find that the trial testimony and exhibits, together with the Court's own field observations referred to in this opinion, support the

charge that as a consequence of defendants' practices and procedures a substantial percentage of White pupils, receive care in private institutions at public expense, while a higher percentage of minority students with equivalent problems are referred to the more heavily minority public special day schools. In the reporting private day schools for the emotionally handicapped, as of June 30, 1977, the White population ran from a low of 6 percent to a high of 94 percent and averaged 50 percent White. Forty-five percent of the publicly funded children are White—a striking discrepancy from the 5 percent White students in the special day schools. No errors in calculation or analysis provided by defendants explains this gross difference.

### G. *Explanations for Discrepancy in Percentage of Minority Students*

Defendants' witnesses almost uniformly point to two interlocking phenomenon when confronted with a demand for an explanation of the disproportionately high percentage of minority students in the special day schools. First, it is argued, individuals from the low socio-economic backgrounds of these children may be more prone to emotional disturbance and behavioral maladjustment leading to special day school placement. Second, defendants claim that non-minority parents confronted with a socially maladjusted child are often prone to fight to keep the child from being placed in the heavily minority special day schools. As noted in section III F 7, *supra*, these non-minority parents are more apt to have the skill needed to manipulate the system and avail themselves of private schools at public expense. Alternatively, middle class families, the majority of whom are White, are likely to have the means to pay for private treatment for their children should public funds not be forthcoming. In addition, many of these parents contest placement so that the child remains in the regular school or in an alternative program within the public school system. Certain of defendants' witnesses admitted that White parents visiting the special day schools object to the program because they are reluctant to place their children in a predominantly Black and Hispanic setting. Ms. Delia Duggan, a social worker at the EU in Staten Island, which serves a primarily White middle class community, testified that these parents often oppose special day school placement for their children because they do not want them bussed off the island. Transcript at 3403.

These two factors, the environmental and the self-selective, constitute defendants' explanation of the overly high proportion of minorities in the school. The following excerpts from one witness' testimony are typical:

THE WITNESS: The sociology and anthropology of our city . . . . [There are] people who are totally overwhelmed, and cannot make a living adequately or decently and cannot live in housing. When you get a middle-class parent who cannot afford to have private treatment, or even afford to take a child who is running away from home—a girl, for instance. Some of the middle-class parents will take this destructive child or disquieting girl and she gets into a private school or even goes to live in a commune somewhere. Now, the families—the people of the poor don't do this. They don't have the money to do it and the resources or even the understanding of how to do it. They feel totally overwhelmed by our city structure which is coming down on them. So we get the students who don't know the resources to get treatment or placement . . . .

Q. Dr. Rothman, in your opinion could poverty and/or discrimination contribute to the mental illness or emotional disturbance among the population?

A. Of course it would in terms of the students I see coming to the special school. They are mainly the children of poverty and of discrimination. And these are families who feel that no matter what access they have, or rather, they feel there is no access to climb out of poverty because of the discriminatory practices.

So the society in the city in which we live, which makes it very difficult, if not impossible, to climb out of poverty via education, via jobs, via housing, produces a group of people, a group of students who feel extremely powerless, extremely frustrated, extremely depressed, apathetic, which creates violence, which creates aggression, which creates what would then become emotional disturbance.

Q. Why is it the child who comes to [a special day school] needs more nurturing than that available in the regular school?

A. Each student comes with a tremendous history of emotional deprivation in addition to the social deprivation or the economic deprivation. We have the students who are the foundlings who never knew who their parents were or who a parent was. These are the students that come from homes which have had no emotional stability, who have had a series of either mothers or fathers or other relatives. These are students who live with street culture, violence, crime, who have learned to survive by wit and coping [with] methods of the street.

So they need more than just reading, writing, arithmetic. And they need more than the traditional support of a guidance counselor in the regular school system. They need to learn emotional mechanisms in dealing with the injustices of their lives . . . in a way that is not self-destructive and in a way that is not destructive to society. We have to teach alternate ways to crime.

Testimony of Dr. Esther Rothman, transcript at 2924, 2927–28.

Dr. Abraham J. Tannenbaum, a psychologist who appeared as an expert witness for defendants, gave the following explanation for the racial disparity in the special day schools:

Q. Can you give us your impression as to why [this disparity] has occurred?

A. Well, I believe that these children have been victimized by socio-economic problems in their communities, breakdown of family structures.

I also believe that there is an overlay of racism that these children are victims of and that we have perhaps misinterpreted or not interpreted accurately the effects of racism. That these children, if they are victims of racism, are under a more serious handicap than even if they are victims of poverty.

Therefore, it doesn't surprise me that some of these children would have to be referred to special schools. They are reacting to the conditions of their lives. Transcript at 3603–04.

The Court takes judicial notice of a considerable body of psychological and sociological literature suggesting that children from low socio-economic backgrounds and, in particular, students from minority groups, may as a consequence of their environment, suffer considerable behavioral disorders and emotional problems. These writings lend support to defendants' environmentally-based explanations of the racial disparity in the special schools.

In the discussion which follows we stress negative aspects of some minority children's environment. But the many children from these "disadvantaged" backgrounds who adjust well to school and life in general should remind us of the strengths of expanded ghetto families and the "security and protection" of this "small" "safe" world. F. Riessman, *The Culturally Deprived Child*, 36 (1962). Different is not necessarily worse. *See, e. g., Hurley v. Van Lare*, 380 F.Supp. 167, 171 (E.D.N.Y. 1974) (poor people more apt to share limited assets). There is a danger in overstating the difficulties to the point of encouraging hopelessness.

It is commonly recognized that crowded and inadequate housing facilities, economic insecurity, broken homes, neglect and physical punishment often resorted to by harried parents, can lead to emotional distress, behavioral disorders and delinquency. S. A. Kirk, *Educating Exceptional Children*, 397–400 (2d Edition 1972); M. L. Goldberg, "Factors Affecting Educational Attainment in Depressed Urban Areas," in A. H. Passow, M. L. Goldberg, A. J. Tannenbaum,

*Education of the Disadvantaged, A Book of Readings,* 49–50 (1967); F. Reissman, *The Culturally Deprived Child,* 36, 42 (1962).

Poor health—both physical and psychic—is said to be much more common in the ghettos than in other areas of the city. Infant mortality in Harlem is, for example, more than twice the average for the City as a whole. N.Y. Times p. 1, col. 1, April 10, 1978. This is a result of:

> [I]nadequate diets and debilitating living conditions in the community's badly heated and maintained housing stock.
>
> The unhealthy life style followed by the section's large population of alcoholics, drug addicts and street people.
>
> The absence of a good system of health care.

*Id.* at col. 2.

In New York City the overwhelming number of children who are victims of such environmental conditions are minority students. Although experts in this area of education have cautioned against putting too much stress on environment as the explanation of the problems of minority pupils, as opposed to the often poorer quality of the school facilities and instruction, no one seems to deny that environment does play a substantial role. *See, e. g.,* K. B. Clark, *Dark Ghetto* (1965).

There is, in addition, a commonly recognized conflict between the orientation which children from some low socio-economic backgrounds experience in their homes, and the largely middle class values characterizing school. This radical incongruity between life inside and outside the school has been true for almost all first and second generation immigrants where a foreign language is spoken at home, parental pressures are for work rather than study and street pressures may be for violence, not quiet introspection. Many Blacks in the City of New York, although their American lineage is long, are from families which migrated relatively recently from the rural south; they have many of the same problems as immigrants—problems compounded by the burdens of racial prejudice.

The conflict between school and the rest of the child's life causes an inability to adjust to academic requirements on a variety of levels. One manifestation of the problem relevant for our purposes involves attitude toward authority. It has been noted that:

> [w]hile the lower class parental and societal authority is not supposed to be questioned, it is something that can be 'gotten around' when nobody is watching. Authoritarianism indicates an underlying disrespect for all constituted authority and only a thin shell of superficial conformity hides the violent impulses that sporadically break through.

T. S. Langner, "Socio-economic Status and Personality Conflicts," in J. I. Roberts, *School Children in the Urban Slum,* 208 (1967). In psychological terms, the lower class individual is regarded as more likely to have a poorly internalized superego. This may be caused by parentally imposed physical punishment, punishment more direct and external than that experienced by middle class children.

> The child who is physically punished without the threat of loss of love will play according to the rules only as long as the policeman is watching. The middle class child, on the contrary, has internalized the policeman, and will stick to the rules even if nobody is looking. This quality in itself is necessary for success, as defined by the middle class in our culture.

T. S. Langner, *supra,* at 202. The poor internalization of the superego has been cited as at the root of "[s]uch phenomena as psychopathy, 'acting out,' dissocial behavior and delinquency. . . ." *Id.* at 204.

Disadvantaged children may act out in class as a reaction against insufficient control. There is a theory suggesting that in lower class culture a close conceptual connection is made between authority and nurturance, between control and being cared for. This, in turn, produces frequent attempts to test the severity of authority to see if it remains firm. If rebellion produces swift, firm punishment the individual is re-

assured of affection at the same time he complains of the injustice of being caught. Some environments, tested for strictness, may be rejected

> ostensibly for being too strict, actually for not being strict enough. This is frequently so in the case of "problematic" behavior by lower class youngsters in the public schools, which generally cannot command the coercive controls implicitly sought by the individual. . . .

W. B. Miller, "Lower Class Culture as a Generating Milieu of Gang Delinquency," in S. Dintz, R. R. Dynes, A. C. Clarke, *Deviance, Studies in the Process of Stigmatization and Societal Reaction,* 158, 166 (1969).

In addition, the lower class child has been identified as present-oriented, less likely to see the value of planning ahead than would his middle class counterpart, who is more apt to perceive the rewards of "good" behavior. The desire for satisfaction of present needs, the perceived futility of self-control, obviously contribute to behavioral disorders within the school environment where restraint is prized.

> It should be clear that lofty aspirations and limited realistic opportunities are precisely the conditions which invite social deviant behavior. For people with limited opportunities, continued effort toward accepted goals using only the approved methods, while socially appropriate, may lead to personal disorganization. The poor reality testing and high unrealistic goals observed in many atypical children illustrates this.

M. J. Trippe, "The Social Psychology of Exceptional Children, Part II" in J. P. Glavin, *Major Issues in Special Education,* 19 (1973). *See also* S. A. Kirk, *Educating Exceptional Children,* 398–99 (2d Edition 1972). As noted elsewhere, many of the children referred to special day schools exhibit an inability to postpone satisfaction of immediate desires.

For the Black child, faced with the additional problems of widespread racial discrimination, the chasm between home and community and school is even wider than for the poor child generally. This may cause substantial behavioral disorder and alienation from school.

> . . . The more constricted an individual's frame of reference and the greater its distance from the cultural mainstream, the less meaningful and the less effective are the dominant cultural values that impinge on him in the schools and other social institutions. Certainly the Negro group is the one most consistently barred from the 'cultural mainstream' and thus, the least amenable to the values and teachings of the school . . .

M. L. Goldberg, "Factors Affecting Educational Attainment In Depressed Urban Areas," in A. H. Passow, M. L. Goldberg, A. J. Tannenbaum, *Education of the Disadvantaged, A Book of Readings,* 49 (1967) (citations omitted). *See also,* M. Deutsch, "Minority Groups and Class Status As Related to Social and Personality Factors in Scholastic Achievement," in M. Deutsch, *The Disadvantaged Child, Studies of the Social Environment and Learning Process,* 89, 102–103 (1967).

This difference in style and even in language between lower and dominant classes is a worldwide phenomenon creating serious teaching problems. *See Hart v. Community School Board of Education, N. Y. School District # 21,* 383 F.Supp. 699, 746–47 (E.D. N.Y. 1974), *aff'd,* 512 F.2d 37 (2d Cir. 1975); J. Kandell, "Dutch School Uses Working-Class Speech to Help Pupils," N.Y. Times, May 9, 1978, p. 2, col. 3. *Cf. Martin Luther King Junior Elementary School Children v. The Michigan Board of Education,* 451 F.Supp. 1324, 1328–1330 (E.D.Mich. 1978) (students with only "Black English" background may prove violation of equal education opportunity guaranteed by 20 U.S.C. § 1703(f), imposing responsibility on educational agencies to overcome language barriers where equal participation by students in instructional programs is impeded).

The pattern of Black family life has been cited as contributing further to these children's problems in school.

> . . . the lower-class Negro child entering school often has had no experience

with a successful male model or thereby with the corresponding psychological framework in which effort can result in at least the possibility of achievement. Yet the value system of the school and of the learning system is predicated on the assumption that effort will result in achievement.

M. Deutsch, "The Disadvantaged and the Learning Process," in M. Deutsch, *The Disadvantaged Child, Studies of the Social Environment and the Learning Process,* 39, 43 (1967).

Sociologist Dr. Kenneth B. Clark has explored the existence of self-hatred among Black children. This syndrome, present among children of any group whose parents occupy inferior social, economic and educational status, may be particularly acute among some Blacks, who face greater barriers in seeking increased economic status and assimilation into the dominant culture. Frustration and self-hatred often produce hostility and aggression. As Dr. Clark puts it:

> To the extent that Negroes as a group are still bombarded with negative social pressures, to this extent a relatively large minority of them will be driven to express their humiliation and defiance in self-destructive and anti-social behavior. . . . Generally accepted social values have significance for accepted individuals, but little meaning for those who are rejected and involuntarily isolated from society's benefits. The rejected individual must either construct for himself or acquire from his narrow environment new values appropriate to his restricted and inferior status. These new values may be anti-social. But they strengthened his ego. They tend to give him some security, prestige, and status within the caste to which he has been relegated. It is possible that his disregard for property rights stems from a basic desire for revenge and aggression against something considered so important by the society which has humiliated him.

K. B. Clark, *Prejudice and Your Child,* 52–53 (1955).

The relationship between low academic achievement and behavioral and emotional disorders has bearing here as well. A plethora of sociological and educational studies provides solid support for the proposition that children from low socio-economic backgrounds tend, for a variety of reasons, to do more poorly academically than their middle class counterparts. This, in turn, causes increasing frustration and alienation from the school environment.

The lack of achievement in early grades stems from many of the same causes already cited as directly responsible for emotional and behavioral disorders. These include an environment often bereft of verbal and instructional stimuli, where language development and study habits necessary for scholastic success are disregarded. M. Deutsch, "The Disadvantaged and the Learning Process," in M. Deutsch, *The Disadvantaged Child, Studies of the Social Environment and the Learning Process,* 39–57 (1967); J. McVicker Hunt, "The Psychological Basis for Using Pre-School Enrichment As an Antidote for Cultural Deprivation," in A. H. Passow, M. L. Goldberg, A. J. Tannenbaum, *Education of the Disadvantaged, A Book of Readings,* 203–04 (1967).

Discrepancy between the values and surroundings of the disadvantaged pupil's home and those represented by school has been recognized repeatedly as responsible in large part for an inability to cope with normal classroom work. There is an absence of the preparation for the school experience, which is built into middle class homes. This deficiency has been shown to be causally related to low scholastic achievement, particularly among lower class Blacks. M. Deutsch, "Minority Groups and Class Status As Related To Social and Personality Factors In Scholastic Achievement" in M. Deutsch, *The Disadvantaged Child, Studies of the Social Environment and the Learning Process,* 89–143 (1967). Difficulties may be compounded by a pupil's perception that teachers who prize academic excellence are reacting negatively. These factors contribute to a poor self-image, further depress achievement, and form

a vicious circle. *Id.;* H. H. Davidson and G. Laing, "Children's Perceptions of Their Teachers' Feelings Toward Them Related to Self-Perception, School Achievement and Behavior," in J. I. Roberts, *School Children in the Urban Slums,* 222, 224 (1967).

In the absence of substantial enrichment programs in the early grades and a conscious effort on the part of teachers to combat the problem of cultural deprivation and poor self-image, the achievement dilemma worsens. By the time the pupil reaches secondary school underachievement may evolve into alienation from school, compounding emotional and behavioral problems. It has been noted:

> Early difficulty in mastering the basic intellectual skills which the schools and thus broader society demands leads to defeat and from there, a developing negative self-image, rebellion against the increasingly defeating school experiences, a search for status outside the school together with active resentment against the society which the school represents . . . Realistic or perceived barriers to social mobility through legitimate channels, one of which is longer years of schooling, weakens the drive to succeed at school, especially since success requires skills which the disadvantaged youth has often been unable to master.

M. L. Goldberg, "Factors Affecting Educational Attainment In Depressed Urban Areas" in A. H. Passow, M. L. Goldberg, A. J. Tannenbaum, *Education of the Disadvantaged, A Book of Readings,* 50 (1967). *Cf.* C. A. Murray, Report, "The Link Between Learning Disabilities and Juvenile Delinquency, Current Theory and Knowledge," 1265–68 (mimeo. 1976) (survey of studies on the connection between learning disabilities—disorders in one or more of the basic psychological processes involved in understanding or using spoken or written languages—and juvenile delinquency suggesting that, despite a lack of hard proof casually relating the two problems, virtually all delinquents have histories of some learning problems and may have specific learning disabilities).

The relation between underachievement and behavioral maladjustment or aggressive delinquency is underscored by psychologist S. A. Kirk. Dr. Kirk attributes these disorders, at least partially, to psychological factors, including frustration caused by placement in "situations which are too difficult for their capabilities or in which they are unable to satisfy their motives and drives." S. A. Kirk, *Educating Exceptional Children,* 396–97 (2d Edition 1972).

It is clear that Puerto Rican or other Hispanic children from the Western Hemisphere, who in New York City are most often members of a low socio-economic stratum and often in the throes of accommodation to a new culture, suffer from some of the same deprivations and sense of alienation as do Blacks; they too have behavioral and learning problems. *See, e. g.,* S. L. Elam, "Acculturation and Learning Problems of Puerto Rican Children," in W. Webster, *The Disadvantaged Learner: Knowing, Understanding, Educating,* 296 (1966). The disproportion of Hispanics in special day schools as compared to public schools generally is not, however, as great as it is for Blacks.

Testimony relating to three Black families poignantly illustrated how the fate of children in school is heavily influenced by the home environment.

One plaintiff and his mother took the stand. The pupil had been suspended from school, referred for evaluation and then recommended for placement in a special day school after allegedly having thrown a metal object at a teacher in the regular school. The child had had a history of behavioral problems, having been suspended twice from junior high school.

His mother, however, opposed the recommendation for special day school placement and instituted a state court action to contest it. As a result of that proceeding, her son was not sent to a special day school. Instead, he was reassigned to another regular junior high school. Plaintiff is now in the ninth grade at the regular school and has had no severe behavioral problems. During the course of the plaintiff's testimo-

ny, the Court asked him to read part of a newspaper article and his reading ability was good.

The mother, who took the stand after her son, appeared to be an intelligent and aggressive woman; the family life as she described it was a stable one. The parents were concerned with their son's problems and ready to take affirmative steps to assure his progress through school. Her testimony did reveal some confusion on the extent of notice and opportunity for a hearing available to her; had she understood the available procedures, the need for court action to contest placement might have been eliminated. *Compare* transcript at 1036–37, 1041, *with id.* at 1046–47. Nevertheless, it is clear from this case history that, despite certain deficiencies in the system, the concerned and active parent can make it work for his or her child. Emotional, behavioral, and learning problems are not as serious as they might be if compounded by parental neglect.

Testimony of another mother, a defense witness, further illustrates the benefits accruing to a child who, despite behavioral problems, has an aware, concerned parent. In this case, the child had been having difficulty adjusting to the regular public schools; teachers constantly complained about his behavior. His mother took the initiative and made inquiries about possible special schooling. She was referred to a special school which she visited. Favorably impressed, she consented to have her son placed there. She has been attentive to his needs and he appears to be adjusting well and making progress. At the time of his testimony he was working and going to night school. His mother is a woman of limited means, with only high school education, separated from her husband. As she told the Court, however, the proper education and care of her children are her overriding concern.

> My children come first. They are number one to me. My kids are me. In order for me to neglect my children I have to neglect myself. I put everything aside when it comes down to all four of my children.

Testimony of Lizzie Robinson, transcript at 3215. This is not to say that other minority parents are not equally concerned; the difference was that this parent had the spirit and ability to take on the system herself and make it work for her child.

A third case, emerging from testimony of another plaintiff and his mother (transcript at 1054–1108) represents a marked contrast to the other two. This child was transferred from a regular to a special day school in the sixth grade and then switched from one special day school to another when the first one was closed. At the time of the suit he should have been in the ninth grade. Instead he was attending no school due to a dispute with a teacher and his parents' consequent refusal to have him continue in any special school.

The initial recommendation for transfer to a special day school had been made by a psychologist the plaintiff had been seeing privately. This recommendation was then approved by the local school district. (At the time that this occurred, referrals were not preceded by EU diagnosis and COH approval. Recommendations for special education placement would be made by guidance staff or other professionals and were subject only to approval by the principal and school district.)

There was evidence that this plaintiff had had a history of emotional problems beginning in the first grade. He lacked the ability to sit still and concentrate in class, exhibited poor academic performance and had a record of sporadic attendance. The psychologist's study reported motor difficulty, a neurological problem. He also indicated that the pupil's problems in school could be traced largely to feelings of insecurity stemming from parental pressure and attitudes. It was felt that because of the parents' lack of understanding the situation had worsened over the years. In court, plaintiff appeared reasonably alert and his attitude was good, but when asked to read it was clear that he was functionally illiterate.

Although both this plaintiff and his mother expressed dissatisfaction with the special day schools, there was evidence that attempts to reach the parents to take action on the child's problems had gone unanswered. Reports by educators who had observed the pupil in 1974 and recommended other placement had, likewise, been unheeded.

The mother's testimony revealed that the plaintiff came from a complete, upwardly mobile family unit, but that the mother's own emotional problems and the father's failure to give sufficient attention to his son had resulted in passive acceptance of his problems. The mother testified that she had refused to have the child attend the special day school because she felt that it offered no "quality education." Apparently, however, the father had consented to this placement and little if any effort had been made to change it. The result was that the child is now attending no school except for a reading tutorial program twice a week. This is clearly insufficient. *See* transcript at 1086–90; 1101–08.

It is apparent that this plaintiff's difficulties, both in the regular school and in his failure to derive benefit from alternative educational settings, were caused at least in part by his environment. The schools and private agencies had tried to help but the parents failed to respond. This is no criticism of the parents. Both worked hard. Both were concerned about their child. Neither was capable of coping fully with the strains of a hard life. It is not that the first two mothers loved their children more. It is only that this mother was less able to cope. It takes inner strength, skill and initiative to deal with the system and to obtain maximum advantage from it.

Nevertheless, all of this general and specific information does not answer fully the questions posed by the dramatic enrollment statistics of special day schools. There are many poor White families in New York City. For example, at one EU the Court observed, it heard discussions of cases involving families with Italian backgrounds suffering deprivations as great as those in Black or Hispanic families.

Plaintiffs contend that a discriminatory role played by teachers and administrators accounts in large measure for the minority disparity in the day schools. The field of literature referred to, *supra*, suggests that teachers drawn largely from the middle class may expect low achievement and behavior problems with lower class or minority pupils. The pupils perceive this and this leads to even worse behavior and poorer scholastic performance. H. H. Davidson, G. Laing, "Children's Perceptions of Their Teachers' Feelings Toward Them Related to Self-Perception, School Achievement and Behavior," in J. I. Roberts, *School Children in the Urban Slums*, 224 (1967); M. Deutsch "Some Psychosocial Aspects of Learning in the Disadvantaged," in M. Deutsch, *The Disadvantaged Child, Studies of the Social Environment and the Learning Process*, 31, 35 (1967).

The basic clash between the orientation of teachers and that of disadvantaged pupils may compound learning and behavioral problems in still another way. Martin Gerry, witness for the plaintiffs, testified that middle class teachers may be inclined to interpret behavior among minority students as disruptive and "acting out" whereas similarly motivated behavior among Whites or middle class children, more familiar to the teacher, would not result in categorization of the pupil as a discipline problem.

On direct examination, Mr. Gerry made the following observations:

One thing, one major thing that creates the problem between teacher and student can be the incompatibility between the way the teacher looks at education, the way the teacher looks at life and the way that the child perceives the same things. It can be a communication problem. It can be regarded by a teacher as a child being an aggressive or disruptive or uncommunicative or in having looked at— over my eight years with HEW, I would say almost, really, I would [see] thousands of folders where teachers have written down the reasons why they refer children for special education.

Almost all of them deal with some very subjective perception about the child['s] communication and interaction with the teacher. The first thing the system ought to do is to analyze the problem. That means looking not just at the child but looking also at the teacher. The teacher is part of the interaction. The teacher—you know, it would give you a totally distorted view to simply look at what the child contributes to the interaction.

It would be very interesting, for example, if this teacher and this often happens, has problems with a lot of children. It may be that the teacher and the style of the teacher, the inflexibility or the way in which the teacher goes about doing a job may contribute helpfully to what is then perceived as disruptive behavior. That may be a reaction in the clearest sense.

Testimony of Martin Gerry, transcript at 119–20. *Cf.* W. W. Charters, Jr. "Consequences of Educators' Social Position on the Teaching-Learning Process," in J. I. Roberts, *School Children in the Urban Slum*, 561–98 (1967) (suggesting clash between teachers' middle class values and those of disadvantaged children in the classroom but pointing to the lack of research concentrating specifically on this question).

Thus, although the reactions of teachers do not rise to the level of intentional activity which would justify a finding of unconstitutional discrimination in and of itself, the racial disparity is not entirely due to factors beyond defendants' control. The inevitable existence of some innate cultural bias, some misunderstanding of a student's behavior, necessitates checks on pre-diagnosis referral by teachers which often lead to special school placement. Also crucial is an unbiased system of diagnosis and effective full due process rights to notice and a hearing should a recommendation for special school placement be made.

### H. *Mainstreaming*

#### 1. *Theory*

Briefly, "mainstreaming" involves the integration of handicapped children into the regular classroom to the greatest degree possible. A discussion of this approach and the problems and legal implications it raises is essential to an understanding of the special day schools.

As a general proposition all agree that children with special educational needs, including the socially maladjusted and emotionally disturbed, should be served in regular classrooms and neighborhood schools insofar as these arrangements are conducive to good educational progress. In addition, it is acknowledged that supplementary services for exceptional children, or their removal from part or all of the regular school environment may be required. The continuum of acceptable educational programs designed to meet the needs of exceptional children, arranged from least to most restrictive, has traditionally been: 1) regular classroom; 2) regular classroom with specialist consultation; 3) regular classroom with itinerant teachers; 4) regular classroom plus resource room; 5) part-time special class; 6) full-time special class; 7) special day school; and 8) residential institutions. M. C. Reynolds, "A Framework for Considering Some Issues In Special Education," in J. P. Glavin, *Major Issues In Special Education*, 13, 14 (1973).

A standard conceptual approach to the utilization of these resources has been the "Cascade System". It has been described as follows:

The flow of service provisions in the cascade progresses from minimal to maximal. The regular classroom is the level at which the least amount of special resources are needed. There are, however, three modifications of the regular classroom which allow the minimally handicapped child the maximum opportunity to obtain and participate in a normal educational experience.

Modification I provides the regular classroom teacher with the opportunity to obtain consultation with a number of educational and related specialists in instructional materials, reading, psychology, guidance, speech, and others. In this

situation, the regular classroom teacher, who is ultimately responsible for the child, is searching for a better understanding of the child and his problems, and is seeking improved instructional and management techniques. Modification II involves itinerant specialists and differs from I in that these individuals actually work with the child. Modification III includes the placement of the child in a regular classroom, but with some time spent in a special resource area where specific remedial instruction occurs. Specialists working in this area confer with the classroom teacher, and together they plan appropriate programs for the child.

Children who cannot participate or achieve in one of the above modifications of the regular classroom can split their school day by spending part of it in the regular class and the remainder in a special class. In this program option, the special class is staffed by a trained special educator who works with the child in a special adaptation of the regular classroom program as well as other specialized instructional areas. Also in this situation, the special education and regular classroom teachers confer, and jointly plan to insure that the child is provided with a meaningful and coordinated education.

If a child is unable to participate successfully in most regular classroom activities, he may be placed in a full-time special education class where all of his education, with the exception of non-academic areas such as physical education, art, shop, and music, will be provided. In this placement the total curriculum is adapted to each child's individual needs. The special class teacher in this program is ultimately responsible for the children.

Special day schools for handicapped children offer facilities and programs generally unavailable in the regular school. These include . . . smaller pupil-teacher ratios, and the availability of greater amounts of supportive personnel. The children live at home and are frequently transported from large geographic areas extending beyond single school districts.

F. J. Weintraub and A. R. Abeson, "Appropriate Education for All Handicapped Children: A Growing Issue," 23 Syracuse L.Rev. 1037, 1040–41 (1972).

Recently, this scheme has been challenged by increasing numbers of special educators who feel that special day schools and other programs that remove mildly handicapped children from the "mainstream" may in many instances represent an unnecessary and undesirable educational tool, not part of a defensible and acceptable education scheme.

The following definition is a useful starting point for a discussion of mainstreaming as it bears on the issues before us.

Mainstreaming Is:

—providing the most appropriate education for each child in the least restrictive setting.

—looking at the educational needs of children instead of clinical or diagnostic labels such as mentally handicapped, learning disabled, physically handicapped, hearing impaired, or gifted.

—looking for and creating alternatives that will help general educators serve children with learning or adjustment problems in the regular setting. Some approaches being used to help achieve this are consulting teachers, methods and materials specialists, itinerant teachers, and resource room teachers.

—uniting the skills of general education and special education so all children may have equal educational opportunity.

Mainstreaming Is Not:

—wholesale return of all exceptional children in special classes to regular classes.

—permitting children with special needs to remain in regular classrooms without the support services they need.

—ignoring the need of some children for a more specialized program than can be provided in the general education program.

—less costly than serving children in special self-contained classrooms.

J. L. Paul, A. P. Turnbull, Wm. M. Cruickshank, *Mainstreaming, A Practical Guide,* vii–viii (1977) (citations omitted).

The movement reflects dissatisfaction with the way that special education programs have been handled to permit regular teachers to avoid problems they should be capable of dealing with. The following criticisms are typical:

> Special education is part of the arrangement for cooling out students. It has helped to erect a parallel system which permits relief of institutional guilt and humiliation stemming from the failure to achieve competence and effectiveness in the task given to it by society. Special education is helping the regular school maintain its spoiled identity when it creates special programs (whether psychodynamic or behavioral modification) for the "disruptive child" and the "slow learner," many of whom, for some strange reason, happen to be Black and poor and live in the inner city.

J. L. Johnson, "Special Education and the Inner City: A Challenge For the Future or Another Means for Cooling the Mark Out?," The Journal of Special Education 241, 245 (1969).

> The conscience of special educators needs to rub up against morality. In large measure we have been at the mercy of the general education establishment in that we accept problem pupils who have been referred out of the regular grades. In this way, we contribute to the delinquency of the general educators since we remove the pupils that are problems for them and thus reduce their need to deal with individual differences. Because of these pressures from the school system, we have been guilty of fostering quantity with little respect for quality of special education instruction. . . . Our first responsibility is to have an abiding commitment to the less fortunate children we aim to serve.

M. Dunn, "Special Education for the Mildly Retarded—Is Much of It Justifiable?," 35 Exceptional Children 5, 20 (1968).

Generally shared by thoughtful proponents of this approach is a commitment to encouraging acceptance of diversity. Average children are considered to benefit as much from having the handicapped in their classrooms as are exceptional pupils.

> . . . . The special educator's function in mainstreaming . . . becomes twofold: (1) education of the general public and the educational community with respect to normalization—that is, including child diversity and deviation in the social and institutional mainstreaming and (2) changing the educational structures and processes to embrace diversity and pluralism.

W. C. Rhodes, "Beyond Abnormality: Into the Mainstream," in A. G. Pappanikou and J. L. Paul, *Mainstreaming Emotionally Disturbed Children,* 37 (1977). *See also* M. J. Trippe, "The Social Psychology of Exceptional Children, Part II" in J. P. Glavin, *Major Issues in Special Education,* 17–21 (1973).

Moreover, it has been found that "mildly" disturbed exceptional children often do better in regular classes than in settings where they are segregated from their "normal" peers. *See* G. Calhoun, Jr. and R. N. Elliot, Jr. "Self-Concept and Academic Achievement of Educable Retarded and Emotionally Disturbed Pupils," 43 Exceptional Children 379, 380 (1970); G. O. Johnson, "Special Education for the Mentally Handicapped-Paradox," 29 Exceptional Children 62–66 (1962).

Suggested programs for accomplishing integration of exceptional with "normal" pupils are founded on the premise that properly trained regular teachers, supported and counseled by special educators, can adapt classroom practices and procedures to serve adequately both normal and exceptional children. Effective mainstreaming involves training of teachers along with the presence of support personnel in regular classes, including consultants, crisis or resource room teachers, psychologists and psychiatrists. In sum, mainstreaming of pupils cannot occur in a vacuum; to whatever extent implemented, it

must involve many coordinated changes in the system as a whole. As one study has put it, the system itself must be "mainstreamed". J. L. Paul, "Mainstreaming Emotionally Disturbed Children," in A. J. Pappanikou, J. L. Paul, *Mainstreaming Emotionally Disturbed Children*, 11, 16 (1977). *See also* J. P. Glavin, H. C. Quay, F. R. Annesley, J. S. Werry, "An Experimental Resource Room For Behavior Problem Children," in J. P. Glavin, *Major Issues in Special Education* 165 (1973).

Mainstreaming includes a movement away from rigid labelling. Categorizing children is viewed as destructive because it stigmatizes, promotes a sense of negative self-worth and may result in pigeonholing rather than in efforts to improve a child's condition or a classroom situation. Labelling is also feared because it may be erroneous, either as a result of misapplication of agreed upon criteria or use of criteria of questionable validity. Rigid labels are to be replaced by more flexible definitions of exceptional children, definitions designed to emphasize specific learning needs rather than defects. The child is to be placed in the least restrictive environment possible to meet these needs. It has been noted that

> [a]busive classification of children should be as much a target of the freeing impulse of mainstreaming as special class placement. Both inappropriate labelling and placement of a child compromise the integrity and freedom of the child.

J. L. Paul, "Mainstreaming Emotionally Disturbed Children," in A. J. Pappanikou, J. L. Paul, *Mainstreaming Emotionally Disturbed Children*, 1, 8 (1977). *See also* R. M. Smith and J. T. Niesworth, "Special Education: A Changing Field; Careers in Special Educational and Definitions," in R. E. Schmid, J. Moneypenny, R. Johnston, *Contemporary Issues In Special Education*, 6, 8–9 (1977); D. Kirp, W. Buss, P. Kuriloff, "Legal Reform of Special Education: Empirical Studies and Procedural Proposals," 62 Cal.L.Rev. 40, 44–45 (1974); D. Kirp, "School as Sorters, The Constitutional and Policy Implications of Student Classification," 121 U.Penn.L.Rev. 705, 719, 731–37 (1973).

It should be noted that mainstreaming does not necessarily call for the eradication of all special education settings. Some educators do take an extreme position, sometimes termed a "zero reject" model, aimed at making it virtually impossible to switch mildly disturbed or behaviorally disoriented children out of the regular classroom, but providing support and special training to the regular teacher. *E. g.*, M. S. Lilly, "A Training Based Model for Special Education," in J. P. Glavin, *Major Issues In Special Education*, 219 (1973). *See also* testimony of Dr. Rachel Lauer, transcript at 1142–45. Most take a less absolutist stance, and are critical of the "zero reject" model.

Some very peculiar things have happened in the name of education in the United States, and this movement toward integration into the regular grades is among them. Tens of thousands of children are involved as well as thousands of teachers. However, the literature is devoid of any reasonable research which demonstrates the positive gains to both exceptional and normal children under this arrangement. Overnight, educational leadership has advocated integration. No solid facts exist to support their claims. The literature is full of opinions, but not fact born of careful longitudinal research under relatively controlled conditions—essentials in this significant issue. . . .

Caution is recommended, for the needs of a generation of children are at stake. Those things which can be considered good in the special class should be retained and further perfected. Those elements which give rise to sound hope for integration should immediately be put to the test. The culling from both should provide the base for a rich educational plan for the next generation of exceptional children.

. . . . .

1. For the child, it is desirable to provide service outside the regular classroom . . . . when his needs cannot reasonably be met within the flexibility possible

in the regular classroom. Meeting needs does not include children who exist, even placidly in a regular class, but whose problems are such that educational growth fails. The fact that they present no problem to the group or the teacher is not enough. They must benefit by remaining.

2. It must be remembered that the normal pupils have rights too. The usual school operates on a large group basis and has goals which are set in terms of a broad normal range. The exceptional child with bizarre behavior, excessive aggression, or an all-out belligerent attitude may upset the group or require an inordinate amount of teacher time so that the other pupils are left with too little help. In other words, it may be asking the class to take on more than it can when a disturbed pupil remains. When the group is being sacrificed for the individual, resources outside the classroom are needed.

3. Some teachers handle a trying child well, others do not. Some have high tolerance, some low tolerance. There is nothing to be gained by saying that every teacher should be able to accept one such child or two. When the disturbed child takes up the teacher's psychic energy and reduces her effectiveness, removal is necessary.

Wm. M. Cruikshank, G. O. Johnson, *Education of Exceptional Children and Youth*, 82, 84, 597–98 (3d Edition 1975). *See also* F. Christoplos, P. Renz, "A Critical Examination of Special Education Programs," 3 Journal of Special Education 371, 373–74 (1969) (no reliable evidence either way as to effect on learning of "normal" or exceptional children from inclusion of the latter in the regular class).

Criticism and skepticism of mainstreaming has stemmed also from a fear that the process may advance without adequate changes in the system and that the results will be disastrous. A recent study of the impact of mainstreaming on deaf children pointed out the dangers incurred in forcing untrained teachers in overcrowded classrooms to deal with a new group of students who are tragically vulnerable educationally, psychologically and socially. "The dream is equality and social acceptance. The fact is that nine out of ten deaf children will receive neither. For some, mainstreaming may be catastrophic." J. Greenberg, G. Doolittle, "Can Schools Speak the Language of the Deaf," N.Y. Times Sunday Magazine, 50, Dec. 11, 1977.

The controversy over mainstreaming of emotionally disturbed and behaviorally maladjusted students is especially intense. The disruptive behavior so often manifested by these children presents more of a threat to the integrity of the regular classroom than do under-achievement or physical handicaps. Unlike the latter problems, "acting out" is not easily accommodated by special academic materials or adjustment of the physical plant. A. J. Pappanikou, J. L. Paul, *Mainstreaming Emotionally Disturbed Children*, xii–xiii (1977); Wm. C. Morse "The Psychology of Mainstreaming Socio-Emotionally Disturbed Children," in A. J. Pappanikou and J. L. Paul, *supra* at 18, 22.

One defense witness, psychologist Dr. Florence Halpern, was particularly critical of the movement towards education of these children in the least restrictive environment possible.

A. . . ., for the . . . reason that the large school is not the atmosphere for these kids and they are discriminated against by the other kids.

Q. You would much prefer to put them in a special school?

A. Where the school is there and they are comfortable there.

Transcript at 3095.

The predominant view seems to be that special day schools and classes are merely the beginning of treatment; that the aim is referral out of these settings as soon as possible. On the other hand, they should not necessarily be abandoned.

Mainstreaming is no more than a *preference* in favor of regular educational placement. Because mainstreaming reflects a preference, it is not, nor should it

become, an inflexible rule; rather, it should be a guide for conduct, not a rule of conduct. As a guide, *it should not prohibit alternatives to mainstream placement.*

H. R. Turnbull III, "Legal Implications," in A. P. Pappanikou, J. L. Paul, *Mainstreaming Emotionally Disturbed Children*, 43, 45 (1977) (emphasis in original).

The testimony supports a nondogmatic, pragmatic approach. Plaintiffs' as well as defendants' witnesses admitted that special day schools are desirable for at least some of the students currently being referred to these schools. For instance, Dr. Steven Weiss, Associate Professor of Education at New York University, favors the "least restrictive environment" approach, but did note that a properly constituted special day school program can play a useful role in special education. *E. g.*, transcript at 1485. Dr. Kenneth B. Clark testified on this point as follows:

THE COURT: Well, do you have a professional view with respect to whether there is a need[, . . .] a usefulness in the spectrum of special services available[, . . .] for a well-run day school with small classes, extra service, more guidance, and . . . specially trained teachers? . . . . In other words, you wouldn't on a theoretical basis . . . eliminate this end of the spectrum?

THE WITNESS: No. . . . A well-run system in which . . . the problems presented by this child are such . . . that a panel of professionals with high standards would say, look, this child needs a special kind of care short of hospitalization, short of institutionalization, and . . . these services would be provided in the context of other things which the child needs, such as a family situation.

Yes, there is room, there is a place for children whose problems are beyond those that can be handled in the classroom or for that matter handled in an out-patient sort of service such as the Child Guidance centers, Jewish Board of Guardians, or Northside . . . .. —I am not object-ing to the special facilities for children who need [them]—I'm objecting to just using the facilities as a catchall and pushing children in without regard to a serious study of whether they need it or not, and without regard to what you're doing for those who need it.

Transcript at 1701–02.

The Commissioner of Education of the State of New York seems fully sensitive to the nuances of the mainstreaming controversy. As he has noted, while "mainstreaming to the maximum extent possible is the goal for all handicapped children, it is not sound educational programming to place a child in a 'mainstreaming' setting in the absence of some evidence that the needs of the child can be met there." *In the Matter of the Appeal of Cornelia*, N.Y. Comm.Ed.Dec. No. 9575 (1977), *cited in* V. Garfinkle, "Recent Developments in the Law on the Education of Handicapped Children in New York State," 27 (1978) (unpub.).

In light of the weight of professional opinion, it is impossible for the Court to conclude that special day schools are unacceptable educational alternatives for socially maladjusted and emotionally disturbed children. Nor can we realistically mandate that a specific number of children be mainstreamed over a specific period of time. As has already been noted, mainstreaming involves a multitude of coordinated changes in the educational system as a whole. There are a variety of ways in which the generally recognized goal of smoother transition and increased continuity among all levels of services provided for exceptional children can be implemented. These must vary in accordance with the specifics of the system involved. Moreover, the dynamics of the process involve professional judgments only educators and administrators can make in considering resources provided by legislators and executives. In fulfilling an appropriate judiciary role in this suit, it would be inappropriate to require extensive structural overhaul of the special education system for emotionally disturbed children in New York City.

Nevertheless, there are discrete areas of special education, highlighted by the mainstreaming movement, into which the judiciary must venture because of statutory and constitutional mandates. Due process rights to notice and hearing prior to special education placement to provide safeguards against misclassification, along with the appropriate education of all handicapped children once placed as part of a right to equal educational opportunity, have been recognized repeatedly in the course of studies in the education of exceptional pupils. *See, e. g.,* N. Hobbs, *The Futures of Children,* 156–179 (1975); H. R. Turnbull III, "Legal Implications," in A. J. Pappanikou and J. L. Paul, *Mainstreaming Emotionally Disturbed Children,* 43 (1977). There must be adequate safeguards against unnecessary referral of children to these schools. It is crucial, not only that proper identification of pupils for possible referral take place in the first instance, but also that reevaluations be undertaken with sufficient frequency to assure that children are assigned to the least restrictive environment suitable for their educational needs. To the extent that children are placed in the restrictive setting of a special day school, they must be provided with adequate facilities, educational materials and therapeutic support staff.

### 2. *Alleged Lack of Consistent Use of Special Day Schools*

Part of the criticism leveled against the special schools is that insufficient efforts are made to refer students to other, less restrictive educational environments. In a 1973 report on the special day schools it was noted that reluctance of principals accounted for the failure to meet the stated aim of return to the mainstream. Principals stated, however, that the practice of holding students in the schools was usually agreed to by the child and parent. J. D. Goldman, "Special Day Schools for Socially Maladjusted and Emotionally Disturbed Children," 27 (mimeo. 1973).

The process of returning a child from a special school has been described in section III E, *supra.* As was noted there are no written criteria used in this process. Rather, the decision stems from an observation of the pupil's progress—both emotional and academic—in the special school. One principal testified that the average stay for a child in her school was from one to two years. She has instituted a program in which the students are instructed that they may apply on their own initiative for re-entrance into the regular school. Their applications are screened by school personnel and then referred to the COH. Although pupils may apply at any time, this principal feels that a stay of at least six months is necessary before anything can be gained from the special day school experience. Testimony of Marjorie Louer, transcript at 2440. Another witness testified that he uses a similar method. Testimony of Dr. Julian Schtierman, transcript at 2812–15. Dr. Dorothy Arnsten, a school psychologist, noted that although students could take the initiative on mainstreaming, the actual decision to return to a regular school setting should not be left entirely in his hands. Often a child who could function in a regular school feels reluctant to leave the comfortable setting of the special day school. In such a case efforts must be made to help him overcome these fears so that he learns to cope with a more normal existence. Transcript at 2898–99.

The decision to return the child may depend in part on the availability of special services, including a resource room or BCG staff. One of defendants' witnesses admitted that the paucity of BCG staff in the regular school may deter mainstreaming. Testimony of Dr. Gerald David, transcript at 2104.

During the period June 1, 1976 to May 31, 1977, 344 or approximately 10% of the total special day school population at that time, were sent back to the regular school. Only 17 students were discharged to a CEH class. Although these classes, housed in the same building as the regular school, are commonly considered less restrictive than the self-contained special day school, they are not truly in the mainstream. Moreover, there was testimony suggesting that the progres-

sion back to the mainstream does not necessarily run from special to regular school via a CEH class. Testimony of Dr. Martin Groveman, transcript at 2322. Other witnesses object to any special class placement at all and have expressed the opinion that these special classes are at least as restrictive as the special school. *E.g.*, Testimony of Dr. Florence Halpern, transcript at 3097. There was also testimony supporting the view that transfers into the freshman class at a new school are more desirable than transfers into the mid-grades. Avoidance of the latter alleviates the strain of entering a setting where peers are already adjusted and faculty might look askance at a new "problem" student. Whatever the weight of any of these considerations, they can properly be taken into account by sensitive educators and therapists concerned with the welfare of special day school students.

Differences of professional opinion are reflected in the variance in the numbers of students mainstreamed from each of the special schools in existence during the period June 1, 1976 through May 31, 1977:

| School | Total Number of Students | Number of Students Returning to Regular Classes |
|---|---|---|
| Intermediate School | | |
| P 12X | 162 | 9 |
| P 75Q | 244 | 45 |
| P 23Q | 134 | 17 |
| P 9Q | 182 | 30 |
| P 4Q | 139 | 1 |
| P 371K | 246 | 58 |
| P 369K | 205 | 32 |
| P 36K | 224 | 34 |
| P 82M | 107 | 12 |
| P 169M | 215 | 49 |
| High School | | |
| P 58M | 462 | 32 |
| P 8M (Girls) | 163 | 1 |
| P 8M (Boys) | 234 | 9 |
| P 141K | 129 | 8 |
| P 85K | 488 | 3 |

I. *Supplementation of Record by Judicial Views*

The extensive record consisting of some 4000 pages of transcript and hundreds of exhibits was supplemented by a number of views. With the consent of the parties, the Court visited four day schools, an EU, and a COH. The general impression of the institutions observed while they were working was quite favorable.

A high school in Brooklyn was operating in a modern building designed particularly for the day school. Extensive extracurricular and special pedagogical devices were being utilized. For example, there was a course in car repair where students were actually working on automobiles, learning with considerable enthusiasm skills that had immediate application. During the course of the activity the teachers were taking special pains to utilize manuals and other materials that would entail reading and use of communication skills. The school has a highly skilled band generating considerable enthusiasm among the students. A special bakery was in use. A great deal of learning was obviously going on in small classes. The principal and staff were highly skilled and devoted to the students and it was clear that the students reciprocated, with a great deal of affection and respect, the attention given to them by the faculty. A number of students came to the Court on their own initiative and pleaded, "Please do not close down *our* school".

A boys' junior high school in Brooklyn was also in a new building designed particularly for it. The students were relaxed and related well to the faculty. Each student was required to check in with his teacher in the morning and work out a special program on a "contract" basis. In so doing, the student would obligate himself to follow fairly rigorously an educational program arranged for the day by himself and faculty advisors. The students were obviously learning and had enthusiasm for the work being done in the school. The teachers appeared to be extremely devoted to their students.

Another boys' junior high school, this one in Queens, was located in an older building, but it was in good repair. The curriculum was traditional, but the students appeared to be cheerful and were relating well to their teachers. The Court observed a number of special projects and a good deal of emphasis on physical education and shop work.

By contrast, a girls' school in Brooklyn was being operated in an old and unsecure building with limited facilities. The curriculum was traditional. There was a sense of oppression and severe discipline throughout. Special programs suffered from a lack of supplies. The "beauty shop" had fewer cosmetics than an ordinary middle class woman would have on her night table. There were no electric typewriters used in the typing class and no modern sewing machines available in the sewing class. This school was closed during the course of the litigation.

The generally favorable impressions which the Court received from its visits to these day schools are corroborated by the testimony of Dr. Abraham J. Tannenbaum, one of defendants' expert witnesses. Dr. Tannenbaum visited four of the special day schools: P 75Q, P 9Q, P 8M and P 82M. With the exception of the latter school, which has now been closed, he found a generally therapeutic atmosphere, empathetic teachers and much constructive learning. The following comments from Dr. Tannenbaum's report are indicative:

> In general, P 9–Q has succeeded in creating a supportive environment for children with serious behavior disorders. An atmosphere of orderliness pervades the school building, but there is no trace of fear or overt anger among pupils. The children are respectful of the staff and appreciate the kind of help they are getting since it is extended with a higher degree of sincerity. There is no graffiti on the school walls and no vandalism. Quite the contrary, the principal tries to communicate to parents the message that their children are lucky to be part of a program that is so deeply concerned about their children's well being. The parents seem to appreciate that message and are responding most cooperatively. It is hard to imagine a more stimulating and ego-building atmosphere for preadolescent boys with severe behavioral disorders.

A. J. Tannenbaum, "Report on Visit to P 9–Q" 3 (mimeo. 1977).

There is no doubt that the basic dedication of the staff is paramount to the success of the program at P 75Q. The physical appearance of the school building suggests that the children take pride in their surroundings. There is no graffiti, no evidence of vandalism, no thefts or abuse to equipment, including musical instruments and shop materials that children are permitted to take home. They are aware of being involved in a team-like activity which they wouldn't experience elsewhere. Teachers are involved in every aspect of their lives, not just instruction. They take children home for weekends and invite them to come along on camping trips. In general, it is hard to imagine a more therapeutic environment for behaviorally disordered children, due to the fact that the teaching staff and the administration have developed a psycho-educational program that offers children with battered egos a sense of pride and accomplishment in an atmosphere that is structured, affectionate, challenging, and attractive.

A. J. Tannenbaum, "Report on Visit to P. 75Q" 3 (mimeo. 1977).

> In essence, the staff attempts to create a therapeutic community in which the principal plays the "supermama" role. All staff members make sure that what happens in the street culture doesn't come into the school building because the behavior codes of the street and the school have to be so different. For some children, giving up the street culture is a trying experience since it amounts to giving up one's past and friends, sometimes even the family, and to be seen as a traitor by all of them. In the therapeutic community created at PS 8–M, the staff has to learn how to deal with aggression and to understand that underneath that aggressive veneer the children are frightened and weak in impulse control. They are also dangerous. They will lie or develop the habits of the "con artist" in an effort to build their weak egos. They, therefore, need constant support rather than repression, and they need the opportunity to develop a sense of selfhood

which is goal-directed, strong, and proud. There is no doubt that the skill and dedication of the staff at P 8–M have succeeded in creating an environment where these children are making some headway toward leading useful, self-satisfying lives. It is impossible for this observer to imagine another day care environment that is better suited to achieve this goal with the kinds of adolescent boys assigned to P 8–M.

A. J. Tannenbaum, "Report on Visit to P 8M" 3 (mimeo. 1977).

In court, Dr. Tannenbaum testified as follows:

. . . . My feeling is that if there is a problem in any of these schools, I guess the problem is a reflection of the problem in the state of the art, that if we haven't perfected the state of the art, we don't simply close up the schools on that basis. If we were to follow that kind of a policy, we would have to close up the various professions I know about, including medicine and law and college teaching, because none of them have reached levels of perfection that everybody dreams about. But the schools that I visited where I was impressed with the program represent to me a prototype of what can be done in these schools, and if all the other special schools aspire and train their teachers to reach that level, I think the children can benefit enormously.

Transcript at 3633–34.

The Court observed conference sessions conducted at an EU located in Brooklyn. Present, in addition to the chairperson, were special educators, a psychologist and a social worker. In a number of the cases extensive reports from a psychiatrist were reviewed. In addition, the group considered detailed reports by both teachers and guidance counselors on the work of the students in the regular schools. Each case was examined in great depth with emphasis on the family background, the siblings and the specific physical, emotional and learning disabilities of the students. It was apparent that the conference members were using highly developed skills in attempting to provide the best possible assistance to the child and his family. In a number of instances references had already been made by the social worker to community agencies to assist parents who had very difficult social and legal problems.

As would be expected, the committee was made up of members of the middle class. Obviously they had concentrated on academic activities since they had been successful in the pursuit of studies required for achievement of their special expertise. As a result, whatever their family antecedents, their personal experiences were quite removed from those of the lower socio-economic families with whom they dealt. Nevertheless, there was a great deal of empathy and no sign of overt or covert bias.

The Court's visit to a COH in Brooklyn is described in part in Part III D 8, *supra.* The Court was impressed at the speed with which this efficient and well-functioning organization had been created.

COH members present at the discussion of the three cases the Court observed included two parents; each had a handicapped child. One parent was from a minority group. She was a person of obvious standing in the community. A psychiatrist and a psychologist, as well as the chairperson, an educational specialist, also participated. The conferences were held in a modern school in an office staffed by two secretaries with full clerical and telephone equipment.

The parents received a list of all those present. They were told of their rights at this hearing and beyond. In addition they were handed documents explaining these rights in detail, including instructions on how a COH determination found unsuitable by the parents could be appealed.

The full record from the EU, supplemented by COH inquiries, was read by all participants, including the parents. All members of the committee spoke freely, discussing the cases with impressive knowledge of the details and much sympathy. All members of the committee seemed aware of the available public and private resources.

1274

Parents were allowed to speak at great length and their questions were answered to the fullest extent possible. In one case a further psychiatric report was deemed desirable and arrangements were made to produce it before a final decision was reached.

In general, the parent members with time and inclination to do this work would tend to be from the middle classes. The Court's limited observation indicated a greater awareness by the professional members of the possibility of bias and excessive identification with parents' needs. Some training program for COH board members to avoid such tendencies may be desirable.

## IV. LAW

### A. Right to Treatment

#### 1. Theory

 A right to treatment based on constitutional or statutory grounds, has been developed in several habeas corpus cases. Restraint of liberty resulting from civil commitment for the purpose of therapeutic treatment cannot be justified where no treatment is rendered. *Ragsdale v. Overholser,* 108 U.S.App.D.C. 308, 315, 281 F.2d 943, 950 (1960) (Fahy, J., concurring). *See O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Darnell v. Cameron,* 121 U.S.App.D.C. 58, 61, 348 F.2d 64, 67 (1965); "Developments in the Law—Civil Commitment," 87 Harv. Law Rev. 1190, 1324–29 (1974); *cf. Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1966).

More recent cases have applied the right to treatment in a variety of contexts. In *Wyatt v. Stickney,* 325 F.Supp. 781, 334 F.Supp. 1341 (M.D.Ala.1971) and 344 F.Supp. 373, 387 (M.D.Ala.), *aff'd sub nom., Wyatt v. Aderbelt,* 503 F.2d 1305 (5 Cir. 1974), the court, relying on a due process rationale, found a right to adequate treatment for mentally retarded individuals committed to a state school. The suit, initially triggered by staff reductions due to budgetary restrictions, focused on the general inadequacy of treatment afforded at Alabama state mental hospitals and other facilities. In affirming the opinions and decrees of the District Court, the Court of Appeals declared that the Fifth Circuit had "established that the right to treatment arises as a matter of federal constitutional law under the due process clause of the Fourteenth Amendment." 503 F.2d at 1314. *See also Halderman v. Pennhurst State School and Hospital,* 446 F. Supp. 1295, 1314–20 (E.D.Pa. 1977).

In two other cases, including one from a lower court in this Circuit, the right to treatment has been applied to training schools for juveniles. *Inmates of Boys Training School v. Affleck,* 346 F.Supp. 1354 (D.R.I. 1972); *Martarella v. Kelley,* 349 F.Supp. 575 (S.D.N.Y. 1972). In *Martarella* the plaintiffs were children who had been designated "persons in need of supervision" pursuant to section 732 of the New York Family Court Act. They had committed no crimes, but had been charged with misbehavior. Many were neglected and socially maladjusted. Thus the focus was on a right to treatment for a group of individuals somewhat similar to the plaintiffs now before this court. Judge Lasker relied not only on the notion of a right to treatment for persons held in noncriminal custody, but also on cases dealing specifically with children which have emphasized an underlying assumption of juvenile justice systems—that the state is acting as parens patriae, that any noncriminal detention of a juvenile must be of a rehabilitative as opposed to penal nature. He declared:

> There can be no doubt that the right to treatment, generally, for those held in non-criminal custody (whether based on due process, equal protection or the Eighth Amendment, or a combination of them) has by now been recognized by the Supreme Court, the lower federal courts and the courts of New York.

*Id.* at 599.

Under *Martarella* segregation of plaintiffs in a special day school without affording them appropriate educational and therapeutic treatment would violate their constitutional rights.

## 2. *Students in Special Day Schools*

### a) *Due Process*

Students in the special day schools are not confined or deprived of their liberty to the extent of plaintiffs in the suits described in Part IV A 1, *supra*. Nevertheless, the day schools are a "restrictive" environment. Children are segregated from their peers. They often travel far from their neighborhoods to school.

Moreover, in practice, placement is not entirely voluntary. Although parents and child are given the opportunity to contest recommended special day school placement, should the appeals process result in a decision contrary to the family's wishes, the only alternative to placement may be withdrawal of the child from the public school system. Perhaps of more significance, few, if any, of the parents whose children are referred have the means or awareness necessary to seek alternative placement. *Cf. Halderman, et al. v. Pennhurst State School & Hospital,* 446 F.Supp. 1295, 1310–11 (E.D. Pa.1977) ("voluntariness" an illusory concept as applied to admission and exit from mental hospital since residents found to have no practical alternative at the time of their admission and no place else to go once admitted).

Finally, procedural safeguards are premised on the assumption that the special day schools can afford therapeutic treatment for the properly diagnosed child. Recommendation for special school placement is justified on the ground that this type of environment is the most appropriate to the child's educational needs. Without adequate treatment, therefore, the rationale for confining children in the special day schools collapses. Plaintiffs are entitled to constitutional due process protections.

### b) *Equal Protection*

The right to treatment may also be based upon the equal protection clause. Plaintiffs claim that the acts of placing and continuing their placement in special day schools, with the natural and foreseeable consequences that such placement will isolate them within a racially segregated school sub-system without adequate provision for suitable education, deprive them of equal educational opportunity in violation of the 14th amendment. Plaintiffs also allege the deprivation of their rights as handicapped pupils to a minimally adequate education. It is urged that whether the Court chooses to apply strict scrutiny (finding handicapped children to constitute a suspect class) or an intermediate level of scrutiny (*see* G. Gunther, "The Supreme Court, 1971 Term, Forward, In Search of Evolving Doctrine in a Changing Court: A Model for a Newer Equal Protection," 86 Harv. L. Rev. 1 (1972)), plaintiffs have been denied equal protection.

Emotionally disturbed children might be characterized as a suspect class in accordance with guidelines set by the Supreme Court as follows:

> [a] class . . . saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

*San Antonio School District v. Rodriquez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16. *See Fialkowaski v. Shapp,* 405 F.Supp. 946, 958–59 (E.D.Pa.1975) (retarded children). *But cf. New York Assoc. for Retarded Children v. Rockefeller,* 357 F.Supp. 752, 762–63 (E.D.N.Y.1973) (suggesting that the mentally retarded are not to be regarded as a suspect class).

It is not necessary, however, to decide whether emotionally handicapped students should be treated as a suspect class in a constitutional sense. We deal with minority pupils who claim discrimination on the ground of race. They are entitled to suspect class treatment for that reason. The fact that these plaintiffs are emotionally disturbed children does, nevertheless, compel us to focus on the abuses to which such individuals may be subject.

The importance of an equal educational opportunity for all cannot be underestimated:

Today, education is perhaps the most important function of the state and local governments. . . . It is required in the performance of our most basic responsibilities . . .. It is the very foundation of good citizenship. It is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. It is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an education, where the state has undertaken to provide it, is a right which must be available to all on equal terms.

*Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

When a particular group of students has special needs the right to an adequate education has been interpreted as requiring the state to make substantial efforts towards meeting these needs. Several cases have established for the handicapped the same right of access to free public education existing under the *Brown* precedents for all "normal" children, minority and non-minority. Where, as here, the handicapped children are also from minority groups, the burden of showing a sufficient educational opportunity is especially high.

The landmark case in this area, *Hobson v. Hansen,* 269 F.Supp. 401 (D.D.C.1967), *appeal dismissed,* 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968), is instructive. It involved the impact of sorting on minority pupils. The Court found that the operation of the school system, including a tracking of students at the primary and secondary levels, deprived Blacks and poor pupils of the right to an education equal to that afforded White, affluent students. This was found to violate both the equal protection and due process clauses. *Id.* at 511. The tracks at issue placed students in various curricular groups, ranging from those for "gifted" to those for "retarded" children. The latter afforded a rather limited basic education. This program was held discriminatory. The court relied on the large number of Blacks

in the lower tracks, the lack of movement among tracks in spite of purported flexibility (*id.* at 464), the failure to provide remedial programs for disadvantaged and emotionally handicapped (*id.* at 468, 469–73), and the use in the referral process of standardized tests found culturally and racially biased. *Id.* See also *P. v. Riles,* 343 F.Supp. 1306 (N.D.Cal.1973), *aff'd,* 502 F.2d 963 (9th Cir. 1974); D. Kirp, W. Buss, P. Kuriloff, "Legal Reform of Special Education: Empirical Studies and Procedural Proposals," 62 Cal.L.Rev. 40, 49–50 (1974).

In *Pennsylvania Association of Retarded Children v. Commonwealth of Pennsylvania,* 343 F.Supp. 279 (E.D.Pa.1972), exclusion of mentally retarded children from the public education system was found violative of the equal protection clause. The court decided that the state must provide an education "appropriate to the child's capacity" whether or not the child was mentally retarded. *Id.* at 285 (citations omitted).

Still another important judicial pronouncement in this area is *Mills v. Board of Education,* 348 F.Supp. 866 (D.D.C.1972). The case presented a challenge to classification and assignment of exceptional children to non-mainstream educational facilities. The court declared that since other handicapped children were given free public education, any exceptional child had a right, guaranteed under the equal protection clause, to a constructive education, including appropriate specialized instruction. Even more recently in *Panitch v. State of Wisconsin,* 444 F.Supp. 320, 322 (E.D.Wisconsin 1977), a district court held that a long delay in effectuating a state law designed to give equal education to the handicapped was sufficient indication of "intentional discrimination" in violation of the equal protection clause.

These cases demonstrate that the isolation of minority students in special education settings with small hope of truly fruitful education or movement into less restrictive environments constitutes a denial of equal protection. They provide persuasive support for a right to adequate treatment for plaintiffs, including adequate diagnosis

and classification procedures as well as satisfactorily equipped and staffed special day schools.

■ Nevertheless, there is still the need to prove discrimination. Mere disproportionate impact along racial lines will not, in the absence of a finding of intent to discriminate, support a finding of a violation of equal protection guarantees. *See, e. g., Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Thus in the case before us, the high proportion of Blacks and other minorities in the special day schools would not, in and of itself, require a decision for plaintiffs.

Disproportionate impact is, of course, highly relevant evidence. As Justice Stevens noted in his concurring opinion in *Washington v. Davis:*

> Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation.

426 U.S. 229, 253, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597 (1976). Plaintiffs must demonstrate that all of the circumstances, including the statistical data, fairly support an inference of an intent to discriminate. *See also* Part IV C, *infra,* for a discussion of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and related cases dealing with statistics, discriminatory impact and burdens of proof.

c) *Statutory Rights*

As in *Rouse v. Cameron,* 125 U.S.App. D.C. 366, 373 F.2d 451 (1967), a right to treatment may be founded on statutory grounds, specifically on the federal Education of all Handicapped Children Act, 20 U.S.C. § 1401 *et seq.* (1978), the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (1975), and sections 4402 *et seq.* of N.Y. Educ.Law (McKinney 1978), along with applicable federal and state regulations. *See* sections III C 1 and 2, *supra;* Appendices B and C. These acts are designed to guarantee at least a minimum education for all handicapped pupils and to assure against any possibility of racial or cultural discrimination. Together they support a right to adequate treatment for plaintiffs, including entitlement to constructive services within the special day school; to proper classification for such placement; to the opportunity to contest recommended placement; and to periodic reassessment of the appropriateness of that placement.

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1974), also serves as a statutory basis for plaintiffs' right to treatment. Title VI provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

It is undisputed that defendants receive federal financial assistance.

■ A violation of Title VI will be found if it can be shown that conduct has a racially discriminatory effect. No intent to discriminate need be demonstrated. *Child v. Beame,* 425 F.Supp. 194, 199 (S.D.N.Y.1977). *See also Resident Advisory Board v. Rizzo,* 425 F.Supp. 987, 1021–23 (E.D.Pa.1976) (same standard for Title VIII, prohibiting housing discrimination, as for employment discrimination).

A prima facie violation of Title VI would be established if it were shown that referrals and assignments to the special day schools are the result of policies, practices and the use of vague and subjective criteria which have a racially discriminatory effect as evidenced by the overrepresentation of minority students in these schools. This showing would shift the burden to defendants to rebut the inference that their actions are a substantial cause of the racial disparity and deficiency in educational opportunity for minority students in the special day schools. *See* discussion of burdens of proof in section IV C, *infra.*

Title VI has been held to require satisfactory levels of education for children of all races and ethnic backgrounds. In *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), the Supreme Court found that the failure to provide language courses for students of Chinese ancestry constituted lack of adequate educational opportunity within the meaning of Title VI. Plaintiffs had shown that no student could receive a high school diploma without meeting standards of proficiency in English. The failure to provide educational facilities tailored to these students' needs thus amounted to foreclosure of any meaningful education. In articulating a standard to be used in Title VI cases, the Court, relying on regulations promulgated in compliance with the Act (45 CFR § 80.3(b)(1) and (2)), noted that:

> Discrimination is barred which has that *effect* even though no purposeful design is present; a recipient may not . . . utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

414 U.S. at 568, 94 S.Ct. at 789 (citations omitted, emphasis in original).

More recently, the Tenth Circuit, relying on *Lau v. Nichols,* found that in a primarily Spanish-speaking school a curriculum oriented towards white middle-class pupils violated Title VI. The court noted that the performance of the students in that school was well below what it should have been for students of their age. This was found to be due, at least in part, to the lack of materials reflecting the needs of the minority children. *Serna v. Portales School District,* 499 F.2d 1147 (10th Cir. 1974). *See Soria v. Oxnard Board of Trustees,* 386 F.Supp. 539, 544–45 (C.D.Cal.1974) (Title VI effects standard reiterated; the court noted the defendant's affirmative duty to desegregate its schools, irrespective of any finding of intent to discriminate).

B. *Right to Due Process in Procedures*

Plaintiffs claim a violation of their due process rights in that pupils have been, and continue to be, transferred to special day schools without adequate prior notice and an opportunity to be heard. This, it is argued, constitutes a violation not only of the due process clause of the 14th Amendment, but also of due process guarantees included in federal and state statutes and regulations. Defendants have two answers to these charges. First, they claim there is no right to notice and hearing prior to a change in educational placement; second, assuming the existence of such a right, they deny that their practises have violated it in any way.

■ The argument that there is no right to notice and hearing prior to a change in educational setting is without merit; it flies in the face of judicial pronouncements as well as the congressional and state policies outlined in the statutes and regulations. *See* section III C 1 and 2, *supra;* Appendices B and C. Placement of children out of the mainstream requires procedural due process protection. The law supports plaintiffs' contention that the following abuses— if established by the evidence—would constitute a violation of due process: (a) use of surreptitious means to obtain parental consent for special day school placement by mailing uninformed parents forms which are signed without full realization of what is involved; (b) denial of plaintiffs' right to a hearing by not appointing a surrogate parent to represent the interests of the child should the parent disagree with the child's objection to placement in a special school or be disinterested in the matter; (c) failure to reevaluate students already placed in these schools without the benefit of the due process protections built into the current regulations; (d) failure to carry out an annual and triennial review of all students currently in the special day schools as provided in the regulations; and (e) failure to provide parents with clinical records upon which recommendations for special day school placement are made so that they are unable to prepare for a hearing to contest the placement.

In *Mills v. Board of Education,* 348 F.Supp. 866, 875 (D.D.C.1972) the court noted that "[d]ue process of law requires a hearing prior to exclusion, termination or classification into a special program" (citations omitted). The court also ordered periodic review of each child's status and of the soundness of present placement. *Id.* at 878. *See Hairston v. Drosick,* 423 F.Supp. 180, 184–85 (S.D.West Virginia 1976) (exclusion of a handicapped child from the regular classroom without procedural safeguards is a violation of constitutional rights as well as of the Rehabilitation Act of 1973).

*Pennsylvania Association for Retarded Children v. Pennsylvania,* 343 F.Supp. 279 (E.D.Pa.1972) was resolved by a consent decree providing for public education for all retarded children and guaranteeing both prior notice of suggested non-mainstream placement and the opportunity for a hearing to contest the recommendation. In its opinion, the court acknowledged the danger of stigma in labelling a child mentally retarded; it emphasized the need for due process hearings in any instance where the state's action may result in stigmatization. Id. 295. *See New York Association for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 762 (E.D.N.Y.1973).

Legal commentators have recognized the dangers of misclassification in special education placement, whether due to misuse of proper criteria, invalidity of such criteria, or the vulnerability of minority group and behavioral problem pupils to misclassification because of impatient or innately biased teachers, and the possibility of stigma attached to special education placement. These possibilities mandate a hearing, involving parent, student, educator and administrator, prior to placement. *See, e. g.,* S. L. Ross, H. G. DeYoung, J. S. Cohen, "Confrontation: Special Education and the Law", in R. E. Schmid, J. Moneypenny, R. Johnston, *Contemporary Issues in Special Education,* 20 (1977); D. Kirp, Wm. Buss and P. Kuriloff, "Legal Reform of Special Education: Empirical Studies and Procedural Proposals", 62 *Cal.L.Rev.* 40, 117–55 (1974); Kirp, "Student Classification, Public Policy and the Courts", 44 *Harv. Education-*al Review* 7 (1974); Jones, "Coercive Behavior Control in the Schools: Reconciling 'Individually Appropriate' Education with Damaging Changes in Educational Status," 29 Stan.L.Rev. 93, 111 (1976). Parents must have adequate access to all records and the opportunity to obtain an independent evaluation of the child should it be desired. D. Kirp, Wm. Buss, P. Kuriloff, *supra* at 128.

Finally, adequate notice is an essential part of due process. As the Supreme Court noted in *Goss v. Lopez,* a case involving due process requirements prior to school suspension:

> The fundamental requisite of due process of law is the opportunity to be heard . . . a right that has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to . . . contest. . . Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.

419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1974) (citations omitted).

There is no general rule on the details of required notice. Rather, "the timing and content of notice . . . will depend on appropriate accommodation of the competing interests involved." *Goss v. Lopez, supra,* 419 U.S. at 579, 95 S.Ct. at 738–39. *See also Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), *cited in Goss v. Lopez, supra,* 419 U.S. at 578, 95 S.Ct. at 738.

Reinforcing this case law are, of course, the statutory and regulatory requirements already referred to outlining the contours of due process rights to notice and hearing as well as to periodic reevaluations of the appropriateness of special education placement.

C. *Discrimination in Referral of Students to Predominantly White Private Facilities*

Plaintiffs in this litigation initially focused their charges of discrimination on the apportionment of students between the "regular" and "special" public schools. During the course of the trial the Court heard testimony suggesting that another source of discrimination may be the referral of some emotionally disturbed children to private agencies, rather than special public schools. Since the private facilities are used by a higher percentage of White children, the statistical disproportion between the private and public special schools raises the possibility of a prima facie case of racial discrimination. If this is so, the burden rests on the defendants to demonstrate that they have not engaged in this kind of discrimination.

The Supreme Court has long held that tangible public assistance may not be granted to public schools that discriminate. More recently, it determined that private schools may not adopt racially discriminatory admission policies. The Court pointed out that it had "consistently affirmed decisions enjoining state tuition grants to students attending racially discriminatory private schools." *Norwood v. Harrison*, 413 U.S. 455, 464, 93 S.Ct. 2804, 2809-10, 37 L.Ed.2d 723 (1973); *Brown v. South Carolina Board of Education*, 296 F.Supp. 199 (S.C.), *aff'd per curiam*, 393 U.S. 222, 89 S.Ct. 449, 21 L.Ed.2d 391 (1968); *Poindexter v. Louisiana Financial Assistance Comm'n*, 275 F.Supp. 833 (E.D.La.1967), *aff'd per curiam*, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); *Green v. Connally*, 330 F.Supp. 1150 (D.D.C.), *aff'd sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971).

In *Norwood* the Court held that "a textbook lending program is not legally distinguishable from the forms of state assistance foreclosed by the prior cases." 413 U.S. at 466, 93 S.Ct. at 2810. It declared:

Free textbooks, like tuition grants directed to private school students, are a form of financial assistance inuring to the benefit of the private schools themselves. An inescapable educational cost for students in both public and private schools is the expense of providing all necessary learning materials. When, as here, that necessary expense is borne by the State, the economic consequence is to give aid to the enterprise; if the school engages in discriminatory practices the State by tangible aid in the form of textbooks thereby gives support to such discrimination. Racial discrimination in state-operated schools is barred by the Constitution and "[i]t is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Lee v. Macon County Board of Education*, 267 F.Supp. 458, 475-76 (M.D.Ala.1967).

*Id.* at 464-466, 93 S.Ct. at 2810 (footnote omitted). The Court accepted as unchallenged the right of private schools to practice discrimination.

Subsequently, in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Court ruled that 42 U.S.C. § 1981 forbids racial discrimination even in private schools. The Supreme Court pointed out that although parents may have a First Amendment right "to send their children to educational institutions that promote the belief that racial segregation is desirable, and that the children have an equal right to attend such institutions . . . it does not follow that the *practice* of excluding racial minorities from such institutions is also protected by the same principle." 427 U.S. at 176, 96 S.Ct. at 2597.

The Court has repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by reasonable government regulation. Indeed, the Court in *Pierce* [*v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925),] expressly acknowledged "the power of the State reasonably to regulate

all schools, to inspect, supervise and examine them, their teachers and pupils . . . ." 268 U.S., at 534, 45 S.Ct., at 573.

Section 1981, as applied to the conduct at issue here, constitutes an exercise of federal legislative power under § 2 of the Thirteenth Amendment fully consistent with *Meyer, Pierce*, and the cases that followed in their wake. As the Court held in *Jones v. Alfred H. Mayer Co.* [392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189], *supra*, "[i]t has never been doubted . . 'that the power vested in Congress to enforce [the Thirteenth Amendment] by appropriate legislation' . . . includes the power to enact laws 'direct and primary, operating upon the acts of individuals, whether sanctioned by State legislation or not.'" 392 U.S., at 438, 88 S.Ct., at 2202 (citation omitted). The prohibition of racial discrimination that interferes with the making and enforcement of contracts for private educational services furthers goals closely analogous to those served by § 1981's elimination of racial discrimination in the making of private employment contracts and, more generally, by § 1982's guarantee that "a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man." *Jones v. Alfred H. Mayer Co.*, 392 U.S., at 443, 88 S.Ct., at 2205.

427 U.S. at 178–79, 96 S.Ct. at 2598-99, 96 S.Ct. at 2598 (some citations and footnote omitted). *See* Comment, "Racial Exclusion by Religious Schools: *Brown v. Dade Christian Schools, Inc.*," 91 Harv.L.Rev. 879, 885–86 (1978).

The practice complained of in the present case is more subtle than those considered and struck down by the Supreme Court. *Cf. Wilder v. Sugarman*, 385 F.Supp. 1013 (S.D.N.Y.1974) (raising somewhat similar legal contentions; the case has been dismissed as moot). No one contends that any of the private special day schools have racially discriminatory admission policies. However, no one disputes that the state helps fund the special private schools and that a substantial statistical disproportion exists among students at the special private

and the special public schools. The ratio of minority students to White students is much lower in the private (publicly reimbursed) than in the public schools.

The case law makes clear that such statistical disparities at least provide the basis for a rebuttable presumption of discrimination. *Child v. Beame*, 425 F.Supp. 194 (S.D. N.Y.1977). Once a prima facie case of discrimination is established, "the burden of proof then shifts to defendant officials to show that the pattern of actions taken by those officials can be explained in a manner consistent with the absence of segregative intent." *Arthur v. Nyquist*, 573 F.2d 134, 142 (2nd Cir. 1978).

In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Court rejected the proposition that racial disproportion necessarily reflects illegal discrimination.

> But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact.

*Id.* at 239, 96 S.Ct. at 2047 (emphasis in original). It was explicitly held that:

> Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.

*Id.* at 242, 96 S.Ct. at 2049. Citing *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), a case concerning discrimination in a jury selection, the Court gave further instruction on how the burden of proof shifts in a racial discrimination case:

> With a prima facie case made out, "the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racial-

ly neutral criteria and procedures have produced the monochromatic result." *Alexander, supra,* 405 U.S. at 632, 92 S.Ct. at 1226, 31 L.Ed.2d at 542.

*Id.* at 241, 96 S.Ct. 2048.

Some aspect of *mala fides,* no matter how remote or indirect, apparently must be attributable to the defendants under *Washington v. Davis* before they can be found to have discriminated illegally. Whether an unacceptable state of mind be reflected by acting with intent to discriminate, *Keyes v. School Dist. No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), by failing to act with intent that the failure have a discriminatory effect, or by willful or even negligent disregard of the racial effect of an act or failure to act, *Hart v. Community School Board of Education, New York School District # 21,* 512 F.2d 37, 51 (2d Cir. 1975), some delict, some illegal purpose, some blameworthy failure on the part of a defendant as a reason for accountability is required.

In *Keyes v. School Dist. No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Court addressed the question of how intent is to be established in school desegregation cases. The Court first observed:

> There are no hard-and-fast standards governing the allocation of the burden of proof in every situation. The issue, rather, "is merely a question of policy and fairness based on experience in the different situations." 9 J. Wigmore, Evidence § 2486, at 275 (3d ed. 1940). In the context of racial segregation in public education, the courts, including this Court, have recognized a variety of situations, in which "fairness" and "policy" require state authorities to bear the burden of explaining actions or conditions which appear to be racially motivated.

*Id.* at 209, 93 S.Ct. at 2698. It then noted that "it is not enough, of course," to discharge their burden of proof that segregated schooling is not also the result of intentionally segregative acts "that the school authorities rely upon some allegedly logical, racially neutral explanation for their ac-

tions." Rather, "their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions." *Id.* at 210, 93 S.Ct. at 2698.

More recent discussions of discriminatory intent are found in *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) and *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). *Arlington* involved a petition to rezone from single to multiple family classification, designed to increase minority housing facilities. The petition was denied by the Village of Arlington, an almost entirely White community. The Court of Appeals held that the "ultimate effect" of the Village's denial was racially discriminatory. The Supreme Court reversed:

> Respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision. This conclusion ends the constitutional inquiry. The Court of Appeals' further finding that the Village's decision carried a discriminatory "ultimate effect" is without independent constitutional significance.

*Village of Arlington Heights, supra,* 429 U.S. at 270–71, 97 S.Ct. at 566. In note 21, the Court explained:

> Proof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision. But in this case respondents failed to make the required threshold showing.

*Id.* In reaching its holding, the Court identified, "without purporting to be exhaustive," extensive areas of "proper inquiry in determining whether racially discriminatory intent existed." *Id.* at 268, 97 S.Ct. at 565.

In defining the concept of discriminatory intent, the Second Circuit has made it clear that so long as there is "foreseeable effect", there need not be a finding of racial motivation. *Hart v. Community School Board of Education, New York School District # 21*, 512 F.2d 37, 51 (2d Cir. 1975). Affirming the District Court, the Court of Appeals held that:

> We conclude that enough has been shown of intentional state action through the community school board and its predecessor local school board to support a finding of segregative intent from the foreseeable consequences of action taken, coupled with inaction in the face of tendered choices.

*Id.* The court also endorsed the language of the Sixth Circuit in *Oliver v. Michigan State Bd. of Ed.*, 508 F.2d 178, 182 (6th Cir. 1974):

> A presumption of segregative purpose arises when plaintiffs establish that the natural, probable and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies. 508 F.2d 178, at 182 (6th Cir. 1974); *cf. Higgins v. Board of Education*, 508 F.2d 779 (6th Cir. 1974).

512 F.2d at 51. *See also School District of Omaha v. United States*, 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977) (Eighth Circuit adopted "natural and foreseeable result" test; Supreme Court remands on what were apparently other grounds of remedy).

*Davis*, with its reliance on intent, has confused some of the commentators and courts. *See generally*, M. J. Perry, "The Disproportionate Impact Theory of Racial Discrimination," 25 U.Penn.L.Rev. 540 (1976); T. Eisenberg, "Disproportionate Impact and Illicit Motive," 52 N.Y.U.L.Rev. 36 (1977); Comment, Proof of Racially Discriminatory Purpose Under the Equal Protection Clause: *Washington v. Davis*; *Arlington Heights*; *Mt. Healthy* and *Williamsburgh*, 12 Harv.Rights-Civ.Lib.L.Rev. 725 (1977); Note, Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction, 86 Yale L. Journal 317 (1976); S. Weinstein, "The Role of Intent and Effect Under the Equal Protection Clause of the Fourteenth Amendment" (1978) (unpub. paper for Columbia Seminar on file in this case). The disquiet with *Davis* reflected by these legal articles is perhaps best summed up by Professor Perry:

> The most troubling aspect of *Washington v. Davis* is not that the Court's opinion was deficient analytically but that the Court seemed to say that the judiciary shall play a severely diminished role in ameliorating racial inequities.

*Perry, supra*, at 588.

But the doubts engendered by *Davis* are not as troubling in this circuit as elsewhere. For in its most recent opinion on the subject, the Second Circuit concluded that "the *Hart* test remains valid even after the Supreme Court's opinions in *Washington v. Davis, Arlington Heights v. Metropolitan Housing Development Corp.*, and *Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603." *Arthur v. Nyquist*, 573 F.2d 134 at 143 (2nd Cir. 1978). Reviewing its prior decisions, the Court noted that it had always "stressed that segregative intent could only be inferred in the context of an examination of alternative policies available to state officials." *Id.* at 142. It then restated the law as it now stands in this circuit:

> In adopting this approach, we focused not on the mental processes of a changing group of school board members, but rather on the actions taken by the board itself. When such actions have the "natural, probable and foreseeable result of increasing or perpetuating segregation," a presumption of segregative purpose is

created. The burden of proof then shifts to defendant officials to show that the pattern of actions taken by those officials can be explained in a manner consistent with the absence of segregative intent. Put differently, once the burden of proof has shifted, *school officials must be able to demonstrate that no reasonable alternative policy would have achieved the same permissible educational goals with less segregative effect.* When such a showing cannot be made, it is entirely reasonable to infer that the officials acted with unlawful segregative intent.

*Id.* at 142 (emphasis added). *Cf. United States v. Texas Education Agency,* 564 F.2d 162 (5th Cir. 1977) (describing *Hart* as "a well articulated decision" and adopting "natural and foreseeable consequences" test).

In view of the Second Circuit's position, we need not decide if the definition of segregative official intent is subjective or objective, a question left open by the courts. *See* discussion of cases in *United States v. Texas Education Agency,* 564 F.2d 162, 168 (5th Cir. 1977); Comment, "Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction," 86 Yale L.J. 317 (1976).

In the present case, although the private and the public special schools both receive public funds, the private schools are perceived as materially better than the public schools. The net effect of the present referral system has been to leave a larger proportion of minority students in the public institutions than might otherwise be there if different procedures were followed. A screening process that passes Whites through and leaves minorities behind is prima facie unconstitutional.

To rebut successfully this showing of discrimination, the state must show that less segregative referral procedures are unavailable. As part of its proof, it must demonstrate that it has taken "affirmative steps . . . to insure the availability of all of its programs to blacks who may choose to participate". *Brumfield v. Dodd,* 425 F.Supp. 528, 532 (E.D.La.1976), *quoting*

*Norwood v. Harrison,* 382 F.Supp. 921 (N.D. Miss.1974). In this case, the state's "programs" include the private as well as the public special schools.

◼ Extensive references have been made in this discussion and in section III D 8, *supra,* V D, *infra,* as well as elsewhere, to comparisons between middle class and lower class utilization of procedures and institutions. It is important to point out that this case is not being decided on the theory that there has been discrimination on the basis of wealth. At least where education is involved, the Supreme Court has held that classifications predicated on financial resources are not unconstitutional. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). "[D]iscrimination against the poor does not become discrimination against an ethnic minority merely because there is a statistical correlation between poverty and ethic backgrounds." *Ybarra v. City of Town, of Los Altos Hills,* 503 F.2d 250, 253 (9th Cir. 1974). A fortiori, following the reasoning of *San Antonio,* discrimination against those with less ability to manipulate a system fair on its face because of greater knowledge, skill, assurance and initiative cannot be deemed unconstitutional. But the courts will recognize that people with less education and resources are less capable of protecting their rights. *See Swarb v. Lennox,* 314 F.Supp. 1091, 1101 (E.D.Pa.1970), *aff'd,* 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972) ("more proof may be required of non-high school graduates [waiving rights] since the phraseology of the clauses in the notes . . . is most difficult for laymen to understand"). Educational authorities are fully aware of this discrepancy in ability and must guard against discrimination flowing from it.

◼ Where, as here, a regulatory scheme impartial in form results in an application predictably and foreseeably invidiously discriminatory in racial effect, the Constitution is violated. *See, e.g., Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution. . . .

*Id.* at 374, 6 S.Ct. at 1073. The eyes of authorities are sufficiently evil, if they could and should have foreseen the racially discriminatory import of their actions. *Hart v. Community School Board of Education, New York School District # 21,* 383 F.Supp. 699 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37 (2d Cir. 1975). As Judge Gurfein has recently reminded us, "care must be taken lest certain needy beneficiaries, because of limitations of poverty or ignorance, fail to receive the full amount of benefits to which they are entitled." *Jones v. Califano,* 576 F.2d 12, 20 (2d Cir. 1978).

■ A "benign motive" is no justification for discrimination. *United States v. Texas Education Agency,* 564 F.2d 162, 174 (5th Cir. 1977); *Kirksey v. Board of Supervisors of Hinds County, Miss.,* 554 F.2d 139, 143–144 (5th Cir. 1977). Use of private schools to speed placements is not a "compelling interest" permitting discrimination. *Cf. Resident Advisory Board v. Rizzo,* 564 F.2d 126, 148 (3rd Cir. 1977).

## V. APPLICATION OF LAW TO FACTS

■ The special day schools are segregated. This condition was the "natural, probable and foreseeable result" of educational decisions of the City and State of New York. These schools have had disproportionately minority populations from the outset. City and State policies described in Part III F 7, *supra,* and elsewhere in this opinion, allowing the predominantly White middle class to avoid special day schools, have tended to reinforce ، these schools' heavy minority status. In view of the stigma still attached to these schools—though unwarranted by the facts of a generally good therapeutic and pedagogic environment—these policies are invidious. They violate the Constitution and statutes.

There are other, more specific, reasons why plaintiffs are entitled to a remedy. We turn to them in the sections which follow.

### A. Evaluation Process as Violation of Right to Treatment and Due Process

#### 1. Right to Treatment

■ Since proper evaluation is recognized as central to acceptable special education, a program falling substantially below minimum established standards would constitute a violation of the right to treatment. Perfection is not expected. All deficiencies do not necessarily constitute constitutional or statutory deprivations. Nevertheless, regrettably, defendants' programs do fall short of minimally acceptable legal standards in some particulars.

Staffing shortages at the EUs necessitate extra effort on the part of those professionals who are available, but do not jeopardize plaintiffs' right to treatment. Although it is impossible for every child to have a psychiatric screening prior to referral, arrangements are made for one in cases where it is deemed essential. The evidence reveals no professional consensus on whether the failure to obtain a psychiatric report in every case is a serious deficiency. Similarly, although not all the EUs have a full-time neurologist, the EU staff is on the alert for "soft signs" of neurological impairment and examinations are conducted where necessary.

The evidence also reveals concerted efforts at eliminating linguistic barriers impeding accurate evaluation. Every EU has at least one bilingual professional. Where possible, tests are administered in the child's language; at other times, a translator may be used. Sometimes the language problem is alleviated by the use of non-verbal tests. Testimony of Elaine Thompson, transcript at 1832–34; testimony of Dolores Goidel, transcript at 1831–32. The Court

takes judicial notice of the limited pool of qualified bilingual professionals.

EUs are also lacking in minority staff. The following table is representative:

Ethnic Breakdown of Evaluation Unit
Professional Staff (as of 12/20/77)

| Staff | Amer. Indian or Alaskan Native | Black Not of Hispanic Origin | Asian or Pacific Islander | Hispanic | White Not of Hispanic Origin |
|---|---|---|---|---|---|
| Principals | | | | | |
| Asst. Principals | | | | | 1 |
| Teachers | | 1 | | 3 | 101 |
| Other Professional Staff | | 26 | | 10 | 140 |
| Sub-totals | | 27 | | 13 | 242 |
| Part-time Professional Staff | | 1 | | 3 | 10 |
| Totals | | 28 | | 16 | 252 |

Conceivably, the paucity of minority professionals may increase the chance of cultural bias and skewed diagnosis and referral. Although the percentages of minority staff are relatively low when compared to the percentages of minority students evaluated for special day school placement, the ratios are not compelling evidence of racial discrimination or denial of a right to treatment, particularly since good faith efforts are being made to recruit minority staff. *E. g.*, testimony of Joyce Coppin, transcript at 2527–28. Here, too, we take judicial notice of the fact that there is a relatively small pool of qualified professionals. Harm to children arguably will be reduced by selecting professional staff on the basis of competence rather than on racial or ethnic grounds. We also note evidence of defendants' awareness of the danger of possible cultural bias, the efforts made not to base placement decisions on results from one type of test or a single professional's opinion, and the professional workshops which have begun to emphasize ways of avoiding cultural bias in testing.

As noted in section III F 3, *supra,* plaintiffs also charge that EU personnel employ insufficiently objective criteria in making decisions on placement, thus increasing the possibility of racial segregation. We recognize the dangers posed by the fact that the terms "handicapped" and "disabled" are socially defined categories. "Their content

depends on the demands others make . . . The fine line between "handicapped" and "normal" has been arbitrarily drawn by the 'normal' majority." S. O. Burke, "Affirmative Action Laws For People With Handicaps: Problems of Enforcement," 3 (mimeo. 1978) (citations omitted). Use of a conferencing technique in evaluation and placement recommendations, the refusal to base categorization upon a single set of tests, and other efforts observed by the Court at its visit to the EU and during the trial assure against the danger of excessive subjectivity. Moreover, the very difficulty of defining "handicapped" supports defendants' contentions that it is impracticable to reduce a combination of professional judgments to precise criteria.

With regard to ongoing evaluation or re-evaluation, however, defendants have not fulfilled standards of adequacy. There is evidence of long waiting lists for the triennial evaluation mandated by the EHA. There is no showing of systematic annual review of students in special day schools by the COHs in conformance with state regulations promulgated in compliance with the EHA. The state regulations mandate that the IEP must contain, among other things:

(ii) A statement of annual goals . . . [and] (v) Appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual

basis, whether the instructional objectives are being achieved.

8 N.Y.C.R.R. § 200.4(f) 1. (1977).

Although some of the special day school principals testified about their own policies of annual reevaluation of pupils, there does not appear to be any coordinated or organized effort in this direction. Many children presently in the day schools have not had the advantage of current EU studies or of COH screening and other procedural protections. Some children may, therefore, be in day schools who would not be there had present standards been utilized. Even if triennial evaluations are eventually carried out, these children may remain in special day schools unnecessarily for some years.

Defendants seek to excuse the waiting lists for reevaluation by calling attention to the fact that in the original *Riley Ried* order (N.Y.Comm.Ed.Dec. No. 8742 (1973)) the State Commissioner of Education declared that there should be a priority in favor of "unserved" children, that is, students awaiting evaluation for special placement for the first time. This order does not constitute a valid justification for inadequate reevaluation amounting to a violation of constitutional and statutory rights.

There is also evidence indicating that children may be moved from one special educational setting to another—for example, CEH class to special day school or vice versa—in the absence of a full diagnostic work-up or clear-cut reasons for the move. This happens despite the fact that any change in placement is supposed to trigger the entire evaluative process.

Decertification is erratic and poorly defined. Some witnesses testified that it is always accompanied by full review; other testimony belied this fact. The latter testimony reflects the reality for a substantial number of students.

Plaintiffs' expert witnesses' criticism of the failure to conduct evaluation of students in the regular school constitutes no deprivation. There is no consensus of professional opinion on this point. Reports from the regular schools seem, in general, to be substantial and younger children are

generally observed for at least a day in a diagnostic classroom at the EU.

In sum, the system of diagnosis and classification, so crucial to affording adequate treatment, suffers from inadequate staffing and some lack of control. There is, however, considerable evidence of good intentions and strong efforts to improve it.

### 2. *Due Process*

Conduct of the referral, evaluation and reevaluation processes also constitutes a violation of due process rights guaranteed by the Constitution and statutes. *See* discussion in section IV B, *supra*.

Defendants have made commendable efforts to comply with newly formulated due process requirements. Nevertheless, the actual notice afforded parents in the current system, taken as a whole, is not sufficient to meet its intended purposes. Defendants also state that the pupils assigned to the special schools suffer no stigma. They claim that at least since April, 1975, no child has been classified as "socially maladjusted and emotionally disturbed" (the former SMED acronym). Rather, the "severely emotionally disturbed" child (the category into which special day school students fall) is defined in applicable regulations as one

whose emotional disturbance is so severe that the child is unable to relate to other children and may have an absence of speech, and in addition needs the support of clinical services. A severely emotionally disturbed child is one whose condition has been determined to be such by a school psychologist, a psychiatrist, or by an approved mental health clinic.

8 N.Y.C.R.R. § 200.2(a)(3) (1977). Defendants also note that the name of the bureau in charge of the special day schools has been changed from the Bureau for Socially Maladjusted and Emotionally Disturbed to the Bureau for the Education of the Emotionally Handicapped, another effort to avoid offensive labels. Without minimizing the Board's valiant attempts to avoid stigmatization, evidence suggests that children

segregated in special schools are still stigmatized to some degree. In deciding this case we assume that this, along with other considerations, is sufficient to support a triggering of due process rights.

Each of the notice steps in defendants' system of evaluation and referral is designed in literal compliance with statutory mandates. All of the steps taken together do not, however, constitute notice adequate under the circumstances involved in the placement of students in the special day schools.

*Step One—Notice to parents upon initiation of referral for EU evaluation:*

The referring school and the COH are supposed to advise parents of their procedural due process rights, including the right to withdraw the child from the evaluation process at any time. There is no written notice at this point except for a Parental Consent and Waiver of Confidentiality Form, sent to parents prior to evaluation by the EU. This form explains the necessity for exchange of information about the child among EU professionals and apprises the parent of the opportunity to meet with the COH to discuss any change in placement. In signing the form the parent consents to the evaluation and to COH review of the EU recommendation. The form does not provide any detail of the steps involved in the evaluation and placement process nor specific information about the way to challenge a determination of placement.

*Step Two—Notice at EU during initial interview:*

The parent who accompanies the child to the EU meets with the social worker. The social worker explains the evaluation process and gives the parent a relatively detailed booklet, "Your Child's Right to an Education". (The Court observed the booklet being given to parents again at COH hearings. *See* discussion in section III D 8 *supra.*) This pamphlet applies to children with any kind of handicapping condition. It includes explanations of: (1) behavior problems which may indicate certain handicaps; (2) the role of the COH and the type of notice to which parents are entitled if special education placement is recommended; (3) each school district's responsibility to identify children with handicapping conditions; (4) the evaluation process; (5) each of the special education programs; (6) the school district's obligations to guard the child's right to privacy in his school records and to give parents access to records; (7) the school's right to suspend a child from school and the child's right to a hearing if such suspension is for a period greater than five days; (8) reasons for which a child is validly excused from attendance; and (9) the way to challenge the COH's educational placement decision. The booklet is relatively long and encompasses a large range of topics. Only the section on the COH and the last section provide information on the evaluation and placement process itself, including the time and manner in which the parent can challenge placement.

The document would be overwhelming for even a well-educated layperson. Parents of children likely to be referred to the special day schools must rely heavily on the social worker's explanation for a full understanding of the process. Yet the practice among social workers varies and there is no fixed outline for them to follow. Language and cultural barriers also inhibit comprehension.

*Step Three—Meeting with social worker following case conference:*

Following the case conference among EU personnel, the social worker is charged with contacting the parent to discuss the findings and go over the tests used in the evaluation process. There is no written document used in this consultation or any evidence that a specific format is required or systematically utilized.

*Step Four—COH notification to parents prior to review of EU determination:*

Notice at this stage takes the form of the "Option Letter." This letter informs the parent of the recommended placement and

provides either for COH review within 45 days of (contingent) placement of the child in the special education program (Option One) or review within 10 days accompanied by possible parental pursuit of a due process hearing (Option Two). The evidence indicates that, as a practical matter, only the most aggressive and well-informed parents are capable of utilizing Option Two.

*Step Five—COH notice following parental choice of Option Two:*

If the parent checks Option Two he is given notice from the COH including: a full description of the options considered by the EU, the reasons for rejecting certain of these, a full description of the proposed action, explanation of the tests and reports used in making the classification, notice that the school records and reports are available to the parents for review and duplication, information on obtaining both an impartial hearing challenging the COH decision and an appeal from that hearing, and information on the right to an independent evaluation of the child. (This independent evaluation will be at public expense only if the parent disagrees with the school district's evaluation and the impartial hearing officer's recommendation concurs with the parent's choice of placement.) 8 N.Y.C. R.R. § 200.5(b)(2)(vi) (1977). There is no standardized written form used in giving this notice. At the COH hearings the Court observed the chairperson trying to explain the parents' and child's rights, but it was apparent that they already were fully cognizant of them or disinterested.

The notice afforded in the course of the above five steps is inadequate for two reasons. First, there is no single document which spells out, in simple, succinct and readily understandable form, the entire process of evaluation, including the ways to challenge recommended placement. Such a document would afford realistic notice in the context of the instant case. We are dealing, by defendants' own admission, with a population from largely underprivileged, often broken homes, and with parents who are, more likely than not, poorly educated, harried, beset by their own personal problems and intimidated by authority and a plethora of forms. If there is to be any chance of realistically giving notice to a group of this type, it must be done as simply and clearly as possible.

Ms. Garfinkle has concluded from her extensive study of the problem that a

> sampling of the parent consent forms presently in use, in and around New York City, raise doubts that a substantial number of parents who sign these forms do, in fact, understand what they have agreed to.

V. Garfinkle, "Recent Developments in the Law on the Education of Handicapped Children in New York State" 46 (1978) (unpub.).

Certainly a Spanish language translation, and possibly other translations, such as Italian, should be available. Illustrations and diagrams using comic book style explanations might prove helpful.

The need for a single, simple, document is most glaring when we consider the position of parents confronted with the Option Letter who may well check Option One without a full understanding of what this means. If Option One is checked, the child may be placed in the special education setting before the parent receives the benefit of COH notice as outlined in Step Five, *supra.* It is unclear if the parent who checks Option One ever gets this notice, or if so, at what point. An aggressive parent will, of course, probably be heard by the COH at any time. The Court observed one case at the COH hearing concerning a child who was already attending a school for the speech handicapped. The parent obtained a promise from the Committee that if she was dissatisfied at any time, the COH would hear her and try to correct the placement. Obviously most minority parents could exhibit no such skill.

Neither is notice afforded sufficiently early. The type of document suggested above should be distributed to parents at least at the initial stage of the process, i. e., at the point at which the parent is asked to consent to referral for evaluation. If, at this stage, one document were received

which spelled out the entire process, a parent would be afforded a look at the big picture and any further notice provided along the way could act as reinforcement. Further explanations and the same or other documents might be given at later stages.

As it stands now, parents receive a barrage of papers and forms. Each item reveals bits and pieces of the whole process. There may well be a tendency for parents to consent in a piecemeal fashion, without full comprehension of the entire system. Children may be placed before they or their parents have realized fully the implications of placement or the possibility of contesting it. This impression is supported by the testimony of Grace Cavanagh, Chief Administrator of the Hearing Office for the Handicapped. Ms. Cavanagh stated at trial that of the 250 hearings completed by the Board of Education between Jan. 1 and Nov. 1, 1977, one involved a case where a child was in a special day school and the parent wanted him moved to a special class and one (a plaintiff in the instant suit) involved objection to the possibility of special day school placement. About one-half of the total number of hearings involved parents seeking, on their own initiative, placement in private schools at public expense. Transcript at 2209–11. A logical inference to be drawn from such testimony is that the type of notice afforded has not been sufficient in reaching parents of children slated for, or already in, the special day schools.

The second violation of due process guarantees involves reevaluation, including formulation of the IEP. The educational plan is considered an integral part of procedural due process rights to notice and hearing prior to initial or subsequent placement. The inadequacy of defendants' reevaluation has been covered in our discussion of the extent to which the evaluation and placement process violates a right to treatment in section V A 1, *supra.* It need not be repeated at this point. In a sense, these violations of due process are a part of the violation of a broader right to treatment.

### B. *Special Day Schools as Violative of the Right to Treatment*

The heart of the treatment is found in the special day schools themselves. In this area, there is a clear consensus that deficiencies exist. First, virtually all the witnesses who testified about the schools admitted that they would benefit from increased BCG staff, guidance counselors, attendance teachers, medical personnel and the like. Although some of defendants' witnesses insisted that the smaller class size, individual attention and informality provided a "therapeutic atmosphere", there was a consensus that the disturbed children attending the special day schools should, as part of a complete treatment program, receive clinical therapy and have adequate access to guidance counselors and "crisis teachers". Bearing repetition here is the testimony of psychiatrist, Dr. Howard Weiner, a witness for the defense, who stated that adequate staff for a school of 150 pupils would consist of, at the least, part-time psychiatric services, a full-time psychologist and a full-time social worker; and that for a school of 300, an adequate staff would be even greater. Transcript at 2401. As our summary of the conditions in the schools in section III B, *supra,* makes clear, none come close to this standard.

All witnesses agreed that the pupils in the special day schools are seriously deficient in reading and mathematics skills. Any hope of successful reentry into a regular educational setting and of realization of longer range success depends on achievement in these basic areas. Here, too, the special day schools are deficient. Testimony reveals that remedial reading and mathematics teachers and reading and mathematics laboratories have been severely cut back with the result that not all children are served adequately. Moreover, in several schools special programs designed specifically to increase motivation and interest in learning cannot function because of inadequate supplies or faculty; despite complaints by principals, no steps have been taken to remedy these deficiencies. *See* section III F 6 *supra.*

Few of the schools have complete physical education programs. Without minimizing the importance of such activities for these children, we do not find that this lack constitutes a violation of plaintiffs' rights. It would be uneconomical to offer these pupils the full range of physical education programs available to students in larger institutions. It is this economic consideration, along with pedagogical factors, which explains the move towards union school districts in this country. In the case of the special day schools it is clear that the advantage of a small school unit outweighs any disadvantage stemming from a lack of specialized physical education facilities that might be available in larger institutions.

This deficiency is clearly distinguishable from the problem raised by shortage of clinical and other support staff discussed in section III F 5, *supra.* To skimp in the latter instance is a serious deprivation inasmuch as referral to the day school is predicated upon availability of precisely the type of therapy afforded by these professionals.

Defendants' witnesses and other personnel are obviously well-intentioned and skilled. There was no evidence of outright malevolence or indifference to the fate of the children involved. On the contrary, personnel do a fine job considering their limited resources. These positive aspects, however, do not undercut our findings of inadequate treatment. As observed in *Martarella v. Kelley*:

> The concept of treatment as a constitutional quid pro quo for the state's right to detain . . . children, the mentally ill, for example,—involves the delivery of therapeutic services—services which must emanate from the staff. Treatment in this sense goes beyond good will and kindness, although those virtues may be indispensible to the success of the therapy.

349 F.Supp. 575, 586 (S.D.N.Y.1972). The good intentions and helpfulness of those involved in the referral to, and treatment in, the special day schools, do not, therefore, compensate for inadequacies.

Although we do not question the educational justification for the existence of the schools as part of a continuum of services for emotionally disturbed children, they must offer suitable education and treatment to their students. Defendants' programs do not meet this standard.

### C. Statutory Violations

#### 1. EHA; Rehabilitation Act of 1973; New York State Education Law

Statutory violations have largely been covered in our discussion of the inadequacies of the evaluation process and of the special schools themselves. *See* sections V A and B, *supra.* They merit only brief recapitulation at this point.

With regard to evaluation and reevaluation, the state and federal statutory provisions mandating triennial clinical reevaluation and annual COH review of each child's status in conjunction with formulation of an IEP have not been complied with adequately in violation of: 20 U.S.C. §§ 1412, 1413 (1978); 42 Fed.Reg. No. 163, 42490–91, 42496–97, §§ 1219.342–346, 121a.530–534 (1977); N.Y.Educ.Law § 4402 1.b.(2)(3) (McKinney 1978); 8 N.Y.C.R.R. § 200.3 (1977); and 42 Fed.Reg. No. 86, 22682–83, §§ 84.33(b)(2) and 84.35 (1977).

Similarly, the procedural due process guarantees spelled out in state and federal law and regulations have, to the extent described *supra*, been violated. *See* 20 U.S.C. § 1415 (1978); 42 Fed.Reg. No. 163, 42494–96, §§ 121a.500–529 (1977); N.Y. Educ.Law § 4404; 8 N.Y.C.R.R. § 200.5 (1977); 42 Fed.Reg. No. 86, 22682–3, § 84.36 (1977).

The lack of adequate support staff, curriculum, and facilities in the special day schools violates sections 1412 and 1414 of the EHA and section 4402 of New York's Education Law. Each of these provisions, accompanied by extensive regulations, requires appropriate educational services for every handicapped child. The inadequacy of these schools also violates section 794 and accompanying regulations under the Rehabilitation Act of 1973, designed to prevent

discrimination against handicapped individuals and to assure that they receive education suited to their specific needs. 29 U.S.C. § 794 (1975); 42 Fed.Reg.. No. 86, 22782 § 84.3 (1977).

### 2. *Title VI*

■ To the extent that it has been shown that students have been referred to largely racially segregated schools, many of which have inadequate therapeutic and curricular offerings, we find a denial of equal educational opportunity in violation of Title VI (42 U.S.C. § 2000d (1974)). Coupled with this is a failure to conduct sufficient periodic reevaluations of students in the schools. The lack of objective criteria, which may result in racially discriminatory placement of students in special education programs, along with inadequate notice, lack of reevaluation and deficient programs, have been cited by the United States Department of Health, Education and Welfare as constituting a possible basis for liability under Title VI when accompanied by disproportionate numbers of minority students in a given program. *See* M. Gerry, Memorandum on "Identification of Discrimination in the Assignment of Children to Special Education Programs", Office of Civil Rights, U.S. Department of Health, Education & Welfare (1975); M. Gerry, "Statement of Findings", Office of Civil Rights, United States Department of Health, Education & Welfare (1977); section II B(2), *supra* (fuller explanations of specific charges contained in H.E.W. findings). As noted elsewhere, the evidence reveals that the initial referral as well as the reevaluation and decertification processes have been incomplete, thus failing to provide adequate safeguards against possible racially biased placement and retention. Even though the system is now much improved, many of the students in the special day schools were admitted prior to current reforms.

### D. *Use of Private Facilities at Government Expense by a Disproportionate Percentage of the Middle Class*

Inadequacy of procedures to bring to the attention of parents and children the rights of those assigned to special day schools results in part from difficulties in communicating with members of lower socio-economic groups. As noted in section V A 2, *supra,* insufficient effort has been made to equalize the effective position of such persons—primarily members of minority groups—and of those in the middle classes—primarily Whites. This failure explains, in part, the disproportion of minorities in the special day schools.

Another and equally serious reason for the disproportion is related to this failure to communicate. Availability of public funds for private facilities for those who insist upon them permits more knowledgeable members of the middle class to avoid sending their children to public special day schools. Since anyone whose case has not been processed in 60 days may utilize this escape route and since existing delays make it available in many instances, the state has, in effect, provided a voluntary system of assignment to special day schools. The procedures are such that minorities cannot exercise this option as effectively as Whites. These procedures and practices engaged in by city and state officials foreseeably and illegally result in segregated special day schools.

## VI. DEFENSE OF LACK OF FUNDS

■ Throughout the course of the trial, defendants' witnesses, admitting that portions of the system of special education under attack were less than optimal, pointed to budget cuts occasioned by the current New York City fiscal crisis. New York City's monetary problems do not excuse violation of plaintiffs' rights.

This is not the first case in which lack of funds has been pleaded in answer to attacks on inadequate care. In *Wyatt v. Stickney,* 325 F.Supp. 781, 782–83 (M.D.Alabama 1971), 344 F.Supp. 373, 377 (M.D.Alabama 1972), *aff'd sub nom Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974), the State of Alabama had discharged a number of professionals due to a shortage of funds caused by

a cut in the state's cigarette tax. In granting relief from inadequate treatment caused, in part, by the cuts, the court refused to countenance the use of fiscal constraints as a defense. In one of the District Court opinions in that case, Judge Johnson noted:

> . . . the unavailability of neither funds, nor staff and facilities, will justify a default by defendants in the provision of suitable treatment for the mentally ill.

344 F.Supp. at 377. Similarly, in *Mills v. Board of Education*, 348 F.Supp. 866, 875–76 (D.D.C.1972), it was pointed out that insufficient funds will not provide an excuse for continuing a system of special education which may result in discrimination in violation of the equal protection clause.

The current New York City fiscal crisis, therefore, provides no excuse for violations of plaintiffs' rights. In fashioning its relief, however, the Court cannot ignore the rather substantial cost of educating these children. Nor can we forget the inescapable fact that to spend substantially more on this pupil population may well necessitate a sacrifice in services now afforded children in the rest of the school system.

The amount currently spent on students in special day schools is strong evidence of lack of malevolent purpose. The per capita cost of educating a child in a special day school, based on fiscal year 1976 figures, is about $6,300 per pupil per year. The cost of a regular school education is some $2,300 per pupil per year. In addition, there are the enormous costs of the EUs, COHs and appellate processes plus the higher capital costs attributed to less heavily utilized buildings. A special day school education costs substantially more than three times a mainstream education.

New York City receives some help in meeting the expense of operating its special day schools. The EHA provides funds to New York State from which, as of March 1, 1978, the New York City Board of Education receives $55 per handicapped child—a small fraction of the cost of educating a handicapped child. State aid is allocated according to whether the program serves a population of students classified as severely or non-severely handicapped. The children in the special day schools are regarded as possessing "severe" emotional disturbance. *See* 8 N.Y.C.R.R. § 200.2(a)(3) (1977). For such severely handicapped children, New York City receives just under $3,000 per child, based not on the number of pupils on register, but on average daily attendance. The result is that the average payments for those in the special programs are considerably reduced because absentee rates tend to be high. Nevertheless, therapeutic and clinical resources must be provided for almost all the children registered even if they attend sporadically.

The City is also reimbursed for 90% of its transportation costs for handicapped children from a combination of state and federal funds. In the special day schools, however, this cost is a relatively small percentage of the total cost, $420 per child per year, again based on fiscal year 1976 figures.

While it is difficult to reconcile some of the figures, it appears that New York City receives a total of approximately $3400 from state and federal funds for each child in full attendance in a special day school. This is far less than the extra cost of educating a child in this program. Were the Court to mandate substantially increased services the fiscal burden would be absorbed wholly by the City.

## VII. CONCLUSION

The case is a difficult and close one. It is apparent that the plaintiffs have not established a basis for closing all special day schools, one of the main forms of relief they seek. We cannot allow any ideological promise of future statistically pure integration, however valid, to destroy the actuality of institutions that are providing, here and now, a better education for minorities. *Cf.* D. Bell, Jr., "The Legacy of W. E. G. DuBois: A Rational Model for Achieving Public School Equity for America's Black Children," 11 Creighton L.Rev. 409 (1977). Rather, preserving and improving what is good, we must aid educators in providing

the equality in education that is our constitutional goal.

As it is now developing, the system does, in theory, protect adequately the procedural and substantive due process, equal protection and statutory rights of plaintiffs. In practice, however, minorities are discriminated against.

The Court has been impressed by the dedication and good faith of those charged with operation and supervision of New York City's special day schools and related services. It would be a mistake at this critical period, when procedures and programs are in the process of improvement, for the courts to impose powerful affirmative sanctions. They might so confuse and distort the system that the costs and derangements would far outweigh possible benefits. Nevertheless, as Judge Wright declared in *Hobson v. Hansen*, 269 F.Supp. 401, 498 (D.D.C.1967), the fact that "a party is in the process of curing illegality, although that circumstance may affect the relief [eventually mandated by the court,] does not oust the court from its jurisdiction to declare a constitutional wrong."

The parties will meet with each other and then with the Court to attempt to work out the specific terms of a decree. *See Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1247–50 (1977). For the purpose of focusing this discussion it is suggested that the decree might assume the following general form.

First, in view of the fact that many children presently in day schools have not had the advantage of the full protection of current statutes, regulations and procedures, all parents of children in special day schools who have not had their cases considered by the present Evaluation Units and have not had the advantage of review by a Committee on Handicapped and other procedural protections should be notified by mail of the possibility of evaluation within a specified period. Notification might be by letter in English and Spanish. *Cf. In the Matter of the Appeal of Timothy and Mary D.,* N.Y. Comm.Ed.Dec. No. 8574 (1977) (as of July 1, 1976 when the new state law took effect,

parents whose children had been placed in special education programs before parental consent was required "were entitled . . . to an impartial hearing at the local level to review the appropriateness of the . . . classification."), *cited in* V. Garfinkle, "Recent Developments in the Law of the Education of Handicapped Children in New York State" (1978) (unpub.).

Second, all teachers in regular schools, administrators, clinicians and others should be notified by bulletin or otherwise of the Court's concern over the high ratio of minority persons in the special day schools. As indicated in section III I, *supra,* there may be special need for training of parent members of COHs to avoid misunderstanding. It should be emphasized that (a) it is necessary to avoid bias in discipline and referral; (b) unnecessary use of private schools at public expense may have an indirect illegal effect of allowing middle class students to avoid programs which minority students utilize; and (c) the inability of many in the lower socio-economic groups to appreciate fully the protections and advantages or disadvantages of various alternative programs and procedures requires that they have their rights explained to them as fully as possible at every opportunity. Affirmative efforts must be made to involve parents and children in decisions affecting the children's future.

Third, an in-house training program to obtain bias-free consistency in approach and policy in EUs, COHs and day schools with respect to mainstreaming appears to be necessary. Disparity in percentages of mainstreaming among the various day schools and lack of knowledge of any policy by principals and others reflects absence of control by top administrators. It is unacceptable to have students returned to regular schools from the day schools reluctantly tolerated, or met with hostility by teachers and supervisors, as appears to be the pattern in at least some regular schools; steps to avoid such reactions need to be taken.

Fourth, an independent advocate or ombudsman system for parents and children being considered for, or assigned to, special

day schools might be established. It would have the duty of representing the parents, or the child if there were a possible conflict of interest between parent and child. Referral could be made by any person with substantial grounds for belief that the child's case had not been considered adequately or that the parent or child had not understood fully or was incapable of enforcing the child's rights.

Fifth, the parties, with the assistance of the Court if requested, might call on communication experts from this city to develop readily understandable explanations to parents and children of their rights. In this great communication center of the world, with its many public-spirited and talented people, there should be no difficulty in finding people willing and able to develop materials designed to explain to the poorly educated the rights and opportunities of their children.

The Court notes with interest continuing commendable efforts of school authorities to meet this communications problem. For example, after the trial was completed, a new form of option letter was issued; explanations of due process procedures and descriptions of programs were attached. Memorandum of J. R. Coppin to COH and EU Coordinators, April 17, 1978.

Sixth, a report by defendants should be furnished to the Court by September 1979, indicating changes in the program to insure due process and adequate treatment consistent with this opinion. In addition to the selection and decertification problems referred to above, the report must address steps, required by statute, taken to correct inadequacies in IEPs. Steps taken to increase clinical staff in the day schools must be discussed. There will need to be reference to efforts made to increase minority representation in the staffs of EUs, COHs and the day schools themselves. Following the 1979 report, the parties could, if they wish, arrange for a conference with the Court to ascertain whether further relief were required.

It is requested that representatives of the New York State Commission of Education and of the United States Department of Health, Education and Welfare participate in these conferences, first with counsel and then with the Court. They should contemplate the possibility of providing funding for the advocacy proposal or its equivalent. They should also consider other ways in which federal or state agencies might assist the city in the operation of its special day school system through fiscal and other aid. Allocation of resources to education or specific forms of education are peculiarly legislative and executive tasks; the role of the Court is necessarily peripheral.

So ordered.

## APPENDIX A

### *Glossary of Abbreviations*

BCG Bureau of Child Guidance. This bureau, under DSEPPS, acts as the mental health service agency for the New York City public school system. The BCG is composed of licensed professionals providing services in regular and special day schools.

BEEH Bureau for Education of the Emotionally Handicapped. This is one of the DSEPPS bureaus for special education. As its name indicates, it is responsible for the education of emotionally handicapped pupils—pupils whose behavior may range from severely introverted to highly aggressive. The services which it supervises range from resource rooms used for children who remain primarily in regular classes, to residential treatment centers. The special day schools involved in this suit are under the aegis of the BEEH and are generally considered more restrictive than resource rooms or special classes, but less restrictive than a residential center where students live full-time.

CEH (A) and (B) Classes for the Emotionally Handicapped. These are classes designed for pupils with emotional problems requiring some removal from the regular classrooms. The theory is that students in these classes, which are housed in the same building as a regular school, are not so dangerous to themselves or others in their modes of behavior as to require a separate physical

**1296**

setting such as the special day school. The CEH classes are, generally, considered "less restrictive" then the day schools. The difference in type of student referred to a CEH (A) as opposed to (B) class is explored in the body of this opinion along with a discussion of the differentiation between special day schools and special class students.

COH Committee on the Handicapped. This is a committee, present in each of New York City's 32 school districts, which is responsible by statute for the identification and annual review and evaluation of the status of each handicapped child or child thought to be handicapped in the district. Each of the subcommittees of a COH has membership consisting of professional personnel and at least one lay person whose child is handicapped. The COH is also responsible for advising the Board of Education as to required triennial clinical evaluations, evaluating and reporting on the adequacy of special education programs, giving notice and information to parents on recommended changes in educational placement, and the steps in arriving at those decisions.

DSEPPS Division for Special Education and Pupil Services. This is the centralized body within the New York City Board of Education which administers all programs for handicapped children regardless of age. Through six bureaus, DSEPPS organizes and administers 31 different programs.

EHA Education of the Handicapped Act, 20 U.S.C. § 1401 *et seq.* (1978). Federal legislation mandates that school districts accepting federal funds for education of handicapped children provide a modicum of services and abide by specific requirements as to evaluation and placement.

EU Evaluation Unit. These are centers (there are now 26 in New York City), which provide diagnoses of students referred by regular schools for possible special education placement. The EUs also evaluate and diagnose students already placed in a special education setting who are due for a triennial reevaluation.

HC 30 These are classes for brain-injured children administered by the Bureau for Education of Physically Handicapped. The HC 30 classes are not directly related to the CEH classes or special day schools, but were referred to extensively in testimony.

IEP Individualized Education Program. This is a plan required by federal law to be kept for every child in a special education program. The purpose is to set goals for the pupil's progress, keep track of achievement, both academically and otherwise, and act as a point of reference for reevaluation of the validity of continuing the specific special education placement.

NIEH These are classes for the neurologically impaired and emotionally handicapped. Students in these classes, as opposed to those who are properly referred to the special day schools, have definite physiological as well as emotional problems. These classes are administered by a separate bureau of the same name.

SMED Socially Maladjusted and Emotionally Disturbed. The term SMED was used as the name of the bureau now referred to as BEEH. The term was also used in referring to the special day school themselves after the term "600" schools was formally abandoned.